# EXHIBIT A1

Electronically FILED by Superior Court of California, County of Los Angeles on 04/28/2022 01:08 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Lozano,Deputy Clerk

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td>

**NOTICE TO DEFENDANT:** POLARIS INDUSTRIES, INC., a Delaware Corporation
***(AVISO AL DEMANDADO):***



**YOU ARE BEING SUED BY PLAINTIFF:** JAMES DEBIASIO, a California resident
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

</td><td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

</td></tr>
</table>

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr><td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SUPERIOR COURT STATE OF CALIFORNIA, COUNTY OF LOS ANGELES
111 N. Hill Street, Los Angeles, California 90012

</td><td>

CASE NUMBER: *(Número del Caso):*
**22STCV14289**

</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):* Roland Tellis, Esq., BARON & BUDD, P.C.
15910 Ventura Blvd., #1600, Encino, CA 91436
(818)839-2333

DATE: 04/28/2022
*(Fecha)*

Sherri R. Carter Executive Officer / Clerk of Court
Clerk, by R. Lozano , Deputy
*(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [X] on behalf of *(specify):* Polaris Industries, Inc., a Delaware Corporation

   under: [X] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)     [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
   [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

For your protection and privacy, please press the Clear This Form button after you have printed the form.    [ Print this form ]  [ Save this form ]    [ Clear this form ]

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Elihu Berle

Electronically FILED by Superior Court of California, County of Los Angeles on 04/28/2022 01:00 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Lozano,Deputy Clerk

1  Roland Tellis (SBN 186269)
   David B. Fernandes, Jr. (SBN 280944)
2  **BARON & BUDD, P.C.**
   15910 Ventura Boulevard, Suite 1600
3  Encino, California 91436
   Telephone: (818) 839-2333
4  rtellis@baronbudd.com
   dfernandes@baronbudd.com
5

6  Courtney L. Davenport
   **THE DAVENPORT LAW FIRM LLC**
7  18805 Porterfield Way
   Germantown, Maryland 20874
8  Telephone: 703-901-1660
   courtney@thedavenportlawfirm.com
9

   Adam J. Levitt
   John E. Tangren
   Daniel R. Ferri
   **DICELLO LEVITT GUTZLER LLC**
   Ten North Dearborn Street
   Sixth Floor
   Chicago, Illinois 60602
   Telephone: 312-214-7900
   alevitt@dicellolevitt.com
   jtangren@dicellolevitt.com
   dferri@dicellolevitt.com

10 *Counsel for Plaintiff and the Proposed Class*

11 ## SUPERIOR COURT OF THE STATE OF CALIFORNIA

12 ## COUNTY OF LOS ANGELES

13

14 JAMES DEBIASIO, a California resident.

15                          Plaintiff,
16          vs.

17 POLARIS INDUSTRIES, INC., a Delaware
   Corporation;
18                          Defendant.
19

CASE NO. 22STCV14289

**CLASS ACTION COMPLAINT FOR:**

1. **VIOLATION OF THE CLRA (CAL. CIV. CODE §§ 1750,** *et seq.***)**
2. **VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTY (Cal. Civ. Code §§ 1790,** *et seq.***)**
3. **VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY (Cal. Civ. Code §§ 1790,** *et seq.***)**
4. **FRAUDULENT OMISSION**
5. **UNJUST ENRICHMENT**
6. **VIOLATION OF THE UCL (CAL. BUS. & PROF. CODE §§ 17200,** *et seq.***)**

**JURY TRIAL DEMANDED**

20

21

22

23

24

25

26

27

28

1

# I.   **INTRODUCTION**

1.      Plaintiff **JAMES DEBIASIO** (hereinafter, "Plaintiff"), through his attorneys, brings this Class Action Complaint (hereinafter, "Complaint"), for himself and others similarly situated, seeking damages and any other available legal or equitable remedies resulting from the fraudulent actions of Defendant **POLARIS INDUSTRIES, INC.** (hereinafter "Polaris"), with regard to Polaris' fraudulent business practices, as described in detail below, that caused Plaintiff and the other Class members damages.

2.      Plaintiff brings this action against Polaris under California Code of Civil Procedure § 382. All allegations in this Complaint are based upon information and belief, except for those allegations which pertain to Plaintiff. Plaintiff's information and beliefs are based upon, inter alia, the investigation conducted to date by Plaintiff and his counsel. Each allegation in this Complaint either has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery. Unless otherwise stated, Plaintiff alleges that any violations by Polaris were knowing and intentional.

3.      This action concerns recreational off-road vehicles ("ROVs") manufactured by Defendant, Polaris Industries, Inc., that all suffer from a common design defect causing the vehicles' engine compartments to reach temperatures in excess of what they are designed to withstand (the "Thermal Degradation Defect"). The Thermal Degradation Defect causes premature wear and damage to the engine components in all of the Class Vehicles[1] and puts the owners' lives at risk.

---

[1] The Class Vehicles are the: 2011-2014 RZR XP 900 series, 2012-2018 RZR 570 series, 2014-2018 RZR XP 1000 series, 2015-2018 RZR 900 and S 900 series, 2016-2018 RZR XP Turbo series, 2016-2018 General 1000 series, 2014-2018 Ranger XP 900 series, 2017-2018 Ranger XP 1000, 2014-2018 Ranger Crew XP 900, 2014-2018 Ranger 570 series, 2014-2018 Ranger 570 Crew series, 2017-2018 Ranger 500, 2017-2018 Ace 500, 2017-2018 Ace 570, and 2017-2018 Ace 900.

1    4.    As described in detail below, the Thermal Degradation Defect is manifest in
2    all Class Vehicles because their engine compartments all reach temperatures in excess of
3    what the vehicles' components are designed to withstand, which immediately and
4    prematurely degrades them.

5    5.    The Class Vehicles are equipped with a high-powered "ProStar" engine that
6    is located directly behind the occupant compartment in a tight space that restricts airflow
7    and provides the surrounding components with little clearance from the hot exhaust and
8    the complex series of insufficient heat shields. This tight engine compartment is also
9    covered by a plastic bed, further reducing airflow, and preventing the ability to detect
10   damaged components. The ProStar's exhaust gas exits the engine via the exhaust manifold
11   head pipe, which is routed forward toward the occupants, then turns 180 degrees, creating
12   a U-shape, where it is connected to the remainder of the exhaust piping, located
13   longitudinally in the engine compartment along the upper right side of the engine head and
14   attached to the silencer (the muffler), which is mounted at the rear of the vehicle inches
15   from the back of the engine, where the exhaust is released.

16   6.    The exhaust manifold and piping that makes up the system lacks proper
17   ventilation and relies on a series of complex heat shields that provide inadequate thermal
18   protection from the design and retain high temperatures. Thus, the hottest area of this high-
19   performance engine is located inches behind the occupants, in an enclosed area of the
20   vehicle with little room for airflow to dissipate the high heat.

21   7.    The Thermal Degradation Defect is exacerbated by a design with limited
22   clearances between the exhaust system and plastic body components, as well as critical
23   hoses, wiring, and fuel and brake lines, which are continually exposed to high temperatures.
24   The extremely high temperatures, combined with inadequate cooling and heat shielding,
25   result in the degradation and melting of the surrounding components, including fuel system
26   components, leading to a reduced life cycle and compromised parts and assemblies.

27

28

8.      Since the release of the first model with this engine configuration, Polaris has been aware that it causes component degradation, melting, and even fires. In fact, Polaris employees suggested changing the orientation of the exhaust and removing components from proximity to the exhaust pipe as complaints increased, but Polaris declined to do so because of costs.

9.      Since 2013, Polaris has recalled, at different times, all of the Class Vehicles due to the Thermal Degradation Defect having caused melting components, hundreds of fires, dozens of severe injuries, and at least four deaths.

10.     None of these recalls, however, addressed the root problem (the defectively designed tight engine/exhaust configuration) that leads to the Class Vehicles emitting excessive heat that degrades components. Therefore, Polaris' recalls have failed to remedy the effects on vehicle owners and the Thermal Degradation Defect continues to subject Plaintiff and Class members to component degradation.

11.     Polaris' competitors have designed and packaged their engines and exhaust systems in a way that allows for rapid heat dissipation. There are also numerous aftermarket products available for Polaris off-road vehicles, ranging from fans to heat shields and wraps, intended to reduce the engine compartment temperatures and protect various components from continued exposure to extreme heat. Because consumers only search for aftermarket products after they have purchased the vehicles, and often find them only through targeted searches about the issue they are experiencing, consumers are not aware of these products or the need for them before they purchase the vehicles. The sellers of these products frequently note that Polaris vehicles run hotter than they should.

12.     Polaris has concealed from Plaintiff, Class members, and the public the full and complete nature of the Thermal Degradation Defect, and that it has failed to develop an adequate, permanent fix for the Thermal Degradation Defect. In fact, Polaris is aware that the best fix is a significant redesign of all Class Vehicles, which is likely unavailable to Class members. In absence of significant redesign, the Class Vehicles require an

1   extensive combination of mitigating measures, which Polaris has failed to offer. Instead, it
2   has implemented several band-aid repairs that even Polaris has acknowledged are
3   ineffective.

4          13.    Class Vehicle owners and lessees are unable to operate their Class Vehicles
5   without their vehicles suffering the thermal degradation of component parts that occurs due
6   to the Thermal Degradation Defect.

7          14.    Because of this misconduct, Plaintiff and Class members have suffered actual
8   damages. Plaintiff and Class members did not receive the benefit of their bargain; rather,
9   they purchased vehicles that are of a lesser standard, grade, and quality than represented,
10  and they did not receive vehicles that met ordinary and reasonable consumer expectations
11  regarding safe and reliable operation. Purchasers of the Class Vehicles either would have
12  not purchased the vehicles at all or would have paid significantly less had the Thermal
13  Degradation Defect been disclosed. Plaintiff and Class members were deprived of a safe,
14  defect-free Class Vehicle.

15                    **II.    JURISDICTION AND VENUE**

16         15.    This Court has jurisdiction over this action under the California Constitution,
17  Article VI, section 10, which grants the Superior Court, "Original jurisdiction in all causes
18  except those given by statute to other courts." The statutes under which Plaintiff brings this
19  action do not specify any other basis for jurisdiction.

20         16.    Venue is proper in this judicial district under California Code of Civil
21  Procedure §§ 395(a) and 395.5 as a portion of the acts and injuries complained of herein
22  occurred in this County. Further, Polaris does not reside in the state of California.

23         17.    On information and belief, Polaris operates a large portion of their business
24  within California, including within the County of Los Angeles. The unlawful acts alleged
25  herein has a direct effect on Plaintiff and those similarly situated within the state of
26  California and within the County of Los Angeles. The claims alleged herein arise from the
27  purchase of Class Vehicles by Plaintiff and other Class members from Polaris within the

28

1  state of California. All of the claims Plaintiff asserts for himself and for the putative Class

2  relate exclusively to Class Vehicles purchased within the State of California.

### III.   THE PARTIES

**A.   Plaintiff**

18.   Plaintiff James DeBiasio is a citizen of California and a resident of Van Nuys, California. Plaintiff purchased a new 2016 RZR XP 1000 Series (for purposes of this section, "Class Vehicle") from Simi RV, which at the time was an authorized Polaris dealership, in Simi Valley, California, on or around August 8, 2016. Plaintiff purchased his Class Vehicle without knowledge of the Thermal Degradation Defect. When Plaintiff purchased his Class Vehicle, he reasonably expected that it would not generate excessive heat during his use and have its component parts suffer from exacerbated thermal degradation due to the Thermal Degradation Defect. Plaintiff operated his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used. Nonetheless, Plaintiff's Class Vehicle generated excessive heat due to the Thermal Degradation Defect, causing its component parts to degrade.

19.   Before purchasing his Class Vehicle, Plaintiff researched the 2016 RZR XP 1000 series on Polaris' website. Plaintiff recalls Polaris touting the performance of the Class Vehicle and its engine. Polaris omitted on its website the fact that the Class Vehicle generated excessive heat and that this excessive heat leads to its component parts degrading and a risk of fire. Plaintiff also discussed the Class Vehicle with a salesperson at Simi RV, who also failed to disclose to Plaintiff that the Class Vehicle generates excessive heat that leads to its component parts degrading and a risk of fire. Had Polaris disclosed its knowledge of the Thermal Degradation Defect, Plaintiff would have heard, seen and been aware of it. When Plaintiff purchased his Class Vehicle, he did not expect that it would generate excessive heat, nor did he expect that his Class Vehicle's component parts would degrade from normal use due to the Thermal Degradation Defect. Plaintiff suffered injury-in-fact and lost money as a result of the conduct at issue because had Polaris disclosed the

existence of the Thermal Degradation Defect and the fact that the component parts on Plaintiff's Class Vehicle would degrade from normal use, he would not have purchased the Class Vehicle. Indeed, as part of the purchase of his Class Vehicle, Plaintiff believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

**B.    Defendant**

20.    Polaris Industries, Inc. is a Delaware corporation, with its principal place of business located at 2100 Highway 55, Medina, Minnesota, and is a citizen of Minnesota and Delaware. Polaris is also registered as an active foreign corporation in California.

## IV.    FACTUAL BACKGROUND

**A.    Polaris' Defective Engine and Engine Configuration**

21.    Polaris first entered the off-road vehicle ("ORV") market in 1985 and produced its first Recreational Off-Road Vehicle ("ROV," also often referred to as a "side-by-side"), the six-wheeled Ranger, in 1998.[2] In 2000, Polaris unveiled the four-wheeled Ranger.[3]

22.    Polaris introduced the Ranger RZR in 2007 (for Model Year 2008), as a smaller, sportier, and more agile alternative to the utilitarian Ranger.[4] Polaris subsequently shortened its name to RZR (hereinafter referred to as "RZR").

23.    Ranger models are utility variants often used in commercial applications on farms, for land management, and for maintenance jobs. The inability to use them can affect livelihoods. Class Vehicles include two-person and four-person Rangers models, all with a plastic cargo bed mounted directly above the engine.

24.    RZR models are high performance vehicles with a narrow chassis, sport-tuned suspension, a plastic engine cover, and small stowage area. Class Vehicles include two-person through six-person models.

---

[2] Polaris, 2014 Annual Report, Form 10-K, Dec. 31, 2014, at 4.
[3] *Id.*
[4] *Id.*

25.     Polaris's 2006 patent filing for a "Side-By-Side ATV" design, which became the Ranger RZR, was designed to reduce the width from the usual 54" to 50." (The term "ATV," or "All-Terrain Vehicle," is sometimes used interchangeably with the terms "ROV" or "ORV.") Reducing the width was an important market advantage because the vehicles could move at an accelerated pace and could be loaded into the bed of a full-size pickup truck for transport. However, reduced width typically increases the risk of rollover, a significant problem with ROVs. In an attempt to mitigate this rollover risk, Polaris' design lowered the vehicle's center of gravity by positioning heavier components, such as the engine, closer to the height of the vehicle's frame, thereby improving the stability of the vehicle. To accomplish this width reduction, the patent disclosed a behind-the-seat engine location, rather than the previous under-the-seat location.[5]

26.     The patent, which was granted in 2008, describes a narrower vehicle width and improved center of gravity. According to the patent: "In this embodiment, engine is a 760 cc engine producing about 50 horsepower. Engine produces excellent acceleration characteristics and responsiveness. ATV weighs about 950 pounds and has a power to weight ratio of about 0.053/1. Any suitable engine may be used in ATV, and ATV may be constructed to any suitable weight, however the present invention contemplates ATVs having a power to weight ratio of at least 0.045/1."[6]

27.     The patent drawings depict the exhaust manifold and head pipe exiting the engine on the right side of the engine bay and then up and toward the rear of the vehicle, away from the occupant compartment and open to the side of the vehicle, resulting in a less obstructed air flow, as shown below:

---

[5] US2008/0023249 A1, "Side-by-Side ATV," filed July 28, 2016.
[6] *Id.* at 4.

Exhaust manifold and header pipe exit engine on the right side

28.     When it debuted in 2007, the Ranger RZR had an engine configuration and offset placement that matched that described in this patent. Its top speed was 55 mph, its weight was 945 lbs., and its power-to-weight ratio was .055, which was 44% higher than the competitor Yamaha Rhino.[7] It could accelerate faster than any other ROV, and its compact size made it capable of navigating narrow trails. As Polaris describes it: "The new Ranger RZR delivers total Side x Side domination with its monstrous 800 Twin EFI. It's the only trail-capable Side x Side you can buy, going everywhere other Side by Sides can't. With the fastest acceleration, the highest top speed, incredibly responsive handling, and all the utility you need, the Ranger RZR leaves all other Side x Sides in the dust."[8]

29.     Polaris claimed its handling performance attributes were the result of its low center of gravity design: "The RANGER RZR and RZR S use a patented design that positions the engine behind the seat, creating the lowest center of gravity. It's like you're riding on rails, with razor-sharp handling and performance."[9]

30.     Below is an image of this original, patented configuration on a RZR 800. The engine exhaust pipe is directed away from the occupant compartment and exposed to a relatively open wheel well:[10]

[7] Polaris Ranger 2008 Brochure, at 6.
[8] Polaris Ranger 2008 Brochure, at 8.
[9] Polaris Ranger 2009 brochure, at 21.
[10] Product Review Polaris RZR 800, DuneGuide.com, http://www.duneguide.com/ProductReview_Polaris_RZR800.htm, accessed Apr. 2, 2018.

9

COMPLAINT



Exhaust manifold and header pipe exit engine on right side of engine allowing for heat dissipation via open wheel well.

31.    This design in the older Ranger/RZR models is similar to the design found used by the RZR competitor, Yamaha YXZ1000R, which ports its exhaust valves to the left side and away from the plastic bed and plastic fuel system components:[11]

32.    In 2011, Polaris unveiled its new ProStar 900 Twin EFI engine, specifically designed for the RZR XP 900. According to Polaris, the ProStar 900 engine "cranks out an industry-leading 88 HP and delivers 29% faster acceleration than the closest competitor."[12]

---

[11] Yamaha Motor Sports. 2021 Yamaha YXZ1000R,
https://www.yamahamotorsports.com/pure-sport-side-by-side/models/yxz1000r.
[12] Polaris Ranger Brochure 2011, at 11.

10
COMPLAINT

With a vehicle weight of 1,190 lbs., the new XP 900 increased the power-to-weight ratio to 0.0739 – significantly more than originally envisioned with the patented behind-the-seat design. The new engine "delivers fast throttle response, groundbreaking power and revolutionary acceleration."[13]

33.     Unlike the original behind-the-seat configuration with the engine exhaust ported on the right side, the ProStar engine was placed squarely behind the occupant compartment, with the exhaust manifold and header pipe exiting forward toward the occupants, only inches from the seats and seat belts. The pipe then turns 180 degrees, creating a U-shape, where it is connected to the remainder of the exhaust piping, located longitudinally in the engine compartment along the upper right side of the engine head and attached to the silencer (a.k.a., the muffler), which is mounted at the rear of the vehicle inches from the back of the engine.

34.     The photographs below, taken with the plastic engine covering removed, show this configuration from different angles in single-cylinder and twin-cylinder versions of the ProStar engine.[14]

---

[13] Polaris Ranger Brochure 2011, at 11.
[14] Long Term Report – The Polaris RZR 570, ATV & SXS Illustrated,
http://atvillustrated.com/content/long-term-report-polaris-rzr-570, accessed Apr. 2, 2018.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    35.    A thick plastic bed covers the tight engine compartment and nearby
19 components, further limiting the amount of air flow around the exhaust manifold and
20 header pipe, as depicted in the images below:
21
22
23
24
25
26
27
28

12
COMPLAINT





36.     The enclosed engine and exhaust pipe configuration in the Class Vehicles prevents airflow from dissipating the heat from the exhaust. Heat buildup occurs particularly at low speeds and under high load conditions, frequently experienced while traversing inclines, operating in sand, and with additional occupants. The engine and exhaust configuration, which limits adequate heat dissipation, is located only inches from

---

[15] 2015 RZR 4 XP 1000 for sale, Haacke Motors,
https://www.haackemotors.net/2015_Polaris_RZR%204%20XP%201000_Layton_UT_1
1324333.veh.
[16] UTV Scene's Polaris RZR XP 4 1000 Break In, UTV Scene Magazine, Oct. 30, 2014,
https://utvscene.com/utv-scenes-polaris-rzr-xp-4-1000-break-in/

1    occupants and plastic body components, as well as critical hoses, wiring, and fuel and brake
2    lines, which are continually exposed to excessively high temperatures that are retained in
3    close proximity. The excessive heat exposure degrades these components, melts plastic
4    components in and around the engine, and ignites surrounding combustible materials.

5    37.    Polaris' singularly focused marketing shows that the company was
6    committed to significantly exceeding the power output of its competitors' products, at the
7    expense of safety. Even as Polaris learned of the Thermal Degradation Defect associated
8    with its new ProStar engine configuration, discussed below, it continued introducing
9    models with the ProStar engine and Defect. For example, in 2013, Polaris introduced the
10   Ranger XP 900, which it touted as containing the new ProStar 900 engine that "pumps out
11   60 HP, with incredible class-leading torque across the power band. All that power and
12   torque lets you easily tow up to one ton, or haul up to 1,000 lbs."[17] At the same time, Polaris
13   advertised, "[i]t's also a quiet ride, thanks to a new engine placement behind the seat and
14   below the box. Ground clearance is a high, obstacle-clearing 12"."[18] In its press release
15   announcing the vehicles, Polaris stated, "In recent years, Polaris has aggressively launched
16   new products, evolved its off-road offerings and become No. 1 in the off-road industry
17   with the best and most-innovative ATV and Side-by-Side offerings available."[19]

18   38.    In 2014, Polaris debuted the RZR XP 1000, Ranger 900, and Crew 900, and
19   Ranger 570 and Crew 570. Each of these vehicles contained a ProStar engine with the
20   exhaust manifold and header pipe routed forward inches from the occupant space.[20] The
21   RZR XP 1000's engine "provides an industry-leading 107 horsepower and a true 999ccs
22   of displacement, making it the most powerful and largest engine in the class."[21] Thus, this

23

24

---

25   [17] Polaris 2013 Off Roads Vehicles Brochure, at 5.
     [18] Id.
26   [19] Press Release, Polaris Debuts 2013 ORV and Motorcycle Product Lines, Aug. 1, 2012.
27   [20] Press Release, Polaris Debuts New Products for 2014 Off-Road and Motorcycle Lines, July 31, 2013.
28   [21] Id.

1  RZR had more than double the horsepower originally envisioned in the RZR patent.[22]
2  Noting its "insatiable push to evolve its offerings," Polaris stated it has "become the
3  industry leader by aggressively introducing new products and continuing to innovate our
4  current product lines."[23]

5       39.    In model year 2015, Polaris debuted the RZR 900 and S 900, which featured
6  "unequalled power from their 75 horsepower ProStar 900 engine offering improved power-
7  to-weight ratio and faster acceleration . . . ."[24] In its press release, Polaris stated, "Our
8  model year 2015 lineup is evidence that we have never been stronger and have no intention
9  of slowing down. We are once again introducing more new, innovative products and
10  technologies to create opportunities for more growth in markets around the world."[25] There
11  were hints of a problem, however: All full-size Ranger vehicles received "new intake
12  openings on the pillars behind the driver and passenger, allowing for improved airflow for
13  the engine and clutch air intake systems."[26] However, these air intake systems proved
14  insufficient. Polaris was aware by this point that its engine configuration did not allow
15  sufficient airflow around the hot engine.

16      40.    For model year 2016, Polaris introduced the RZR XP Turbo and RZR XP 4
17  Turbo, this time acknowledging that such a high-powered engine needed additional
18  cooling: "The Polaris ProStar Turbo engine provides an industry-leading 144 horsepower
19  – 30 percent more horsepower and 45 percent more torque than the RZR XP 4 1000 EPS.
20  The ProStar Turbo effortlessly carries a full load of thrill seekers over the most power-
21  robbing terrain. The new engine was developed for extreme performance. . . . For consistent
22  performance at all temperatures, the vehicle also includes a new liquid charged air cooler
23  with front-mounted, dual radiators with high-capacity fan and high-flow electric pump. To

24  _____

25  [22] *Id.*
26  [23] Press Release, Polaris Debuts New Products for 2014 Off-Road and Motorcycle Lines, July 31, 2013.
27  [24] Press Release, Polaris Debuts 2015 ORV and Motorcycle Product Lines, July 29, 2014.
   [25] *Id.*
28  [26] *Id.*

1   control the massive power delivered by the ProStar Turbo, the engine management system
2   has also been updated to include knock detection, boost control and a high-flow return style
3   fuel system ensuring that the engine delivers maximum power under all conditions,
4   altitudes and temperatures."[27]

5       41.    However, the dual radiator fans, positioned far from the exhaust, were not
6   sufficient to address the excessive heat, and the model year 2017 RZR XP Turbo vehicles
7   were designed with a new high-capacity cooling system that "ensures the engine can
8   breathe for maximum power delivery." Nonetheless, the 2017 RZR XP Turbo vehicles also
9   exhibited problems associated with excessive heating, including fires.

10      42.    By 2016, all RZR and all gas-powered 500cc or larger Ranger models
11  contained a ProStar engine situated in a tight compartment with limited airflow directly
12  behind the occupants. Importantly, with the exception of the unique Youth RZR, which
13  does not appear to contain a ProStar engine, all of the ROVs that contain the ProStar engine
14  and exhaust routed forward, directly behind the occupant compartment in a tight,
15  constricted space have been recalled for melting and fire risks.

16  **B.    Thermal Degradation and Corrosion**

17      43.    Thermal management is an important aspect of vehicle development.[28]
18  Polaris vehicles do not sufficiently manage thermal conditions, allowing excessive heat
19  retention, which leads to thermal degradation of plastic components installed in all Class
20  Vehicles. Thermal degradation often occurs microscopically within the plastic, and thus
21  vehicle owners are unaware their vehicle components are degrading.

22      44.    High temperatures make "it essential to monitor the temperatures of all
23  components that may be at risk of failure due to thermal loads and provide appropriate
24  thermal protection. This could be achieved by: 1. Relocating the component, 2. Insertion

25  _____

26  [27] Press Release, Polaris RZR Expands 4-Seat Line-Up to Share the Off-Road Experience
    with Friends and Family, Oct. 6, 2015.
27  [28] Kumar Srinivasan et al., Vehicle Thermal Management Simulation Using a Rapid
    Omni-Tree Based Adaptive Cartesian Mesh Generation Methodology, 2004 ASME Heat
28  Transfer/Fluids Engineering Summer Conf. (July 2004), at 1.

1  of heat shields between the exhaust and the component, 3. Innovative airflow management
2  techniques that increase the convection around the component."[29]

3      45.    The exhaust system temperature is the primary source of heat into the engine
4  compartment.[30] In the vehicle industry, it is well known that excessive temperatures in the
5  engine/exhaust compartment, particularly in tight spaces with little airflow, reduce
6  component service life and cause unseen degradation to nearby components. This is known
7  as thermal degradation in polymers like plastics and resins, which is defined as "molecular
8  deterioration as a result of overheating."[31] In metal components, damage that occurs from
9  excessive temperatures is called high temperature corrosion.[32]

10      46.    Excessive heat caused by restricted airflow leads to component malfunction
11  or premature failure of components or materials.[33] "Vehicle components are expected to
12  retain an acceptable level of their initial properties. However, exposure to heat will reduce
13  component life due to the negative effect of heat on material properties….Effective
14  management of heat can be addressed by some clearance requirements during the
15  packaging phase, upgrading component materials, using heat shields or management
16  airflow around these components."[34]

17      47.    Polaris vehicles contain many plastic components near the engine and
18  exhaust system. Within the plastics industry, it is well known that: "Thermoplastics
19  exposed to elevated temperatures for long periods of time will generally become brittle and

20

21  [29] *Id.* at 2.
   [30] *Id.*
22  [31] Thermal Degradation of Plastics, Zeus Indus. Prods, Inc., Tech. Whitepaper (2005), at
23  1.
   [32] Manabu Noguchi & Hiroshi Yakauwa, Lecture on Fundamental Aspects of High
24  Temperature Corrosion and Corrosion Protection Part 1: Basic Theory, Ebara
25  Engineering Review No. 252 (2016-10), at 1.
   [33] Martin W. Wambsganss, Thermal Management in Heavy Vehicles: A Review
26  Identifying Issues and Research Requirements, Vehicle Thermal Management Sys. 4
27  Conference (May 1999), at 7.
   [34] Alaa El-Sharkaway, *et al.*, Transient Modeling of Vehicle Under-hood and Underbody
28  Component Temperatures, 9 SAE Int'l J. Material Mfg. 330 (May 2016).

1  lose both mechanical strength and toughness. This process will occur more slowly at
2  moderate temperatures and more quickly as the operating temperature for a material is
3  increased."[35]

4      48.    Additionally, plastics generally have a higher rate of thermal expansion than
5  metals or other materials and thus, "[w]hen plastic and metal components are used together
6  in a device that must operate over a wide temperature range, the relatively high thermal
7  expansion of polymers becomes an important design consideration."[36]

8      49.    It is also well known that "elevated operating temperatures may affect a
9  number of other performance characteristics of a thermoplastic. These include electrical
10 properties, chemical resistance, environmental stress crack resistance, fatigue resistance
11 and the ability of the polymer to perform in friction and wear applications, all of which
12 tend to be reduced at the upper end of a material's operating temperature range."[37] Another
13 possible effect is that the plastics can soften, changing their structure and reducing their
14 strength.[38]

15     50.    Simply put, the "hotter the environment becomes, the less performance we
16 can expect."[39]

17     51.    Thermal degradation is often an internal process not noticeable to the human
18 eye. For instance, in plastics with exposure to high temperatures, "degradation is inevitable
19 and the resulting chain reaction will accelerate unless the cycle is interrupted in some
20 manner – the only real variable is how long it is going to take for thermal degradation to
21 become evident and result in a loss in properties that is significant enough for the end-user
22 to notice."[40] Significantly, "[i]n some cases, thermal degradation shows no effect for some

23

24 ─────────────────────
   [35] Keith Hechtel, Turning Up the Heat: Considerations for High Temperature
25 Applications, IAPD Magazine (Apr./May 2014), at 18.
   [36] Id. at 19.
26 [37] Id. at 20.
   [38] Michael Sepe, The Effects of Temperature, Plastics Tech., July 27, 2011.
27 [39] Id.
28 [40] Thermal Degradation of Plastics, supra, at 1.

18
COMPLAINT

1  time and when it occurs the onset of significant thermal degradation can be very rapid, i.e.

2  there is a gestation time before anything appears to happen and then the degradation is both

3  rapid and catastrophic."[41]

4      52.    Thus, from the beginning, the plastic components exposed to the excessive

5  heat begin degrading internally without the owner's awareness.

6      53.    Likewise, excessive temperatures cause high temperature corrosion:

7  "Without water, in many cases the corrosion rate at a normal temperature does not cause a

8  particular problem. However, as the temperature rises, corrosion progresses at a rate that is

9  an engineering problem not to be ignored."[42] Additionally, "[s]ince a corrosion reaction is

10  a thermal activated reaction, basically the reaction rate varies exponentially against the

11  temperature."[43]

12      54.    Some metals can experience a reduction in thickness and thermal stress,

13  particularly when temperature fluctuations occur, such as with the starting and stopping of

14  machinery.[44] This is "a very critical problem."[45]

15      55.    As discussed below, despite industry knowledge that thermal management is

16  an important consideration in vehicle design, Polaris did not have a thermal engineer on

17  staff until mid-2016, long after it was apparent the Class Vehicles exhibit significant

18  thermal issues.

19      56.    The Thermal Degradation Defect is exacerbated by the Class Vehicles'

20  design that places some components closer to hot surfaces than they should be. The

21

22

23  [41] *Id.* at 6.

24  [42] Lecture on Fundamental Aspects of High Temperature Corrosion and Corrosion Protection Part 1: Basic Theory, *supra*, at 1.

25  [43] Manabu Noguchi & Hiroshi Yakauwa, Lecture on Fundamental Aspects of High Temperature Corrosion and Corrosion Protection Part 2: Corrosion Protection and

26  Coatings, Ebara Engineering Review No. 252 (2016-10), at 10.

27  [44] Lecture on Fundamental Aspects of High Temperature Corrosion and Corrosion Protection Part 1: Basic Theory, *supra*, at 8.

28  [45] *Id.* at 9.

systemic, and immediate, problems caused by the Thermal Degradation Defect are readily apparent in several Polaris recalls.

57. For instance, Polaris' April 2016 recall, CPSC recall number 16-146, included several potential problems for various models and years – one of those was improperly routed plastic fuel lines that "may have insufficient clearance to the exhaust head pipe."[46] The misrouted fuel line could allow the line to become kinked, which would cause the fuel tank to build pressure and expand, which could result in contact with the spinning prop shaft, causing a leak.[47]

58. The Thermal Degradation Defect is correlated to these issues. For example, small changes to the plastic fuel vent line routing can cause the part to degrade and develop kinks due to high temperature exposure because of its proximity to the exhaust head pipe. This leads to a cascading effect: The thermally degraded vent line allows the plastic fuel tank to over-pressurize, expand, and contact spinning driveshaft components. The plastic fuel tank is also directly affected by the Thermal Degradation Defect because its proximity to the high-temperature environment reduces its ability maintain its shape. These elements all point back to the design configuration of the Class Vehicles, which do not safely allow for normal and expected movement, shifting, or assembly tolerances of critical components without potential for catastrophic failures in the presence of such high temperatures.

59. The softening that these fuel lines undergo in the excessive heat without airflow will often escape unnoticed once the vehicle stops and the lines harden again, in the same way some plastic bowls are softer when they are first removed from the microwave but re-harden after a minute out of the microwave. However, in the Class Vehicles, the softened, drooping fuel line could contact another hot component, causing a leak that results in a fire. This is particularly true where, as here, the component does not have proper clearance from the exhaust, leaving zero margin of error.

---

[46] Polaris Indus., CPSC Recall No. 16-146, Safety Bulletin Z-16-01-AD, Apr. 19, 2016.
[47] *Id.*

60.     The Canadian recall for the 2015-2016 Ranger 570 and Crew 570 vehicles specifically pointed to the Thermal Degradation Defect as the culprit, stating, "[d]uring prolonged vehicle operation at low speeds the air flow in the engine/exhaust area could be reduced, and may result in elevated engine/exhaust compartment temperatures, which could cause the seat close-off panel to overheat which may pose a fire hazard causing injury and/or damage to property."[48] That the panel that is supposed to protect occupants becomes too hot is evidence of thermal degradation.

61.     Likewise, in September 2016, Polaris recalled the 2014 Ranger XP 900 and Crew 900 for heat shields that could fall off, which it expanded in April 2017 to include model year 2015 as well. The stated cause was that the heat shield fasteners could come loose, but consumers reported that the excessive heat softened or melted the plastic panel to which the shields are attached enough that the fasteners became loose in the holes.[49] [50]

62.     Additionally, Polaris' April 2018 recall for exhaust silencer cracking in 2014-2018 model year RZR 1000 vehicles suggests high temperature corrosion is at the root of the problem. Early life failures of exhaust silencers, which are designed to withstand high temperatures, point to the effect of the excessively high temperatures on the metal. Furthermore, it is yet another prescient signal that the Class Vehicles are experiencing excessive temperatures when, as this recall notes, exhaust silencers crack, and the heat escaping from the cracks is melting nearby components and causing fires – even though they are designed with heat shields to dissipate the anticipated temperatures at this location.

**C.     Thermal Damage Recalls Began Shortly After ProStar Debut**

63.     Before Polaris installed the ProStar engine behind the occupant compartment, Polaris ROVs were not plagued by thermal degradation and engine fires. The only Polaris recall that involved fire risk in the RZR was a 2007 recall of 330 model

---

[48] Canada Recall and Safety Alerts No. 2016326, June 27, 2016.

[49] PRCForum.com, posted by Chris, 2014 900 potential fire issue, June 22, 2015, available at http://www.prcforum.com/forum/26-ranger-problems-solutions/61961-2014-900-potential-fire-issue.html

[50] Polaris Indus., CPSC Recall No. 18-133, Safety Bulletin, Z-18-01, Apr. 2, 2018.

year 2008 RZR 800 vehicles for fuel tank leaks, which according to Polaris had not caused any fires.[51] Likewise the only recall for fire risk in the Ranger vehicles was a 2009 recall of 3,800 model year 2009 Ranger Crew and 6x6 vehicles, concerning a risk of electrical shorting and fire in the rear tail light wiring harnesses.[52]

64.     After the release of the first Class Vehicle, the 2011 RZR XP 900, thermal degradation issues immediately became apparent. Polaris first issued a Technical Safety Bulletin ("TSB") in 2011 (R-11-03) after observing that plastic dividers between the engine and the occupants were melting.

65.     According to facts detailed in a recent Minnesota state court case, *Thompson v. Polaris Industries, Inc.*, which was brought by an owner of a 2017 Polaris XP RZR 900 who suffered burns after his Polaris caught fire, a 2011 RZR 900 caught fire at a Polaris facility in 2011, when the initial Class Vehicles were first released on the market.[53] Expert evidence presented in *Thompson* confirms that "the architecture of the exhaust and fuel system 'are substantially and functionally similar' across all RZR 900 models, starting in 2011 and past 2017."[54]

66.     Additionally, the then-manager of Polaris' Corporate Product Safety department testified that, at that time, the company's Product Action Procedure ("PAP") Committee recommended a recall due to the number of customer reports.[55] Polaris decided instead to develop a heat shield for dealers to install only if a customer complained.[56]

67.     The *Thompson* plaintiff learned that in 2012, the Consumer Product Safety Commission ("CPSC") began investigating the 2011 RZR XP 900, and Polaris downplayed the risks posed by melting components by asserting they, "did not 'constitute[] a substantial

---

[51] Polaris Indus., Recall No. 08-521, Dec. 6, 2007.
[52] Polaris Indus., Recall No. 09-762, Aug. 4, 2009.
[53] *Thompson v. Polaris Indus., Inc.*, Minn., Hennepin Co. Dist. Ct., No. 27-CV-17-12608, Order Granting Motion to Amend Complaint, Feb. 18, 2022, at 2.
[54] *Id.* at 9.
[55] *Id.* at 2-3.
[56] *Id.* at 3.

product hazard or pose[] a significant risk of injury."[57] Nevertheless, the CPSC insisted there was a "substantial product hazard" and recommended that Polaris recall or correct the vehicles.[58]

68. On June 19, 2013, Polaris recalled 4,500 model year 2011 RZR XP 900 vehicles with the ProStar engine/exhaust configuration (CPSC recall number 13-740). The specified cause according to the recall: The firewall behind the driver and passenger seats could overheat and melt.

69. In its earlier corresponding TSB, detailing the issue to dealers prior to the recall, Polaris stated: "Some Ranger RZR XP 900 models may experience hot air leakage from the engine compartment that travels over the service divider panel separating the occupant compartment from the engine compartment, which can cause deformation of the panel. This hot air leakage into the passenger area can also create elevated air and component temperatures that could cause burns to the occupant of the vehicle. Polaris has developed an aluminum heat shield to deflect the hot air and prevent it from damaging the service divider panel."[59] The TSB noted that this safety bulletin updated a previous TSB issued in 2011 (R-11-03) that was completed through warranty claims. The repair was simply to install the heat shield, which "was already installed on 2012 and 2013 RZR 900s that continued to have the same melting and fire issues."[60]

70. It is important to note that "hot air leakage" is caused by such excessive heat coming off the engine/exhaust that it deforms the plastic panel installed specifically to contain the hot air. Further, as explained above, thermal degradation and high temperature corrosion are inevitable in "elevated air and component temperatures" environments.

71. Thus, from the first vehicle containing the ProStar engine with the exhaust manifold and header pipe ported toward the front of the vehicle in a tight compartment,

---

[57] *Id.*
[58] *Id.*
[59] Polaris Indus., Tech. Serv. Bulletin R-13-03, Apr. 25, 2013, at 1.
[60] *Thompson, supra,* at 3.

Polaris acknowledged the engine elevated temperatures of nearby components and could result in deformation of plastics. Like the recalls that would follow, Polaris advised customers to stop using the vehicles and bring them in for an unspecified repair.

72.     In the June 2013 recall announcement, Polaris asserted that there had been one report of burn injuries to a finger.[61] However, at least one owner of a 2011 Ranger RZR XP 900 notified the CPSC that in 2012, he was driving the vehicle through the woods when he and his passenger smelled a burning smell. Moments after they exited the vehicle, they observed a flame behind the seat, which "immediately began to spread and subsequently engulfed the entire [vehicle], until all that remained was the burnt out frame of the vehicle."[62] When he contacted the dealer and Polaris in May 2012, prior to the recall, they offered him a $5,500 credit toward another purchase.[63] Thus, when it asserted in the recall that the firewall could melt and had only burnt a finger, Polaris concealed the fact that it was aware of at least one incident in which the entire vehicle burned in minutes and the fact that the CPSC had already determined that even the melting of components, in absence of fire, was a substantial product hazard.

73.     Over the eight years following that first recall related to thermal issues, Polaris has issued at least fifteen recalls related to fire risks that are often caused by components that have been thermally damaged. (See Exhibit A for a detailed timeline of the recalls.) All of these recalls involved vehicles with the ProStar engine in the tight engine compartment with limited airflow. They include all vehicles made from 2011 through 2018 that contain the ProStar engine configuration and several models made between 2019 and 2021 containing that configuration. Many vehicles have been recalled more than once for different problems that created a fire risk.

---

[61] Polaris Indus., Tech. Serv. Bulletin R-13-03, Apr. 25, 2013, at 1.
[62] CPSC, Epidemiologic Investigation Report No. 140724CCC2757, Sept. 6, 2014, at 2.
[63] *Id.*, at 2.

74.    The recalls cite a myriad of root causes aimed at portraying the thermal issues as discreet problems easily remedied with new components. However, Polaris itself has admitted a more systemic issue was occurring.

75.    According to a *Thompson* opinion detailing facts gleaned through documents and depositions, during this time, Polaris employees were raising alarms about the engine configuration: "In 2015, Polaris's engineering manager over powertrain, Rupak Paul, proposed to upper management that the exhaust of the RZR be rotated, such that it exited the rear of the vehicle rather than toward the occupant seats. Mr. Paul believed this change would significantly reduce RZR fires, and thought that the changes could be implemented in time for the 2017 model year. However, the cost of implementing the change would have been large and Polaris ultimately decided against making this proposed change."[64]

76.    Despite several years of component degradation and fires related to the excessive heat, Polaris did not hire its first thermal engineer, Ramesh Goyal, until June 2016. In August 2016 – the same month Class Plaintiff purchased his vehicle – Goyal wrote an internal email summarizing the issues with the vehicles.[65] As detailed by the court, Goyal concluded the following:[66]

- Key issue seems to be in the shielding as well of its implementation, air flow limitation, and on architectural issues.

- Components are densely packaged especially on the exhaust pipe sides and not well protected from radiation heat.

- Dense packaging and limited air flow in engine compartment.

- Packaging components in the vicinity of exhaust system.

- Heat shield attached to the heat pipe with no air gap in-between make shield ineffective. This makes high temperature environment in the close vicinity.

---

[64] *Thompson, supra*, at 4.
[65] *Thompson, supra*, at 5.
[66] *Id.*

1

    ◦   Limited packaging space – need architecture refinement.

2

    •   Thermal sensitive materials and hoses/conduits needs to be routed away from the heat source if possible.

3

4

77.    Goyal concluded that in future vehicles, Polaris needed to, "[t]ry to re-route thermal sensitive components away from the exhaust system side."[67]

5

6

78.    In April 2016, Polaris issued its largest recall, which included 133,000 model year 2013 to 2016 vehicles, saying the vehicles "can catch fire while consumers are driving, posing fire and burn hazards."[68] Polaris reported it had received 160 reports of fires with just those vehicles and 19 injury reports, including some for third degree burns, as well as the death of a 15-year-old girl.[69]

7

8

9

10

11

79.    In a press release, Polaris stated it had "already begun implementation of its Corrective Action Plan and has made manufacturing updates in new-production vehicles."[70] Polaris' Chairman and CEO Scott Wine assured the public, "[w]e are working day and night to inform our customers and dealers and to obtain the parts needed for the repairs we identified in our comprehensive analysis. We apologize for the inconvenience to our customers as we work to ensure all the systemic thermal risks we identified are eliminated from our vehicles."[71] Thus, Polaris admitted it had *systemic* problems with containing the excessive heat but did not inform the public that its own engineers had concluded the overarching problem was the engine configuration, which it had no plans to change.

12

13

14

15

16

17

18

19

20

80.    Polaris' 2016 Annual Report also acknowledged the systemic issues, stating, "As Polaris has always done, we attacked our problems head-on and learned a great deal as we addressed them. We are putting that knowledge to use as we continue to strengthen

21

22

23

24

25

[67] *Id.*

[68] Polaris Indus., Recall No. 16-146, Apr. 19, 2016.

26

[69] *Id.*

27

[70] Press Release, Polaris Industries Voluntarily Recalls Certain RZR 900 and 1000 Off-Road Vehicles, Apr. 19, 2016.

28

[71] *Id.*

1    our Global Safety and Quality function. Safety and quality have been, and remain, our top
2    priorities, but we know we still have much work to do. We will continue to closely monitor
3    our vehicles' performance. When an issue arises, we will act swiftly to keep our customers
4    safe."[72] Among the new Global Safety and Quality Organization's functions was "Conduct
5    post-sale surveillance, tracking warranty data and social media to identify and address
6    safety trends sooner."[73]

7         81.    The CPSC privately expressed reservations with the efficacy of Polaris'
8    proposed remedies to Polaris employees. In response to numerous Freedom of Information
9    Act requests to the CPSC from safety advocacy group Safety Research & Strategies, the
10   CPSC produced redacted documents related to an investigation into fires in the 2016 RZR
11   Turbo vehicles, which had caused at least 19 fires, resulting in six burn injuries, and a 15-
12   acre fire in Utah's American Fork Canyon in which a 6-year-old passenger on the Polaris
13   was severely burned. The documents show that in a July 27, 2016, email from Jeffrey
14   Jaucshneg, Compliance Officer at the CPSC, to Stacy Bogart at Polaris, Jaucshneg asked
15   whether Polaris had conducted real-world testing of its most current proposed fix, an
16   Electronic Control Unit calibration, to ensure it would actually work in all conditions. The
17   following is an excerpt of his email:[74]

18
19
20
21
22
23
24
25
26

---

[72] Polaris Indus., 2016 Annual Report, at 3.
[73] *Id.* at 11.
[74] CPSC FOIA Response RP160488, at PDF pg. 18.

This is only my opinion, but you stated (Firm Engineers) at the meeting that this vehicles engine was trimmed out for performance (maxing the engines abilities) and my understanding that this engine runs hot anyway. Is this problem going to fester in after 50 rides instead of 20. I do not believe you can come up with a conclusive fix without several weeks of testing.

We have to make sure this fix is not just engineered, it needs to be real world tested, we cannot get this one wrong.

I am concerned that the ECU calibration is not going to solve the issue it will just prolong it from happening again.

I have always given my all to your cases, my gut feeling on this to offer a refund to just get these units out of population, that way you have given the consumer an out. I really think even with the recalibration the vehicles will still have incidents in the future.

In general, I am expecting to have fires reported until Labor day weekend (last big holiday weekend of summer). I am not going to be surprised seeing you sending in updates.

With the high fire danger in the west, I would expect a another wildfire incident. we have extreme temperatures, bad combination. You could go to the U.S. Forest Service DC Office and ask them to post your recalls and stop ride notices at the trail head of all Public land. I would ask them to ban your vehicles from Forest Service Property until the units have been properly fixed. they could draft

82. Despite his reservations, Jauschneg signed off on the proposed fix by August 2016.[75] However, his concerns proved correct: On September 19, 2016, Jeffrey Eyres at Polaris informed the Commission he had just learned of a RZR Turbo fire in Oklahoma in a vehicle that had already received the recall repair.[76]

83. As depicted in the photo below, owners of vehicles repaired under this recall posted on online forums that the heat shield their dealer installed on the exhaust pipe to repair this recall had burned shortly thereafter.[77]

---

[75] Id. at PDF pg. 31.
[76] Id. at PDF pg. 222.
[77] RZR Forums.Net, 16 Turbo with Recall done heat shield allegedly burning, Sept. 24, 2016, http://www.rzrforums.net/rzr-xp-turbo/336465-16-turbo-recall-done-heat-shield-allegedly-burning.html, accessed Apr. 2, 2018.

84.     The *Thompson* court noted that in September 2016, as the number of fires in Polaris vehicles continued increasing, Polaris considered adding fire extinguishers to the vehicles but did not like the optics.[78] It also considered using flame-resistant materials because "the number of thermal incidents 'in which the vehicle is left unrecoverable…begin in the engine compartment where the main heat source is the engine's exhaust system.'"[79] The same defect that causes fires begins causing thermal damage immediately on use; whether or not that eventually results in a fire is an unfortunate luck of the draw.

85.     In September 2016, Polaris issued an update to its 2016 Full-Year Guidance, lowering its estimated share earnings because since its investor day in July 2016, "the Company has experienced additional RZR thermal-related issues and was unable to sufficiently validate the initially identified RZR Turbo recall repair, necessitating a more complex and expensive repair solution."[80] CEO Scott Wine stated, "Our number one priority is to get our loyal owners back to riding safely. We share the frustration of our customers and dealers and are working diligently to expedite the completion of the recall repairs and significantly improve the quality and safety of our products."[81] Polaris did not inform the public that it was aware the root cause of the thermal damage and fires was the tight engine configuration with limited airflow and vulnerable components in close

---

[78] *Thompson, supra*, at 5.
[79] *Id.*
[80] Polaris Indus., Polaris Updates 2016 Full-Year Guidance, Sept. 12, 2016.
[81] *Id.*

29

COMPLAINT

1   proximity to excessively high temperatures, which could not be remedied through the band-
2   aid fixes included in its recalls.

3       86.    Despite all of these recalls, asserted "fixes," and promises to improve safety,
4   on December 19, 2017, Polaris and CPSC issued a joint statement warning the public that
5   fires in the 2013-2017 RZR 900 and 1000 vehicles had caused death, serious injuries, and
6   property damage.[82] The warning noted that many of the vehicles had previously been
7   recalled, "[h]owever, users of the vehicles that were repaired as part of the April 2016 recall
8   continue to report fires, including total-loss fires."[83] The warning also stated that some of
9   the 2017 RZR vehicles not previously recalled have also experienced fires.[84]

10      87.    The joint statement offered no solution, saying only that "[t]he CPSC and
11  Polaris continue to work together to ensure fire risks in these vehicles are addressed.
12  However, at this time, the CPSC and Polaris want to make the public aware of the fires
13  involving these vehicles."[85] This was an admission that Polaris' "fixes" had not corrected
14  the "systemic" thermal issues and that Polaris did not know how to mitigate the excessive
15  heat in the Class Vehicles.

16      88.    On April 2, 2018, the CPSC confirmed Polaris' duplicity, fining the company
17  a record $27.25 million for failing to timely report defects and fire hazards in the RZR and
18  Ranger models that it knew could result in serious injury or death.[86] Neither the CPSC nor
19  Polaris' press releases announcing the fine mentioned the unsolved defect situation with
20  the RZR vehicles.

21      89.    Since then, the company has continued recalling vehicles for fire risks and
22  thermal damage.

23

24  _____
    [82] Joint Statement of CPSC and Polaris on Polaris RZR 900 and 1000 Recreational Off-
25  Highway Vehicles (ROVs), Dec. 19, 2017.
    [83] *Id.*
26  [84] *Id.*
    [85] *Id.*
27  [86] CPSC, Press Release, Polaris Agrees to Pay $27.25 Million Civil Penalty for Failure to
28  Report Defective Recreational Off-Road Vehicles, Apr. 2, 2018.

90.     Additionally, Polaris does not make obtaining the recall repair an easy process. Polaris tells vehicles owners that only a dealer can conduct the replacement repairs, and owners often live far from dealerships. Many Ranger owners use their vehicles as utility vehicles on farms or other remote locations, with dealerships miles away. For example, one forum user who has a 2015 Ranger XP 900 stated, "According to my dealership, which is 90 miles away, I need to return it there and can't do the work myself. He also stated that if it caught fire while riding it, neither Polaris nor my insurance company would be liable. I'd be on the hook for damages myself."[87]

91.     Thus, Ranger owners whose vehicles have been recalled are also forced to make the decision between taking time to deliver the Ranger to a dealership, possibly leaving it there for days while waiting for the repair, or using a vehicle that could catch fire while they are using it.

92.     Consumers have complained to the CPSC of burning plastic components. On July 5, 2017, the owner of a 2016 Polaris RZR XP 4 Turbo reported to the CPSC that temperatures in his vehicle had repeatedly reached 220 to 260 degrees during normal operation, causing the smell of burning plastic and burnt oil, prompting him to buy a fire extinguisher and a rearview mirror to check for flames.[88] The vehicle had overheated and shut down with smoke several times, and the last time, his friends had driven their 2017 RZR XP 4 to pick them up.[89] As they drove back to get a truck and trailer to tow his RZR XP 4 Turbo, the friend's RZR caught fire and burned the rear cargo before he could put the flames out.[90] Polaris replaced the friend's RZR – often its under-the-radar reaction when there is a confirmed fire – but would not allow the dealership to inspect the complainant's

---

[87] Ranger Forums.Net, 2015 XP900 Recall Notice, Apr. 24, 2017, http://www.rangerforums.net/forum/polaris-ranger-xp900/35433-2015-xp900-recall-notice.html, accessed on Apr. 2, 2018.

[88] CPSC, Epidemiologic Investigation Report, No. 20180111-14A85-2147393789, Jan. 11, 2018.

[89] *Id.*

[90] *Id.*

1    engine to determine the cause of the shut downs.[91] The owner concluded that, "Currently
2    my family will not ride in the RZR because of the high probability of fire. This vehicle is
3    unsafe and should not be allowed on the trails or road."[92]

4         93.    On November 23, 2017, the owner of a 2015 Polaris RZR 900 complained
5    to the CPSC that she and her husband had been riding the vehicle for one minute when
6    they noticed a burning smell.[93] When they removed the engine cover, flames and smoke
7    were coming out of the engine.[94] They were able to put the fire out with an extinguisher,
8    but stated that, "[t]he entire engine melted. Also, anything that was plastic melted. The
9    ROV is not repairable."[95] When she contacted Polaris, the company reportedly told her that
10   the vehicle was out of warranty and that "it was her issue, not theirs."[96]

11        94.    As noted, the defect begins causing component degradation upon first use,
12   but some vehicles catch fire as a result of the thermal damage, such as a fuel line becoming
13   so soft that it droops and touches the exhaust, causing a fuel leak that abruptly spreads into
14   a fire in the presence of the hot exhaust.

15        95.    In addition to the recalls, these risks are highlighted in consumer complaints
16   posted on forums. Unfortunately, warnings posted on forums are often read only after a
17   current owner visits the site looking for answers to problems that are already occurring. A
18   consumer posted on a forum that in November 2016, his new 2016 Ranger XP 900 had
19   caught fire only three days after he purchased it after mud and straw ignited on the engine.
20   The consumer reported, "I am choked. I have used this brand new item for 1.5 working

21
22
23

---

24   [91] *Id.*
25   [92] *Id.*
26   [93] CPSC, Epidemiologic Investigation Report, No. 20180118-BD800-1727075, Jan. 18, 2018.
27   [94] *Id.*
     [95] *Id.*
28   [96] *Id.*

days since Nov. 9. The dealer and Polaris see me as 'overreacting,' and I can't get Polaris to contact me."[97]

96.    Polaris was well aware that its "fixes" did not actually mitigate the excessive heat or prevent fires. For instance, on March 5, 2016, a fire started in a 2015 RZR XP4 1000 while a 19-year-old and 13-year-old were sitting in the occupant compartment.[98] The fire engulfed the vehicle and burned it down to the metal chassis before help could arrive.[99] The recall repair had been completed three months earlier.[100] The CPSC report for the incident included the following photos:

 

97.    On February 17, 2018, the owner of a 2015 RZR 1000 that had previously been repaired under recall reported to the CPSC that he had been riding the vehicle for fifteen minutes when he smelled smoke.[101] When he inspected the engine compartment, there was a fire in the front of the engine that engulfed the whole vehicle in flames within minutes, although he was able to put the fire out himself.[102] The CPSC report notes that,

---

[97] Ranger Forums, XP 900 on Tracks Major Problems, by Frankie Paper Boy, Nov. 23, 2016,    http://www.rangerforums.net/forum/polaris-ranger-xp900/30402-xp-900-tracks-major-problems.html, accessed Apr. 2, 2018.
[98] CPSC, Epidemiologic Investigation Report, No. 160309CBB1457, Mar. 28, 2016.
[99] *Id.* at 3.
[100] *Id.* at 1.
[101] CPSC, Epidemiologic Investigation Report, No. 20180411-488A0-1750788, Apr. 11, 2018.
[102] *Id.*

1   "Caller sent an email to Polaris back in February expressing his disappointment with his

2   product catching on fire. Polaris sent him a $1000 voucher to purchase a new product."[103]

3        98.     In 2013, a firefighter posted a warning on a forum under the subject heading,

4   "2013 polaris ranger 900 xp exhaust FIRE danger," saying after he purchased the vehicle,

5   he and his fellow firefighters discovered that in the "new Polaris setup the muffler gets

6   really hot." That is a danger because of "the vehicle's exhaust and muffler placement."[104]

7        99.     Indeed, in August 2016, a 2015 Polaris RZR 1000 vehicle caught fire in

8   California's San Bernardino Forest, destroying 8,110 acres of forestry.[105] The Pilot Fire, as

9   the fire became known, required mandatory and voluntary evacuations, closed schools, put

10  hundreds of firefighters in danger, and came at a significant cost.[106] The following are

11  pictures of the fire:[107]

12

13

14

15

16

17

18

19

20

21

22

---

23  [103] *Id.*

24  [104] PRC Ranger Club, 2013 Polaris Ranger 900 xp exhaust FIRE danger, July 26, 2013,
    http://www.prcforum.com/forum/154-ranger-xp-900-570-fs-discussions/50505-2013-

25  polaris-ranger-900-xp-exhaust-fire-danger.html, accessed Apr. 2, 2018.

    [105] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Complaint filed Aug. 6,

26  2019, at 3.

    [106] "Pilot Fire Grows to 10 Square Miles, Evacuations Ordered," KPCC News, Aug. 8,

27  2016.

28  [107] *Id.*, photos by Stuart Palley.







35

100.    The United States sued Polaris in the Central District of California, alleging negligence, strict product liability, and violations of several statutes related to public resources and public safety.[108] Originally, Polaris contested the negligence and strict product liability claims, asserting the "allegations boil down to 'a Polaris-manufactured product caused damages,'" rather than pleading facts identifying the defect.[109] The government amended its complaint to note the numerous recalls, 2016 Full-Year Guidance update, CPSC and Polaris joint announcement, CPSC fine, and a *New York Times* article about Polaris fires that noted there are dozens of YouTube videos showing RZR vehicles burning and "a slew of litigation."[110] The amended complaint blamed the engine/exhaust configuration that provides little airflow to dissipate heat.[111] After the amended complaint was filed, Polaris moved to dismiss statutory claims but did not move to dismiss the

---

[108] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Complaint filed Aug. 6, 2019.

[109] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Motion to Dismiss filed Jan. 14, 2020, at 9.

[110] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Amended Complaint filed Feb. 3, 2020.

[111] *Id.*, at 9.

1    negligence and strict liability claims.[112] In January 2022, Polaris settled with the

2    government.[113]

3        101.    Despite knowing that its vehicles have caused several land fires, Polaris has

4    denied there is a safety defect even when the vehicle fire causes a forest fire: On May 31,

5    2018, a man was driving his brand new 2018 Polaris RZR 900 when there was "a small

6    explosion followed by a noticeable smell of gas followed by seating compartment being

7    on fire with the seatbelt attachment button already melting. Resulting fire shot flames 30

8    feet into the air with gas tank exploding causing major forest fire."[114] Polaris' response to

9    the CPSC was that although it was investigating and had offered to buy back the vehicle,

10    "[t]he customer's report does not reasonably support a conclusion that the vehicle contains

11    any defect which could create a substantial product hazard or creates an unreasonable risk

12    of death or serious injury. Polaris further disputes that the report indicates any safety

13    problem related to the vehicle and denies any and all liability for the reported incident."[115]

14    Polaris did not mention that it had recently issued a voluntary field action (not an official

15    recall) for several model year 2018 RZR vehicles for a degraded fuel pump flange assembly

16    that could result in a fuel leak but had excluded the RZR 900.[116]

17        102.    Polaris itself has shown that it is aware the Class Vehicles did not have

18    adequate airflow. When Polaris debuted the 2019 RZR XP 4 Turbo at auto shows, it made

19    clear that it had changed the design to allow for 80 percent more airflow:[117]

20

21

---

22    [112] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Motion to Dismiss, Feb. 18,

23    2020.

   [113] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Joint Stipulation for

24    Dismissal Pursuant to Settlement, Jan. 3, 2022.

25    [114] CPSC, Epidemiologic Investigation Report, No. 20180618-7565A-2147387322, June

   18, 2018.

26    [115] *Id.*

27    [116] Press Release, Polaris Issues Voluntary Field Action for Certain RZR and ACE

   Models, Apr. 2, 2018.

28    [117] UTV Action, 2019 Polaris RZR XP 4 Turbo S, July 11, 2019.



103.    Similarly, a review of the 2020 RZR Pro XP, the replacement for the RZR XP Turbo, noted that, "Polaris engineers have added a coolant vent line to the top of the head to help bleed out trapped air which has plagued some owners and been the cause of overheating in the past."[118] The review included a picture of the frame and engine compartment[119]:

---

[118] SXSBlog.com, 2020 Polaris RZR Pro XP: Tech Review, Aug. 2, 2019.
[119] *Id.*



104.    Despite its awareness of its vehicles' need for greater airflow and exhaust pipes that did not exit from the front of the engine in a tight loop surrounded by plastic components, Polaris' recalls did not include the introduction of air intakes or fans. Nor did they include replacing the plastic components with components made of sturdier, more flame-resistant materials. Even though these measures would not have removed the Thermal Degradation Defect, they may have mitigated or prevented some of the thermal damage and fires that resulted from the Thermal Degradation Defect.

105.    Weighing all of the evidence introduced by the *Thompson* plaintiff, the court concluded he could pursue punitive damages because, "Plaintiff has presented prima facie evidence that the alleged defective design creates a high probability of injury. The hottest part of the exhaust system is located directly behind the passenger seat in a confined space, with limited airflow. Polaris exacerbated the heat issue by adding more shielding, which restricted airflow even further, driving the exhaust temperature up. This superheated system is packaged in close proximity to the fuel system and directly below the cargo bed, where Polaris knows that customers often carry spare gasoline canisters. The temperatures

1    are so high that any leak of fuel from the fuel system or from a spare fuel container will

2    automatically ignite directly behind the passenger seating and spread rapidly."[120]

3        106.    The court also concluded that, "Plaintiff presents compelling prima facie

4    evidence that Polaris acted with indifference to the high probability of injury to others. The

5    prima facie evidence shows that Polaris rushed out a newly designed engine and exhaust

6    system for the RZR 900 in order to stay ahead of the competition. In its rush, Polaris failed

7    to follow several safety measures, despite being aware that the new design would create

8    heat issues behind the passenger seats. ...Despite all of the information that Polaris had

9    about the dangers of the exhaust system architecture in the RZR 900s, Polaris chose to

10   continue using the same architecture in its machines from model years 2011 through and

11   past 2017 – the model year that burned Plaintiff. Plaintiff's prima facie evidence presents

12   a compelling picture from which a jury could find that Polaris chose not to do so for

13   financial reasons, arguably placing profits over the safety of its customers."[121]

14       107.    Finally, as noted above, the Court held that, "Plaintiff has put forth expert

15   evidence supporting his argument that the architecture of the exhaust and fuel system 'are

16   substantially and functionally similar' across all RZR 900 models [the model at issue in

17   the case] starting in 2011 and past 2017."[122]

18       108.    The same "substantially and functionally similar" architecture is present in

19   all Class Vehicles and is causing component degradation and thermal damage in all Class

20   Vehicles, resulting in the same "high probability of injury to others" caused by a common

21   defect Polaris has been indifferent to.

22   **D.    Polaris Vehicles Give Off More Heat Than Competitor Vehicles**

23       109.    The fact that the heat generated in the Class Vehicles is excessive – *i.e.*, is

24   greater than the heat generated by competitor vehicles and above the level that is safe for

25   surrounding components – can be demonstrated in several ways, including alternative

26   _____

27   [120] *Thompson, supra*, at 10.
     [121] *Id.*, at 11, 12.

28   [122] *Id.*, at 9.

1  designs undertaken by competitors and the sale of aftermarket products specifically aimed

2  at reducing the Polaris' known excessive heat issues.

3      **i.   Alternative Designs**

4      110.   Recognizing the need for sufficient airflow and mechanisms to dissipate the

5  heat, several of Polaris' competitors have located their exhaust header, where the pipe exits

6  the engine, or exhaust pipes in a location that is more open to airflow and further from the

7  passenger compartment. As noted above, this is the reasoning cited by Polaris' powertrain

8  engineer manager, Rupak Paul, in 2015, when he suggested rotating the exhaust pipes.

9      111.   The Yamaha YXZ1000R, a competitor to the RZR, has its engine

10  "strategically mounted low and longitudinally on its chassis," which means the exhaust

11  headers face outward toward the side of the vehicle, allowing for significant airflow and

12  heat dissipation.[123] As mentioned above, this design is very similar to the original design

13  for the Ranger RZR 800. Below is a picture showing that the exhaust vents out to the side

14  and is located far from the occupants and other components:[124]



15

16

17

18

19

20

21

22

23

24

25

26

27  [123] Yamaha YXZ1000R, UTV Guide, June 19, 2016

28  [124] Yamaha Motor Sports. 2021 Yamaha YXZ1000R,
https://www.yamahamotorsports.com/pure-sport-side-by-side/models/yxz1000r.

112.   The Can-Am Maverick ROV, manufactured by Bombardier Recreational Products, has the exhaust pipe on the driver's side, open to the side of the vehicle. Can-Am stated that the 1000R package "wears a unique exhaust line and muffler for enhanced airflow" and has an oversized air intake behind the passenger seat to keep the engine cool.[125] Below is a diagram that Can-Am includes in its brochures:[126]



113.   Can-Am's answer to the RZR Turbo is the Maverick X3, which offers up to 172 horsepower through its Rotax ACE engine. The Maverick X3's engine is located in the rear of the chassis to reduce noise, vibration, and heat.[127] The vehicle has an intercooler for maximized cooling efficiency and a fan that maximizes heat transfer, as well as three large air intakes located behind the driver to "deliver a constant supply of clean air" to the transmission and engine.[128] Below is a photograph of the Maverick X3's engine:[129]

---

[125] 2019 Can-Am Maverick Sport, UTV Action, Apr. 3, 2018
[126] *Id.*
[127] UTV Guide, Can-Am Maverick X3 X mr Turbo – Mud Has Nowhere to Hide, Nov. 30, 2017.
[128] *Id.*
[129] *Id.*



114.    Below is a photograph of a Maverick Trail, showing that the exhaust pipe is open to air and away from the passenger compartment and other components:[130]



---

[130] Can-Am website, Maverick Trail.

115.    The previous version of the Can-Am Maverick 1000R had the engine on the centerline below the occupants, with its exhaust pipes elongated to allow air to flow around them and provide clearance from other components, as depicted in this Can-Am diagram:[131]



116.    Can-Am touted the increased airflow and exhaust flow: "When an engine breathes easier, it can produce more horsepower. So we optimized air intake, combustion, and exhaust flow. Larger intake plenum, high-flow heads, larger valves, increased compression ratio, and high-flow dual exhaust all contribute to this more power and efficient engine."[132]

117.    A photograph of the under-hood engine compartment of the Can-Am Defender, a competitor to the Polaris Ranger, shows that although this vehicle does have the exhaust oriented forward like the Polaris vehicle, Can-Am added a feature that directs airflow from the clutch outlet to the exhaust heat shield via a duct to dissipate the heat. It also left the exhaust pipe open to airflow from the side:[133]

---

[131] Can-Am Maverick 1000R, UTV Guide, May 8, 2015.
[132] 2014 Can-Am Maverick X RS, Top Speed, Mar. 18, 2014.
[133] Can Am Defender 1000 for sale, https://evopowersports.com/product/defender-1000-exhaust-systems

1
2
3
4
5
6
7
8
9
10



11    118.    According to Dirt Wheels Magazine, in the 2019 Honda Talon, a RZR
12  competitor, "the engine is mounted longitudinally in the frame, eliminating unnecessary
13  right angles in the driveline so that an efficient transfer of power to the rear wheels is
14  possible, resulting in strong acceleration."[134] Further, "[k]nowing the rigors through which
15  customers would put the Talon, designers stressed efficient engine cooling, with
16  motorcycle-inspired shrouds and four side vents, all of which are unique to the side-by-
17  side world."[135] In the picture below, the exhaust is seen in left rear wheel well far from the
18  occupant compartment and other components:[136]
19
20
21
22
23
24
25
26
27  [134] "2019 Honda Talon, It's Real!," Dirt Wheels, Dec. 3, 2018.
     [135] *Id.*
28  [136] *Id.*

119.    The difference between the engine/exhaust compartments in these vehicles and the Polaris vehicles is striking. The competitors' recognition of the need for airflow around the hot engine and exhaust components has offered far better protection to their occupants: The Yamaha YXR1000R, Maverick ROVs, and Honda Talon have not been recalled for fire risks. In fact, the Consumer Federation of America, which tracks recalls of off-road vehicles, recently noted that Polaris has more than three times the number of recalls for fire risks and other crash hazards than the brand with the second highest number of recalls[137]:

---

[137] Cons. Fed. Of Am., An Analysis of OHV Recalls: Increasing Number of OHVs Pulled from Market Due to Safety Concerns, June 10, 2021.

COMPLAINT



Figure 2. OHV Recalls by Brand from January 1, 2010 - June 10, 2021

### ii.    Aftermarket Products

120.    There are numerous aftermarket products, including heat shields, wraps, and cooling system improvements, created specifically for Polaris ROVs. The purpose of these aftermarket products is to protect components that are vulnerable to heat degradation and failure, and to reduce the engine compartment temperatures and improve heat dissipation. Consumers become aware of the products only after they experience the excessive heat and seek solutions through targeted searches. The mere fact that these aftermarket products exist is an indication of a problem. Further, as discussed below, some companies marketing these products note that Polaris vehicles are known for generating excessive heat.

121.    For instance, UTV Driver published an article that noted, "We have heard a few RZR Turbo owners *complaining of their engines overheating. Under super hard driving, under load, we have had it happen to us too. So there has [sic] been a number of companies trying to address the issue* and they have come up with some pretty interesting products."[138]  The article described six aftermarket products that attempt to mitigate excessive heat in Polaris vehicles.

---

[138] "6 Ways to Help the RZR Turbo Not Overheat," UTV Driver, July 21, 2016.

122.    Another company offers an aluminum panel with heat tape on it to stand between the exhaust pipe and the occupant space. The company notes, *"[t]he RZR's are known to melt the plastic behind the passenger seat."*[139]

123.    Another touts its Polaris RZR Regulator Rectifier by stating, "[t]his new Hot Shot rectifier regulator is built using Mosfet Technology, allowing the regulator to run cooler & more efficiently. Rick's worked with RZR owners to customize a part that is easy to install and *will solve common overheating issues.*"[140]

124.    Another company highlights the tight engine/exhaust compartment's effects on surrounding components, offering an exhaust pipe heatshield to protect RZR shocks, stating: "Let's face it, heat can really put a damper on your fun. You're riding hard in your Polaris RZR only to have the right rear shock start to get a little spongy. *The culprit is heat from the exhaust cooking the oil in the shock.* Too much heat in the shock and the oil aerates, at which point the worn shocks no longer provide dampening as designed."[141]

125.    Below is a photo of the exhaust wrapped with Heatshield Armor – note the proximity to the right rear shock:[142]



---

[139] Polaris RZR & RZR-S Exhaust Heat Shield, UTV Inc., Order Form.
[140] Rick's Motorsport Electrics, Polaris RZR Regulator Rectifier, accessed May 6, 2019.
[141] "Eliminate Shock Fade with Heatshield Armor," Heatshield Products, blog.
[142] *Id.*

126.   A company called Bikeman Performance sells an AirXtreme kit for RZR 1000 models, noting "the stock 1000 platform is okay but they left so much airflow on the table."[143] The kit, depicted below, comes with "oversize exhaust valves for maximum airflow," a "BMP porting for maximum airflow and efficiency" (this appears to re-port the exhaust to the side of the engine), and "BMP High Performance Cams for maximum airflow."



## V.   CLASS ACTION ALLEGATIONS

127.   Plaintiff brings this action individually, as well as on behalf of each and all other persons similarly situated, pursuant to California Code of Civil Procedure Section 382.

128.   Plaintiff defines the Class as follows:

> All current and former owners of a Class Vehicle (as defined herein) that was purchased in the State of California.

---

[143] BMP RZR 1000 Big Valve AirXtreme Head Kit, Bikeman, Accessed Jan. 19, 2022.

(the "Class").  Excluded from the above Class is any entity in which Polaris has a controlling interest, and officers or directors of Polaris. Also excluded from this Class is any judge or judicial officer presiding over this matter and the members of his or her immediate family and judicial staff.

129.    The members of the Class are so numerous that individual joinder of all class members is impracticable. Given the breadth of Class Vehicles, Plaintiff is informed and believes that the Class is likely to include tens of thousands of members. While the precise number of Class members is unknown to Plaintiff, it can be ascertained from Polaris' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

130.    The Class is ascertainable. The Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description, including but not limited to by reference to lines drawn on maps. Other than by direct notice, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications, or through the Internet.

131.    A well-defined community of interest in the questions of law or fact involving and affecting all Class members exists, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual Class members. This action is amenable to a class-wide calculation of damages through expert testimony applicable to all Class members. The questions of law and fact common to Plaintiff and the Class members include, among others, the following:

      a.  whether Polaris engaged in the conduct alleged herein;

      b.  whether Polaris' alleged conduct violates applicable law;

c. whether Polaris designed, advertised, marketed, distributed, sold, or otherwise placed the Class Vehicles into the stream of commerce;

d. whether Polaris misled Class members about the safety of the Class Vehicles;

e. whether Polaris failed to disclose to Class members that the Class Vehicles generate excessive heat due to the Thermal Degradation Defect, causing their component parts to degrade;

f. whether the Class Vehicles contain the Thermal Degradation Defect alleged herein;

g. whether Polaris had actual or imputed knowledge about the alleged Defect but failed to disclose it to Plaintiff and the other Class members;

h. whether Polaris' omissions and concealment regarding the quality of the Class Vehicles were likely to deceive Class members in violation of the state consumer protection statutes alleged herein;

i. whether Polaris breached its express warranties to Class members with respect to the Class Vehicles;

j. whether Polaris breached its implied warranties to Class members with respect to the Class Vehicles;

k. whether Class members overpaid for their Class Vehicles as a result of the Thermal Degradation Defect alleged herein;

l. whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

m. the amount and nature of relief to be awarded to Plaintiff and the other Class members.

132. Plaintiff's claims are typical of the other Class members' claims. The evidence and the legal theories regarding Polaris' alleged wrongful conduct are substantially the same for Plaintiff and all Class members.

1     133.   Plaintiff will fairly and adequately protect the interests of the Class members.

2   Plaintiff has retained competent counsel experienced in class action litigation to ensure

3   such protection. Plaintiff and his counsel intend to prosecute this action vigorously.

4     134.   The class action is superior to all other available methods for the fair and

5   efficient adjudication of this case or controversy. Because the injury suffered by any

6   individual Class member may be relatively small, the expense and burden of individual

7   litigation make it virtually impossible for Plaintiff and Class members individually to seek

8   redress for the alleged wrongful conduct. Even if any individual persons or group(s) of

9   Class members could afford individual litigation, it would be unduly burdensome to the

10   courts in which the individual litigation(s) would proceed. The class action device is

11   preferable to individual litigation(s) because it provides the benefits of unitary

12   adjudication, economies of scale, and comprehensive adjudication by a single court.

13     135.   Prosecution of separate actions by individual Class members would create a

14   risk of inconsistent or varying adjudications with respect to individual Class members that

15   would establish incompatible standards of conduct for the party (or parties) opposing the

16   Class and would lead to repetitious trials of the numerous common questions of fact and

17   law. Plaintiff knows of no difficulty that will be encountered in the management of this

18   litigation that would preclude its maintenance as a class action. As a result, a class action

19   is superior to other available methods for the fair and efficient adjudication of this

20   controversy.

21              **VI.    CAUSES OF ACTION**

22                   **FIRST CAUSE OF ACTION**

23       **VIOLATION OF THE CALIFORNIA CONSUMER LEGAL**

24                      **REMEDIES ACT**

25           **CAL. CIV. CODE §§ 1750, *et seq.***

26     136.   Plaintiff James DeBiasio (hereinafter, "Plaintiff") repeats and realleges

27   Paragraphs 1-135, above, as if fully set forth herein.

28

1    137.    Plaintiff brings this Cause of Action individually and on behalf of the other
2    Class members.

3    138.    Plaintiff and the other Class members were deceived by Polaris' failure to
4    disclose that the Class Vehicles share a common design defect in that they contain the
5    Thermal Degradation Defect.

6    139.    Polaris engaged in unfair or deceptive acts or practices when, in the course
7    of its business, it knowingly omitted material facts as to the characteristics and qualities of
8    the Class Vehicles.

9    140.    Polaris failed to disclose material information concerning the Class Vehicles
10   that it had a duty to disclose. Polaris had a duty to disclose the Thermal Degradation Defect
11   because, as detailed above: (a) Polaris knew about the Thermal Degradation Defect, (b)
12   Polaris had exclusive knowledge regarding the Thermal Degradation Defect not known to
13   the general public, Plaintiff, or the other Class members; and (c) Polaris actively concealed
14   material facts concerning the Thermal Degradation Defect from the general public,
15   Plaintiff, and the other Class members. As detailed above, the information concerning the
16   Thermal Degradation Defect was known to Polaris at the time of advertising and selling
17   the Class Vehicles, all of which was intended to induce consumers to purchase the Class
18   Vehicles.

19   141.    Polaris intended for Plaintiff and the other Class members to rely on it to
20   provide adequately designed vehicles, and to honestly and accurately reveal the problems
21   described throughout this Complaint.

22   142.    Polaris intentionally failed or refused to disclose the Thermal Degradation
23   Defect to consumers.

24   143.    Polaris' deceptive omissions were intended to induce Plaintiff and the other
25   Class members to believe that the Class Vehicles were adequately designed and
26   manufactured.

27
28

144.    Polaris' conduct constitutes unfair acts or practices as defined by the California Consumer Legal Remedies Act.

145.    Plaintiff and the other Class members have suffered injury in fact and actual damages resulting from Polaris' material omissions because they paid inflated purchase prices for the Class Vehicles. Plaintiff and the other Class members are entitled to recover actual damages, punitive damages, costs and attorneys' fees, and all other relief that the Court deems proper under California Civil Code § 1780.

146.    In accordance with section 1782(a) of the CLRA, Plaintiff's counsel, on behalf of Plaintiff and California Class members, personally served Polaris on April 22, 2022 with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiff and California Class members, and demanded that they correct or agree to correct the actions described therein within thirty (30) days of such notice. Attached as Exhibit B is a true and correct copy of Plaintiff's letter. If Polaris fails to do so, Plaintiff will amend this Complaint to include compensatory and monetary damages to which Plaintiff and California Class members are entitled.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT**

**FOR BREACH OF EXPRESS WARRANTY**

**Cal. Civ. Code §§ 1790, *et seq.***

147.    Plaintiff repeats and realleges Paragraphs 1-135, above, as if fully set forth herein.

148.    Plaintiff brings this Cause of Action individually and on behalf of the other Class members.

149.    Plaintiff and the other Class members are "buyers" within the meaning of Cal. Civ. Code. § 1791.

150.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791.

151.   Polaris is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791.

152.   Plaintiff and the other Class members bought Class Vehicles manufactured by Polaris.

153.   Polaris made an express warranty to Plaintiff and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

154.   The Class Vehicles share a common design defect, in that they contain the Thermal Degradation Defect.

155.   The Class Vehicles are covered by Polaris' express warranty. The Thermal Degradation Defect described herein substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and the other Class members.

156.   Polaris was provided notice of these issues and defects through numerous consumer complaints, multiple complaints filed against it, and CPSC investigations, as well as internal knowledge derived from internal investigations, testing and expert analysis.

157.   Polaris has had the opportunity to cure the Thermal Degradation Defect in the Class Vehicles, but it has chosen not to do so. Giving Polaris a chance to cure the Thermal Degradation Defect is not practicable in this case and would serve only to delay this litigation, and is thus unnecessary.

158.   As a result of Polaris' breach of its express warranty, Plaintiff and the other Class members received goods with substantially impaired value. Plaintiff and the other Class members have been damaged as a result of their overpayment for the Class Vehicles.

159.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff and the other Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their vehicles, or the overpayment of their Class Vehicles.

160.   Pursuant to Cal. Civ. Code § 1794, Plaintiff and the other Class members are also entitled to costs and attorneys' fees.

**THIRD CAUSE OF ACTION**

**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT**

**FOR BREACH OF IMPLIED WARRANTY**

**Cal. Civ. Code §§ 1790, *et seq.***

161.   Plaintiff repeats and realleges Paragraphs 1-135, above, as if fully set forth herein.

162.   Plaintiff brings this Cause of Action individually and on behalf of the other Class members.

163.   Plaintiff and the other Class members who purchased their Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code. § 1791.

164.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791.

165.   Polaris is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791.

166.   Polaris impliedly warranted to Plaintiff and the other members of the Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

167.   Cal. Civ. Code § 1791.1(a) states that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; and (4) Conform to the promises or affirmations of fact made on the container or label.

168.   The Class Vehicles would not pass without objection in the off-road vehicle trade because they share a common design defect in that they contain the Thermal Degradation Defect.

1    169.    Because of the Thermal Degradation Defect, the Class Vehicles are not fit

2    for their ordinary purposes.

3    170.    The Class Vehicles were not adequately labeled because the labeling failed

4    to disclose the Thermal Degradation Defect described herein.

5    171.    Polaris was provided notice of these issues and Defect through numerous

6    consumer complaints, multiple complaints filed against it, and CPSC investigations, as

7    well as internal knowledge derived from internal investigations, testing and expert analysis.

8    172.    Polaris has had the opportunity to cure the Thermal Degradation Defect in

9    the Class Vehicles, but it has chosen not to do so. Giving Polaris a chance to cure the

10   Thermal Degradation Defect is not practicable in this case and would serve only to delay

11   this litigation, and is thus unnecessary.

12   173.    As a result of Polaris' breach of its implied warranty, Plaintiff and the other

13   Class members received goods with substantially impaired value. Plaintiff and the other

14   Class members have been damaged as a result of their overpayment for the Class Vehicles.

15   174.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and the other Class

16   members are entitled to damages and other legal and equitable relief, including, at their

17   election, the purchase price of their Class Vehicles, or the overpayment for their Class

18   Vehicles.

19   175.    Under Cal. Civ. Code § 1794, Plaintiff and the other Class members are also

20   entitled to costs and attorneys' fees.

21                          **FOURTH CAUSE OF ACTION**

22                          **FRAUDULENT OMISSION**

23   176.    Plaintiff repeats and realleges Paragraphs 1-135, above, as if fully set forth

24   herein.

25   177.    Plaintiff brings this Cause of Action individually and on behalf of the other

26   Class members.

27

28

178.   Polaris was aware of the Thermal Degradation Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

179.   Having been aware of the Thermal Degradation Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Thermal Degradation Defect, Polaris had a duty to disclose the Thermal Degradation Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

180.   Polaris did not disclose the Thermal Degradation Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

181.   For the reasons set forth above, the Thermal Degradation Defect within the Class Vehicles comprises material information with respect to the sale of the Class Vehicles.

182.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

183.   Had Plaintiff and the other members of the Class known of the Thermal Degradation Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

184.   Through its omissions regarding the Thermal Degradation Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

185.   As a direct and proximate result of Polaris' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Thermal Degradation Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

186.    Plaintiff repeats and realleges Paragraphs 1-135, above, as if fully set forth herein.

187.    Plaintiff brings this Cause of Action individually and on behalf of the other Class members.

188.    By reason of its conduct, Polaris caused damages to Plaintiff and Class members. Plaintiff and Class members conferred a benefit on Polaris by overpaying for Class Vehicles at prices that were artificially inflated by Polaris' concealment of the Thermal Degradation Defect.

189.    As a result of Polaris' fraud and deception, Plaintiff and Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris' conduct.

190.    Polaris knowingly benefitted from its unjust conduct. Polaris sold Class Vehicles equipped with the Thermal Degradation Defect for more than what the vehicles were worth, at the expense of Plaintiff and Class members.

191.    Polaris readily accepted and retained these benefits from Plaintiff and Class members.

192.    It is inequitable and unconscionable for Polaris to retain these benefits because they intentionally concealed, suppressed, and failed to disclose the Thermal Degradation Defect to consumers. Plaintiff and Class members would not have purchased the Class Vehicles or would have paid less for them, had Polaris not concealed the Thermal Degradation Defect.

193.    Plaintiff and Class members do not have an adequate remedy at law.

194.    Equity cannot in good conscience permit Polaris to retain the benefits that they derived from Plaintiff and Class members through unjust and unlawful acts, and

1  therefore restitution or disgorgement of the amount of the Polaris' unjust enrichment is
2  necessary.

### SIXTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

6   195.   Plaintiff repeats and realleges Paragraphs 1-194, above, as if fully set forth
7  herein.

8   196.   Plaintiff brings this Cause of Action individually and on behalf of the other
9  Class members.

10   197.   The California Unfair Competition Law ("UCL"), California Business and
11  Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business acts or
12  practices."

13   198.   Polaris' knowing and intentional conduct described in this Complaint
14  constitutes unlawful, fraudulent, and unfair business acts and practices in violation of the
15  UCL. Specifically, Polaris' conduct is unlawful, fraudulent, and unfair in at least the
16  following ways:

    a.  by knowingly and intentionally concealing from Plaintiffs and other Class
       members that the Class Vehicles suffer from the Thermal Degradation Defect
       while obtaining money from Class members;

    b.  by purposefully designing and manufacturing the Class Vehicles to contain
       a defect that causes premature wear and damage to the engine components in
       all of the Class Vehicles and puts the owners' lives at risk, concealing the
       Thermal Degradation Defect from Class members, and failing to fix the
       Thermal Degradation Defect free of charge; and

    c.  by violating the other California laws alleged herein, including California
       common law, the Consumers Legal Remedies Act and Song-Beverly
       Consumer Warranty Act.

1    199.    Additionally, Polaris' acts, omissions, and conduct were "unfair" because
2  they offend public policy and constitute immoral, unethical, and unscrupulous activities
3  that caused substantial injury, including to Plaintiff and Class members. The gravity of
4  harm resulting from Polaris' conduct outweighs any potential benefits attributable to the
5  conduct and there were reasonably available alternatives to further Polaris' legitimate
6  business interests.

7    200.    Polaris' omissions and concealment were material to Plaintiff and other Class
8  members, and Polaris concealed or failed to disclose the truth with the intention that
9  consumers would rely on its concealment and omissions.

10    201.    Polaris' material omissions alleged herein caused Plaintiff and the other
11 Class members to make their purchases of their Class Vehicles. Absent Polaris' omissions,
12 Plaintiff and other Class members would not have purchased their Class Vehicles, or would
13 not have purchased their Class Vehicles at the prices they paid.

14    202.    Accordingly, Plaintiff and the other Class members have suffered
15 ascertainable loss and actual damages as a direct and proximate result of Polaris'
16 concealment of and failure to disclose material information.

17    203.    Polaris' violations present a continuing risk to Plaintiff and the other Class
18 members, as well as to the general public. Polaris' unlawful acts and practices complained
19 of herein affect the public interest.

20    204.    Plaintiff requests that this Court enter an order enjoining Polaris from
21 continuing their unfair, unlawful, and/or deceptive practices and restoring to members of
22 the Class any money Polaris acquired by unfair competition, including restitution and/or
23 restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus.
24 & Prof. Code § 3345, and for such other relief set forth below.

25                    **VII.    PRAYER FOR RELIEF**

26    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief
27 and judgment as follows:

28

1.     An order certifying the proposed Class, designating Plaintiff as the named representative of the Class, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Code of Civil Procedure § 382;

2.     An order enjoining Polaris to desist from further deceptive distribution and sales practices with respect to the Class Vehicles and such other injunctive relief that the Court deems just and proper;

3.     A declaration that Polaris is financially responsible for all Class notice and the administration of Class relief;

4.     An award to Plaintiff and Class members costs, restitution, compensatory damages for economic loss and out of pocket costs, damages under applicable state's laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

5.     Any applicable statutory and civil penalties;

6.     An award of costs and attorneys' fees, as allowed by law;

7.     An order requiring Polaris to pay both pre- and post-judgment interest on any amounts awarded.

8.     Leave to amend this Complaint to conform to the evidence produced at trial; and

9.     Such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

**DATED**: April 28, 2022                              **BARON & BUDD, P.C.**

/s/ *Roland Tellis*
Roland Tellis

Roland Tellis (SBN 186269)
David B. Fernandes, Jr. (SBN 280944)
**BARON & BUDD, P.C.**

62

COMPLAINT

15910 Ventura Blvd, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
rtellis@baronbudd.com
dfernandes@baronbudd.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

Courtney L. Davenport
**THE DAVENPORT LAW FIRM LLC**
18805 Porterfield Way
Germantown, Maryland 20874
Telephone: 703-901-1660
courtney@thedavenportlawfirm.com

***Counsel for Plaintiff and the
Proposed Class***

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all claims and causes of action in this lawsuit.

**DATED**:  April 28, 2022

**BARON & BUDD, P.C.**

*/s/ Roland Tellis*
Roland Tellis

Roland Tellis (SBN 186269)
David B. Fernandes, Jr. (SBN 280944)
**BARON & BUDD, P.C.**
15910 Ventura Blvd, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
rtellis@baronbudd.com
dfernandes@baronbudd.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

Courtney L. Davenport
**THE DAVENPORT LAW FIRM LLC**
18805 Porterfield Way
Germantown, Maryland 20874
Telephone: 703-901-1660
courtney@thedavenportlawfirm.com

***Counsel for Plaintiff and the Proposed Class***

64

# EXHIBIT A – Summary of Polaris Recalls Due to the Thermal Degradation Defect

**1. RZR Recalls**

1.     Since 2013, Polaris has recalled, at different times, all of the Class Vehicles due to the Thermal Degradation Defect having caused melting components, hundreds of fires, dozens of severe injuries, and at least four deaths.

2.     The first recall was issued on June 19, 2013, recall number 13-740, for the first vehicle that had the ProStar engine/exhaust configuration. The recall involved 4,500 model year 2011 RZR XP 900 vehicles. The specified cause: The firewall behind the driver and passenger seats could overheat and melt.

3.     An April 2013 Technical Service Bulletin ("TSB") explaining the recall to dealers provided more detail: "Some Ranger RZR XP 900 models may experience hot air leakage from the engine compartment that travels over the service divider panel separating the occupant compartment from the engine compartment, which can cause deformation of the panel. This hot air leakage into the passenger area can also create elevated air and component temperatures that could cause burns to the occupant of the vehicle. Polaris has developed an aluminum heat shield to deflect the hot air and prevent it from damaging the service divider panel."[1] The TSB noted that this safety bulletin updated a previous TSB issued in 2011 (R-11-03) that was completed through warranty claims. TSB R-11-03 shows that Polaris was aware of this problem two years before it issued the recall and shortly after the 2011 RZR XP 900 was released into the market.

---

[1] Polaris Indus., Tech. Serv. Bulletin R-13-02, Apr. 25, 2013, at 1.

4.      On October 5, 2015, Polaris recalled 53,000 model year 2015 RZR 900 and RZR XP 1000 series vehicles.[2]  The cause stated in the recall notice was that the fuel vent line could be misrouted, causing it to become pinched, which in turn could over pressurize the fuel tank and leak fuel.  Polaris' press release noted that it had also received reports of the driveline contacting the pressurized fuel tank, which also caused fuel leaks.[3]  Polaris said it had received four reports of fuel leaks in the RZR 900 series, including two fires and one minor burn injury, and 25 reports of fuel leaks in the RZR 1000 series, with no fire incidents.[4]

5.      When Polaris subsequently rolled this recall into another expanded recall, it provided more information that demonstrated the fuel vent problem was also related to the exhaust pipe's location. In addition to the kinked fuel vent line, "[a]n improperly routed fuel tank vent line may have insufficient clearance to the exhaust head pipe.  A vent line with insufficient clearance to the exhaust head pipe may pose a fire hazard."[5]  Higher temperatures, such as those created by the Thermal Degradation Defect, can also increase fuel tank pressure, exacerbating the danger posed by a pinched fuel line.

6.      On December 10, 2015, Polaris recalled 2,230 model year 2016 RZR XP Turbo and RZR XP 4 Turbo vehicles, stating that the turbocharger's oil drain line could leak, posing a fire hazard.[6]  At that time, Polaris reported two reports of oil leaks and two

---

[2] Polaris Indus., Recall No. 16-702, Oct. 5, 2015.
[3] Polaris Industries Recalls RZR Recreational Off-Highway Vehicles Due to Potential Fire Hazard, Oct. 5, 2015.
[4] Polaris Indus., Recall No. 16-702, Oct. 5, 2015.
[5] Polaris Indus., Tech. Serv. Bulletin Z-16-01-AD, Apr. 19, 2016.
[6] Polaris Indus., Recall No. 16-713, Dec. 10, 2015.

3

reports of fire with no injury. The turbocharged vehicles were first recalled only two months after they were released into the market.

7.      This recall was expanded to include 13,000 turbocharged vehicles in September 2016, but this time the cause was connected to the Thermal Degradation Defect: "The vehicle's engine can overheat and turbo system's drain tube can loosen."[7] The drain tube could loosen because the excessive heat softened the plastic. Polaris noted it had received 19 reports of vehicles catching fire, causing six burn injuries. Polaris stated one of those incidents involved a young child – that is a 6-year-old girl who was burned over 40 percent of her body when the RZR Turbo caught fire in Utah's American Fork Canyon, also setting fire to 15 acres of land.[8]

8.      Realizing that the initial recall for the RZR 900 and 1000 series was inadequate, Polaris expanded the recall on April 19, 2016, to include a total of 133,000 vehicles: the 2013-2014 RZR XP 900 (production ended after 2014), 2014-2016 RZR XP 1000 (entire production to date), 2015-2016 RZR 900 (entire production to date), 2015-2016 RZR S 900 (entire production to date), 2016 RZR S 1000 (debut year). Each of these vehicles contain the Thermal Degradation Defect.

9.      Polaris did not specify a root cause on the April 19, 2016 recall notice, saying only the vehicles "can catch fire while consumers are driving, posing fire and burn hazards."[9] Polaris reported it had received 160 reports of fires with just those vehicles and

---

[7] Polaris Indus., Recall No. 16-257, Sept. 1, 2016.

[8] Jed Boal, Recent ORV Explosion Raises Questions About Vehicle's Safety, KSL.com, Jul. 26, 2016, https://www.ksl.com/?sid=40821427&nid=148, accessed Apr. 2, 2018.

[9] Polaris Indus., Recall No. 160146, Apr. 19, 2016.

4

19 injury reports, including some for third degree burns.[10]  Polaris also included Baylee Hoaldridge's death.

10.     According to the TSBs Polaris sent to dealers for the April 19, 2016 recall, the vehicles had one or more of several issues related to excessive heat, melting, and fire. Every recalled vehicle also had the engine configuration associated with the Thermal Degradation Defect.

11.     On March 2, 2017, Polaris again expanded on previous recalls, re-recalling 13,500 model year 2016 vehicles that had already been recalled, meaning that those fixed under the expansive April 19, 2016 recall still suffered from the Thermal Degradation Defect, and adding model year 2017 for certain vehicles in the RZR 900 series, RZR XP 1000, and RZR XP 4 Turbo.  Polaris also added the 2016-2017 General 1000 and General 4 1000.[11]  Like some of its previous recalls, the recall for the General 1000 series encompassed its entire production run.  All recalled vehicles featured the ProStar engine and exhaust in a tight compartment surrounded by plastic directly behind the occupant compartment.[12]

12.     The March 2, 2017 recall stated that the engine could misfire, causing the exhaust to overheat, melting nearby components.[13]  Polaris received one report of fire and two reports of melting related to engine misfire.[14] Had the vehicles had a sufficient amount

---

[10] *Id.*
[11] Polaris Indus., Recall No. 17-102, Mar. 2, 2017.
[12]  Polaris   General   1000   EPS:   Full   Test,   UTV   Action,   Apr.   8,   2016, https://utvactionmag.com/polaris-general-1000-eps-full-test/, accessed Apr. 2, 2018.
[13] Polaris Indus., Recall No. 17-102, Mar. 2, 2017.
[14] *Id.*

of airflow around the engine and exhaust, this heat would have dissipated before it melted the surrounding components.

13.     On December 19, 2017, Polaris and the Consumer Product Safety Commission ("CPSC") issued a joint statement warning the public that fires in the 2013-2017 RZR 900 and 1000 vehicles had caused death, serious injuries, and property damage.[15] The warning noted that many of the vehicles had previously been recalled, "[h]owever, users of the vehicles that were repaired as part of the April 2016 recall continue to report fires, including total-loss fires."[16] The warning also stated that some of the 2017 RZR vehicles not previously recalled have also experienced fires.[17]

14.     Three days after the joint CPSC and Polaris announcement, Polaris recalled 560 2018 RZR XP 4 Turbo vehicles.[18]  Polaris had received one report of fire related to this flaw.[19]

15.     On April 2, 2018, Polaris issued yet another recall related to the Thermal Degradation Defect.  This recall applied to 107,000 model year 2014-2018 RZR XP 1000 vehicles in which the exhaust silencer fatigues and cracks and the heat shield fails to manage the heat, leading to melting of nearby components or fire.[20]  Some RZR owners

---

[15] Joint Statement of CPSC and Polaris on Polaris RZR 900 and 1000 Recreational Off-Highway Vehicles (ROVs), Dec. 19, 2017.
[16] *Id.*
[17] *Id.*
[18] Polaris Indus., Recall No. 18-708, Dec. 21, 2017.
[19] *Id.*
[20] Polaris Indus., Recall No. 18-133, Apr. 2, 2018.

6

have noted on a forum that the intense heat from the engine was what was causing the exhaust silencer, also known as a muffler, to crack on the side facing the engine.[21]

16.    The same day, Polaris announced another voluntary field action for the 2017-2018 RZR 570, 2016-2018 RZR S 1000, 2016-2018 RZR XP/XP 4 Turbo, and 2017-2018 Ace 500, 570, and 900 models.  The Ace is a one-seat side-by-side vehicle that shares many characteristics of an ATV. The 2017-2018 Ace vehicles contain a ProStar engine with the exhaust pipe in the same configuration as the other models.  This time, Polaris said the vehicles contained a fuel pump flange assembly that could degrade when exposed to certain chemicals over time, resulting in a fuel leak that could catch fire in the presence of an ignition source.[22]  Polaris' solution was reportedly to install a cover over the fuel pump to protect it from chemical exposure, which shows Polaris used an inadequate material for the assembly within an unforgiving environment.

17.    In sum, all RZR models with the centerline-mounted ProStar engine have been recalled through model year 2018, several for all model years produced.  Prior to the incorporation of the centerline-mounted ProStar Engine in the tight compartment, only 330 total RZR vehicles had been recalled.

18.    Recalls of subsequent model years have also been issued. In May 2021, Polaris recalled 32 model year 2021 RZR Pro XP and Pro XP 4 (the replacement for the

---

[21]  RZRForums.Net, posted by JGKopp, Fuel rail causing fires?, post no. 62, Jan. 26, 2016, available at http://www.rzrforums.net/rzr-xp-4-1000/183116-fuel-rail-causing-fires-5.html.
[22] Polaris Indus., Polaris Issues Voluntary Field Action for Certain RZR and ACE Models, Apr. 2, 2018.

Turbo models) because the vehicles were made without copper seal washers on the turbocharger's oil supply line, which could result in an oil leak that posed a fire risk.[23]

19.    In July 2021, Polaris expanded the recall of the 2021 RZR Pro XP and XP 4, citing a raised edge on the surface of the turbocharger castings that could result in an oil leak, presumably from puncturing the line.[24]

20.    Recently, in April 2022, Polaris issued a Stop Ride/Stop Sale notice, but not a recall, for 1,285 model year 2022 RZR Pro R 4 Premium and Ultimate Models that have an incorrectly routed battery cable, which may contact the prop shaft. That could cause an electrical short, resulting in a fire hazard.[25]

### 2. Ranger Recalls

21.    At the same time the series of RZR recalls were unfolding, the Ranger vehicles with ProStar engines were also being recalled for excessive heat that could result in melting and fires.

22.    In June 2016, Polaris recalled 43,000 model year 2015-2016 Ranger 570 and Crew 570 series vehicles. The U.S. recall stated that the vehicles could overheat during heavy engine loading, slow-speed intermittent use and/or high outdoor temperatures, causing them to catch fire.[26] However, Canada's recall statement explained that the culprit was that the excessively hot exhaust system in a confined space with little air flow could

---

[23] Polaris Indus., Recall No. 21-744, May 31, 2021.
[24] Polaris Indus., Recall No. 21-766, July 22, 2022.
[25] Polaris Indus., "Polaris Issues Stop Ride/Stop Sale for Some Model Year 2022 RZR Pro R 4 Premium and Ultimate Models," Apr. 4, 2022.
[26] Polaris Indus., Recall No. 16-755, June 28, 2016.

set the seat close-off panel on fire.[27]  The remedy was a new heat shield between the engine exhaust and the seat panel.[28]  Polaris had received 36 reports of fire, including three minor burns and one sprained ankle associated with escaping the burning vehicle.[29]

23.     In September 2016, Polaris recalled 42,500 model year 2014 Ranger XP 900 and Crew 900 vehicles, stating it had received 36 reports of fire, including three minor injuries.[30]  The TSB for this recall specified that the fasteners for the cargo box heat shield could become loose, failing to protect the passenger seat panel from exhaust heat.[31]

24.     In April 2017, Polaris expanded the 2016 recall to include model year 2015 vehicles after receiving 13 incident reports, including five fires.[32]  This expanded recall asserted that the heat shield could fall off the vehicle.  Owners reported the heat shields were coming off because the metal attaching bolts were heating up to the point that they melt the plastic panel to which the shields are attached.[33]

25.     In October 2020, Polaris issued a Stop Ride/Stop Sale notice for the 2016-2018 General vehicles.[34]  This Stop Ride/Stop Sale notice – which was purportedly sent to dealers and customers but did not become an official recall subject to CPSC monitoring –

---

[27] Canada Recall and Safety Alerts No. 2016326, June 27, 2016.
[28] *Id.*
[29] Polaris Indus., Recall No. 16-755, June 28, 2016.
[30] Polaris Indus., Recall No. 16-264, Sept. 15, 2016.
[31] Polaris Indus., Tech. Serv. Bulletin R-16-03, Sept. 15, 2016.
[32] Polaris Indus., Recall No. 17-132, Apr. 13, 2017.
[33] PRCForum.com, posted by Chris, 2014 900 potential fire issue, June 22, 2015, available at http://www.prcforum.com/forum/26-ranger-problems-solutions/61961-2014-900-potential-fire-issue.html
[34] Polaris Indus., "Polaris Issues Stop Ride/Stop Sale on Model Year 2016-2018 GENERAL Vehicles," Oct. 16, 2020.

also asserted that the fire risk was posed by "a fuel pump flange assembly that, when exposed to certain chemicals, can degrade over time and crack or experience a nozzle separation, which may result in a fuel leak." Polaris stated there had been no reports of injuries related to this root cause but stated it did not have a remedy, as it was "currently evaluating a comprehensive repair procedure to address this concern."[35] Because it was not an official recall subject to CPSC monitoring, there is no record of the eventual band-aid remedy Polaris devised.

26.    In December 2020, Polaris issued a Stop Ride/Stop Sale notice for 45,000 model year 2020-2021 Ranger 1000 models, 2020 Pro XD models, 2020-2021 Gravely models, and 2020-2021 Bobcat models because they "may experience damage to the vehicle's fuel line in the event a drive belt breaks or fails during operation. Damage to the fuel line can cause a fuel leak which may result in fire."[36] Polaris had received two reports of fire and one report of a drive belt failure and damage to the fuel line that did not result in fire.[37] This Stop Ride/Stop Sale notice eventually became CPSC recall number 21-732, which listed the remedy only as "repair."[38] Although this recall included only 2020-2021 model year vehicles, it applied to vehicles sold beginning in 2018, well before the 2020 model year would have reached the market.

---

[35] *Id.*

[36] Polaris Indus., "Polaris Issues Stop Sale/Stop Ride for Some 2020-2021 Ranger 1000 Models, 2020 Pro XD Models, 2020-2021 Gravely Models and 2020-2021 Bobcat Models," Dec. 9, 2020.

[37] *Id.*

[38] Polaris Indus., Recall No. 21-732, Mar. 25, 2021.

# EXHIBIT B



**BARON  BUDD, P.C.®**

DALLAS | BATON ROUGE | NEW ORLEANS | LOS ANGELES
SAN DIEGO | CHICO | NEW YORK | WASHINGTON, D.C.

Home Office:
Encino Plaza                  3102 Oak Lawn Avenue
15910 Ventura Blvd.                    Suite 1100
Suite 1600              Dallas, TX 75219-4281
Encino, CA 91436                    800.222.2766
800.887.6989                 tel 214.521.3605
tel 818.839.2333               fax 214.520.1181
fax 214.520.1181

April 22, 2022

**VIA PERSONAL SERVICE**

Polaris Industries, Inc.
C/O The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

> Re:   Notice of violations of California Consumers Legal Remedies Act and other state
> consumer protection statutes and breach of warranties

To Whom It May Concern:

We represent owners of certain recreational off-road vehicles ("Class Vehicles")[1] manufactured by Polaris and sold in California that all suffer from a common design defect (the "Defect"). This Defect causes the Class Vehicles' engine compartments to reach temperatures in excess of that which the vehicles' components are designed to withstand. The Defect is present in every single Class Vehicle, results in degraded vehicle components, and has caused numerous injuries and deaths, putting all owners' lives at risk.

Plaintiff James DeBiasio ("Plaintiff") alleges that the Class Vehicles are equipped with a high-powered "ProStar" engine that is located directly behind the occupant compartment in a tight space that restricts airflow and provides the surrounding components with little clearance from the hot exhaust and the complex series of insufficient heat shields. The Class Vehicles' tight engine compartment is also covered by a plastic bed, further reducing airflow. As a result, the extremely high temperatures, combined with inadequate cooling and heat shielding, result in the degradation and melting of the surrounding components, including fuel system components, leading to a reduced life cycle and compromised parts and assemblies. This defective design also puts Plaintiff and the proposed Class members at risk of serious injury or death due to fire risks caused by components that have been thermally damaged. Put simply, the Defect renders the Class Vehicles unsafe and has caused Plaintiff and the proposed Class members to suffer economic harm.

---

[1] The vehicles at issue are the: 2011-2014 RZR XP 900 series, 2012-2018 RZR 570 series, 2014-2018 RZR XP 1000 series, 2015-2018 RZR 900 and S 900 series, 2016-2018 RZR XP Turbo series, 2016-2018 General 1000 series, 2014-2018 Ranger XP 900 series, 2017-2018 Ranger XP 1000, 2014-2018 Ranger Crew XP 900, 2014-2018 Ranger 570 series, 2014-2018 Ranger 570 Crew series, 2017-2018 Ranger 500, 2017-2018 Ace 500, 2017-2018 Ace 570, and 2017-2018 Ace 900.

April 22, 2022
Page 2

Plaintiff understands that Polaris first debuted the "ProStar" engine design at issue here in its 2011 RZR XP 900. Unlike the engines in its older models, the "ProStar" engine used in the 2011 RZR XP 900 was placed squarely behind the occupant compartment, with the exhaust manifold and header pipe exiting forward toward the occupants, only inches from the seats and seat belts. The pipe then turns 180 degrees, creating a U-shape, where it is connected to the remainder of the exhaust piping, located longitudinally in the engine compartment along the upper right side of the engine head and attached to the silencer (a.k.a., the muffler), which is mounted at the rear of the vehicle inches from the back of the engine. Based on the information available to date, we understand that all Class Vehicles are designed this way.

Plaintiff alleges that after the release of the first Class Vehicle, the 2011 RZR XP 900, Polaris immediately became aware of thermal degradation issues. Yet, Polaris continued to equip Class Vehicles with the "ProStar" engine and exhaust located in a tight compartment directly behind the occupants through at least 2018. Our investigation has identified numerous recalls of Class Vehicles due to the Defect having caused melting components, hundreds of fires, dozens of severe injuries, and at least four deaths.

Polaris has failed to disclose the risks posed by Defect to Plaintiff and proposed Class members. Instead, Polaris withheld material facts that contradicted its representations regarding the reliability, safety, and performance of its Class Vehicles. Plaintiff and proposed Class members were harmed and suffered actual damages as a result. They purchased vehicles that are of a lesser standard, grade, and quality than represented, do not meet ordinary and reasonable consumer expectations regarding safe and reliable operation, and are unfit for their intended purpose. Purchasers of the Vehicles paid more—through a higher purchase price—than they would have otherwise paid had the Defect been disclosed.

Polaris's conduct constitutes fraudulent, deceptive, and unfair business practices. This conduct violated Cal. Civ. Code § 1770(a) by, among other things:

- Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have. (Cal. Civ. Code § 1770(a)(5)).

- Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. (Cal. Civ. Code § 1770(a)(7)).

- Advertising goods or services with intent not to sell them as advertised. (Cal. Civ. Code § 1770(a)(9)).

To the extent required under the laws of California, this letter constitutes notice by Plaintiff, on behalf of himself and the proposed Class, of violations of California law, including violation of

April 22, 2022
Page 3

the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*, and of Plaintiff's intent to bring claims for damages against Polaris unless it promptly cures such violations.[2]

Polaris also breached express and implied warranties made to Plaintiff and the proposed Class by manufacturing the Class Vehicles with a dangerous defect. As a result, the Class Vehicles are not merchantable and are unfit for their intended purpose. Polaris has not cured the Defect. Accordingly, Polaris has violated the Song-Beverly Consumer Warranty Act for Breach of Express Warranty and the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty.

Plaintiff and the proposed Class hereby request that within thirty (30) days of receiving this letter, Polaris agrees to (1) buy-back, correct, permanently repair, replace, or otherwise rectify the Class Vehicles, and (2) reimburse Plaintiff and all proposed Class members for any associated out-of-pocket expenses. Absent such action from Polaris, we intend to bring claims for damages as permitted by Cal. Civ. Code § 1782(d), in addition to our claims for equitable, injunctive, and other relief available under applicable law, including attorneys' fees.

We invite you to contact us to discuss these allegations at your earliest convenience. We look forward to hearing from you.

Sincerely,

*/s/ Roland Tellis*

Roland Tellis

cc:     David Fernandes, Baron & Budd, P.C.
        Courtney Davenport, The Davenport Law Firm LLC
        Adam Levitt, DiCello Levitt Gutzler
        John Tangren, DiCello Levitt Gutzler
        Daniel Ferri, DiCello Levitt Gutzler

---

[2] Plaintiff also intends to bring claims for fraudulent omission, unjust enrichment, and violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

| Attorney or Party without Attorney:<br>Roland Tellis<br>BARON & BUDD P.C.<br>15910 Ventura Boulevard Suite 1600<br>Encino, CA 91436<br>Telephone No: 818-839-2333<br><br>Attorney For: | | | | For Court Use Only |
|---|---|---|---|---|
| | | Ref. No. or File No.: | | |
| Insert name of Court, and Judicial District and Branch Court: | | | | |
| Plaintiff:<br>Defendant: | | | | |
| **PROOF OF SERVICE** | Hearing Date: | Time: | Dept/Div: | Case Number: |

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of the Letter Dated April 22, 2022 Re: Notice of violations of California Consumers Legal Remedies Act and other state consumer protection statutes and breach of warranties.

3. a. Party served: Polaris Industries, Inc.
   b. Person served: Amy McLaren, The Corporation Trust Company, Registered Agent.

4. Address where the party was served: 1209 N Orange St, Wilmington, DE 19801

5. I served the party:
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Fri, Apr 22 2022 (2) at: 12:46 PM

6. Person Who Served Papers:
   a. John Garber
   b. FIRST LEGAL
      1517 W. Beverly Blvd.
      LOS ANGELES, CA 90026
   c. (213) 250-1111

   d. The Fee for Service was:

7. I declare under penalty of perjury that the foregoing is true and correct.

<table>
<tr><td>04/22/2022</td><td></td></tr>
<tr><td>(Date)</td><td>(Signature)</td></tr>
</table>



PROOF OF
SERVICE

6989046
(4962305)

Electronically FILED by Superior Court of California, County of Los Angeles on 04/28/2022 01:06 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton, Deputy Clerk

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): 22STCV14289 | FOR COURT USE ONLY |
|---|---|
| Roland Tellis (SBN 186269) BARON & BUDD, P.C., 15910 Ventura Blvd., #1600, Encino, CA 91436 | |

TELEPHONE NO.: (818)839-2333   FAX NO. (Optional):

E-MAIL ADDRESS: rtellis@baronbudd.com

ATTORNEY FOR (Name): PLAINTIFF JAMES DEBIASIO

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES

STREET ADDRESS: 111 N. Hill Street

MAILING ADDRESS: 111 N. Hill Street

CITY AND ZIP CODE: Los Angeles, CA 90012

BRANCH NAME: CENTRAL

CASE NAME: JAMES DEBIASIO v POLARIS INDUSTRIES, INC.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | 22STCV14289 |
| | | | | JUDGE: |
| | | | | DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[X] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [X] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [X] punitive

4. Number of causes of action (specify): SIX (6)

5. This case [X] is   [ ] is not   a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 04/28/2022

Roland Tellis                                                /s/Roland Tellis
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev.September 1, 2021] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courts.ca.gov |
|---|---|---|

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or
toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil
harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

**For your protection and privacy, please press the Clear
This Form button after you have printed the form.**

| Print this form. | | Save this form | | Clear this form. |

| SHORT TITLE: DEBIASIO v. POLARIS INDUSTRIES, INC. | CASE NUMBER 22STCV14289 |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND
# STATEMENT OF LOCATION
# (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Court Filing Location (Column C) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage | 1, 11 |
| | | ☐ A7221 Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☒ A7260 Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240 Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270 Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

| SHORT TITLE: | CASE NUMBER |
|---|---|
| DEBIASIO v. POLARIS INDUSTRIES, INC. | |

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons – See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE: | DEBIASIO v. POLARIS INDUSTRIES, INC. | CASE NUMBER | |
|---|---|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims<br>from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not<br>Specified Above) (43) | ☐ A6121  Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 3 of 4

| SHORT TITLE: DEBIASIO v. POLARIS INDUSTRIES, INC. | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address**: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: | ADDRESS: |
|---|---|
| ☒ 1. ☐ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7.  ☐ 8. ☐ 9. ☐ 10. ☐ 11. | |

| CITY: | STATE: | ZIP CODE: |
|---|---|---|

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the _____ Central _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: _____ 04/28/2022 _____

_____ /s/Roland Tellis _____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

 **Superior Court of California, County of Los Angeles**

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

### What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

### Advantages of ADR
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

## How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

   - **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
   - **JAMS, Inc.** Assistant Manager Reggie Joseph, RJoseph@jamsadr.com (310) 309-6209
   - **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion.** They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs**
   https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

   Day of trial mediation programs have been paused until further notice.

   **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC)**: MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                      FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lacourt.org** under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
   (INSERT DATE)                                    (INSERT DATE)
   complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____          ➤ _____
         (TYPE OR PRINT NAME)                          (ATTORNEY FOR PLAINTIFF)
Date:

_____          ➤ – _____
         (TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)
Date:

_____          ➤ _____
         (TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)
Date:

_____          ➤ _____
         (TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)
Date:

_____          ➤ _____
         (TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)
Date:

_____          ➤ _____
         (TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)
Date:

_____          ➤ _____
         (TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| | | |

TELEPHONE NO.:            FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

     iii.   Be filed within two (2) court days of receipt of the Request; and

     iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
| --- | --- |
| | |

## The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

[ Print ]  [ Save ]                          [ Clear ]

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:                     FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

   ☐   Request for Informal Discovery Conference
   ☐   Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

Print     Save     Clear



| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                          FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

    a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

    b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

## The following parties stipulate:

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR PLAINTIFF)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

Date:

_____          ➢ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

## THE COURT SO ORDERS.

Date: _____

_____
JUDICIAL OFFICER

[ Print ]          [ Save ]                                    [ Clear ]

**FILED**

LOS ANGELES SUPERIOR COURT

MAY 11 2011

JOHN A. CLARKE, CLERK

*N. Navarro*

BY NANCY NAVARRO, DEPUTY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| General Order Re ) | ORDER PURSUANT TO CCP 1054(a), |
| Use of Voluntary Efficient Litigation ) | EXTENDING TIME TO RESPOND BY |
| Stipulations ) | 30 DAYS WHEN PARTIES AGREE |
| ) | TO EARLY ORGANIZATIONAL |
| ) | MEETING STIPULATION |
| ) | |

Whereas the Los Angeles Superior Court and the Executive Committee of the Litigation Section of the Los Angeles County Bar Association have cooperated in drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los Angeles County Bar Association Labor and Employment Law Section; the Consumer Attorneys Association of Los Angeles; the Association of Southern California Defense Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California Employment Lawyers Association all "endorse the goal of promoting efficiency in litigation, and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases;"

-1-

ORDER PURSUANT TO CCP 1054(a)

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation.  This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

-2-

ORDER PURSUANT TO CCP 1054(a)

by Code of Civil Procedure section 1054(a) without further need of a specific court order.

DATED: _May 11, 2011_                _Carolyn B. Kuhl_

Carolyn B. Kuhl, Supervising Judge of the
Civil Departments, Los Angeles Superior Court

-3-

ORDER PURSUANT TO CCP 1054(a)

**FILED**
Superior Court of California
County of Los Angeles

2020-SJ-002-00

FEB 24 2020

Sherri R Carter, Executive Officer/Clerk

By _____ Deputy

1

2

3           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

4                **FOR THE COUNTY OF LOS ANGELES**

5

6    IN RE PERSONAL INJURY              ) CASE NO.: 22STCV14289
     COURT ("PI COURT") PROCEDURES     )
7    SPRING STREET COURTHOUSE          ) FIRST AMENDED STANDING ORDER
     (EFFECTIVE FEBRUARY 24, 2020)     ) RE:  PERSONAL INJURY PROCEDURES
8    _____ ) AT THE SPRING STREET COURTHOUSE

9

10

11           **ALL HEARINGS ARE SET IN THE DEPARTMENT AS
             REFLECTED IN THE NOTICE OF CASE ASSIGNMENT**

12

13           **FINAL STATUS CONFERENCE:**

14                 DATE: _____ AT 10:00 A.M.

15           **TRIAL:**

16                 DATE: _____ AT 8:30 A.M.

17
             **OSC RE DISMISSAL**
18           **(CODE CIV. PROC., § 583.210):**

19                 DATE: _____ AT 8:30 A.M.

20

21    TO EACH PARTY AND TO THE ATTORNEY OF RECORD FOR EACH PARTY:

22        Pursuant to the California Code of Civil Procedure ("C.C.P."), the California Rules of

23   Court ("C.R.C.") and the Los Angeles County Court Rules ("Local Rules"), the Los Angeles

24   Superior Court ("LASC" or "Court") HEREBY AMENDS AND SUPERSEDES THE

25   SEPTEMBER 26, 2019 STANDING ORDER AND, GENERALLY ORDERS AS FOLLOWS

26   IN THIS AND ALL OTHER GENERAL JURISDICTION PERSONAL INJURY ("PI")

27   ACTIONS FILED IN THE CENTRAL DISTRICT.

28   ///

Page 1 of 7

1.     To ensure proper assignment to a PI Court, plaintiff(s) must carefully fill out the Civil Case Cover Sheet Addendum (form LACIV 109). The Court defines "personal injury" as: "an unlimited civil case described on the Civil Case Cover Sheet Addendum and Statement of Location (LACIV 109) as Motor Vehicle-Personal Injury/Property Damage/Wrongful Death; Personal Injury/Property Damage/Wrongful Death-Uninsured Motorist; Product Liability (other than asbestos or toxic/environmental); Medical Malpractice-Physicians & Surgeons; Other Professional Health Care Malpractice; Premises Liability; Intentional Bodily Injury/Property Damage/Wrongful Death; or Other Personal Injury/Property Damage/Wrongful Death. An action for intentional infliction of emotional distress, defamation, civil rights/discrimination, or malpractice (other than medical malpractice), is not included in this definition. An action for injury to real property is not included in this definition" (Local Rule 2.3(a)(1) (A)).

Consistent with Local Rule 2.3(a)(1)(A), the Court will assign a case to the PI Courts if plaintiff(s) checks any of the following boxes in the Civil Case Cover Sheet Addendum:

☐   A7100 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death

☐   A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist

☐   A7260 Product Liability (not asbestos or toxic/environmental)

☐   A7210 Medical Malpractice – Physicians & Surgeons

☐   A7240 Medical Malpractice – Other Professional Health Care Malpractice

☐   A7250 Premises Liability (e.g., slip and fall)

☐   A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism etc.)

☐   A7220 Other Personal Injury/Property Damage/Wrongful Death

The Court will not assign cases to the PI Courts if plaintiff(s) checks any boxes elsewhere in the Civil Case Cover Sheet Addendum (any boxes on pages two and three of that form).

The Court sets the above dates in this action in the PI Court as reflected in the Notice of Case Assignment at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA

2020-SJ-002-00

1  90012 (C.R.C. Rules 3.714(b)(3), 3.729).

2  **FILING OF DOCUMENTS**

3  2.      With the exception of self-represented litigants or parties or attorneys that have obtained

4  an exemption from mandatory electronic filing, parties must electronically file documents.

5  Filings are no longer accepted via facsimile.  The requirements for electronic filing are detailed

6  in the Court's operative General Order Re Mandatory Electronic Filing for Civil, available online

7  at www.lacourt.org (link on homepage).

8  **SERVICE OF SUMMONS AND COMPLAINT**

9  3.      Plaintiff(s) shall serve the summons and complaint in this action upon defendant(s) as

10  soon as possible but no later than three years from the date when the complaint is filed

11  (C.C.P. § 583.210, subd. (a)).  On the OSC re Dismissal date noted above, the PI Court will

12  dismiss the action and/or all unserved parties unless the plaintiff(s) shows cause why the action

13  or the unserved parties should not be dismissed (C.C.P. §§ 583.250; 581, subd. (b)(4)).

14  4.      The Court sets the above trial and final status conference ("FSC") dates on the condition

15  that plaintiff(s) effectuate service on defendant(s) of the summons and complaint within six

16  months of filing the complaint.

17  5.      The PI Court will dismiss the case without prejudice pursuant to Code of Civil Procedure

18  § 581 when no party appears for trial.

19  **STIPULATIONS TO CONTINUE TRIAL**

20  6.      Provided that all parties agree (and there is no violation of the "five-year rule" (C.C.P.

21  § 583.310)), the parties may advance or continue any trial date in the PI Courts without showing

22  good cause or articulating any reason or justification for the change.  To continue or advance a

23  trial date, the parties (or their counsel of record) should jointly execute and submit a Stipulation

24  to Continue Trial, FSC and Related Motion/Discovery Dates (form LACIV CTRL-242, available

25  on the court's website, Personal Injury Court link).  The PI Courts schedule FSCs at 10:00 a.m.,

26  eight court days before the trial date.  Parties seeking to continue the trial and FSC dates shall

27  file the stipulation at least eight court days before the FSC date.  Parties seeking to advance the

28  trial and FSC dates shall file the stipulation at least eight court days before the proposed advanced

Page 3 of 7

First Amended Standing Order Re Personal Injury Procedures, Spring Street Courthouse

FSC date (C.C.P. § 595.2;  Govt. Code § 70617, subd. (c)(2)). In selecting a new trial date, parties should avoid setting on any Monday, or the Tuesday following a court holiday.  Parties may submit a maximum of two stipulations to continue trial, for a total continuance of six months. Subsequent requests to continue trial will be granted upon a showing of good cause by noticed motion.  This rule is retroactive so that any previously granted stipulation to continue trial will count toward the maximum number of allowed continuances.

**NO CASE MANAGEMENT CONFERENCES**

7.      The PI Courts do not conduct case management conferences.  The parties need not file a Case Management Statement.

**LAW AND MOTION**

8.      Any and all electronically-filed documents must be text searchable and bookmarked. (*See* operative General Order re Mandatory Electronic Filing in Civil).

**COURTESY COPIES REQUIRED**

9.      Pursuant to the operative General Order re Mandatory Electronic Filing, courtesy copies of certain documents must be submitted directly to the PI Court courtrooms at the Spring Street Courthouse. The PI Courts also strongly encourage the parties filing and opposing lengthy motions, such as motions for summary judgment/adjudication, to submit one or more three-ring binders organizing the courtesy copy behind tabs. Any courtesy copies of documents with declarations and/or exhibits must be tabbed (C.R.C. Rule 3.1110(f)).  All deposition excerpts referenced in briefs must be marked on the transcripts attached as exhibits (C.R.C. Rule 3.1116(c)).

**RESERVATION HEARING DATE**

10.     Parties must reserve hearing dates for motions in the PI Courts using the Court Reservation System (CRS) available online at *www.lacourt.org* (link on homepage).  After reserving a motion hearing date, the reservation requestor must submit the papers for filing with the reservation receipt number printed on the face page of the document under the caption and attach the reservation receipt as the last page.  Parties or counsel who are unable to utilize the online CRS may reserve a motion hearing date by calling the PI courtroom, Monday through

1  Friday, between 3:00 p.m. and 4:00 p.m.

2  **WITHDRAWAL OF MOTIONS**

3  11.     California Rules of Court, Rule 3.1304(b) requires a moving party to notify the court
4  immediately if a matter will not be heard on the scheduled date. In keeping with that rule, the
5  PI Courts require parties to comply with Code of Civil Procedure section 472(a) with regard to
6  the amending of pleadings related to demurrers or motions to strike so that the PI Courts do not
7  needlessly prepare tentative rulings for these matters.

8  **DISCOVERY MOTIONS**

9  12.     The purpose of an Informal Discovery Conference ("IDC") is to assist the parties to
10  resolve and/or narrow the scope of discovery disputes. Lead trial counsel on each side, or another
11  attorney with full authority to make binding agreements, must attend in person. The PI judges
12  have found that, in nearly every case, the parties amicably resolve disputes with the assistance
13  of the Court.

14  13.     Parties **must** participate in an IDC **before** a Motion to Compel Further Responses to
15  Discovery will be heard unless the moving party submits evidence, by way of declaration, that
16  the opposing party has failed or refused to participate in an IDC. Scheduling or participating in
17  an IDC does not automatically extend any deadlines imposed by the Code of Civil Procedure for
18  noticing and filing discovery motions. Ideally, the parties should participate in an IDC before a
19  motion is filed because the IDC may avoid the necessity of a motion or reduce its scope. Because
20  of that possibility, attorneys are encouraged to stipulate to extend the 45 (or 60) day deadline for
21  filing a motion to compel further discovery responses in order to allow time to participate in an
22  IDC.

23      If parties do not stipulate to extend the deadlines, the moving party may file the motion
24  to avoid it being deemed untimely. However, the IDC must take place before the motion is
25  heard so it is suggested that the moving party reserve a date for the motion hearing that is at least
26  60 days after the date when the IDC reservation is made. Motions to Compel Further Discovery
27  Responses are heard at 10:00 a.m. If the IDC is not productive, the moving party may advance
28  the hearing on a Motion to Compel Further Discovery Responses on any available hearing date

1   that complies with the notice requirements of the Code of Civil Procedure.

2   14.     Parties must reserve IDC dates in the PI Courts using CRS, which is available online at

3   www.lacourt.org (link on homepage). Parties must meet and confer regarding the available dates

4   in CRS prior to accessing the system. After reserving the IDC date, the reservation requestor

5   must file and serve an Informal Discovery Conference Form for Personal Injury Courts (form

6   LACIV 239) at least 15 court days prior to the conference and attach the CRS reservation receipt

7   as the last page. The opposing party may file and serve a responsive IDC form, briefly setting

8   forth that party's response, at least ten court days prior to the IDC.

9   15.     Time permitting, the PI Hub judges may be available to participate in IDCs to try to

10   resolve other types of discovery disputes.

11   **EX PARTE APPLICATIONS**

12   16.     Under the California Rules of Court, courts may only grant *ex parte* relief upon a

13   showing, by admissible evidence, that the moving party will suffer "irreparable harm,"

14   "immediate danger," or where the moving party identifies "a statutory basis for granting relief

15   ex parte" (C.R.C. Rule 3.1202(c)). The PI Courts have no capacity to hear multiple *ex parte*

16   applications or to shorten time to add hearings to their fully booked motion calendars. The PI

17   Courts do not regard the Court's unavailability for timely motion hearings as an "immediate

18   danger" or threat of "irreparable harm" justifying *ex parte* relief. Instead of seeking *ex parte*

19   relief, the moving party should reserve the earliest available motion hearing date (even if it is

20   after the scheduled trial date) and file a motion to continue trial. Parties should also check

21   CRS from time to time because earlier hearing dates may become available as cases settle or

22   hearings are taken off calendar.

23   **REQUEST FOR TRANSFER TO INDEPENDENT CALENDAR DEPARTMENT**

24   17.     Parties seeking to transfer a case from a PI Court to an Independent Calendar ("IC")

25   Court shall file and serve the Court's "Motion/Opposition/Stipulation to Transfer Complicated

26   Personal Injury Case to Independent Calendar Court" (form LACIV 238, available on the Court's

27   website under the PI Courts link). The PI Courts will transfer a matter to an IC Court if the case

28   is not a "Personal Injury" case as defined in this Order, or if it is "complicated." In determining

1  whether a personal injury case is "complicated" the PI Courts will consider, among other things,

2  the number of pretrial hearings or the complexity of issues presented.

3  18.  Parties opposing a motion to transfer have five court days to file an Opposition (using

4  the same LACIV 238 Motion to Transfer form).

5  19.  The PI Courts will not conduct a hearing on any Motion to Transfer to IC Court. Although

6  the parties may stipulate to transfer a case to an Independent Calendar Department, the PI Courts

7  will make an independent determination whether to transfer the case or not.

8  **FINAL STATUS CONFERENCE**

9  20.  Parties shall comply with the requirements of the PI Courts' operative Standing Order

10  Re Final Status Conference, which shall be served with the summons and complaint.

11  **JURY FEES**

12  21.  Parties must pay jury fees no later than 365 calendar days after the filing of the initial

13  complaint (C. C. P. § 631, subd. (c)(2)).

14  **JURY TRIALS**

15  22.  The PI Courts do not conduct jury trials. On the trial date, a PI Court will contact the

16  Master Calendar Court, Department One, in the Stanley Mosk Courthouse. Department One

17  will assign cases for trial to dedicated Civil Trial Courtrooms and designated Criminal

18  Courtrooms.

19  **SANCTIONS**

20  23.  The Court has discretion to impose sanctions for any violation of this general order

21  (C.C.P. §§ 128.7, 187 and Gov. Code, § 68608, subd. (b)).

22

23

24  Dated:  Feb. 24, 2020

25  SAMANTHA P. JESSNER
   Supervising Judge of Civil Courts

26

27

28

Page 7 of 7

First Amended Standing Order Re Personal Injury Procedures, Spring Street Courthouse

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>04/28/2022<br><br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ R. Lozano _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>22STCV14289 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

|   | ASSIGNED JUDGE | DEPT | ROOM |   |   | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Elihu M. Berle | 6 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 04/29/2022
   (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By R. Lozano _____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

**FILED**
Superior Court of California
County of Los Angeles

2021-SJ-018-00

**OCT 08 2021**

Sherri R Carter, Executive Officer/Clerk

By_____ Deputy
Lohana Aubine

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT

In re Personal Injury Cases Assigned
to the Personal Injury Courts at the
Spring Street Courthouse

)
)
)
)
)
)
)

SECOND AMENDED SUPPLEMENTAL
STANDING ORDER RE COVID
PROTECTIVE MEASURES RELATED TO
FINAL STATUS CONFERENCES IN
PERSONAL INJURY CASES AT THE
SPRING STREET COURTHOUSE

In an effort to reduce the number of in-person appearances in the Personal Injury ("PI") courtrooms located in the Spring Street courthouse and to prevent the transmission of the COVID-19 virus, the court hereby issues this supplemental order to the Third Amended Standing Order re: Final Status Conference Personal Injury Courts dated February 24, 2020 ("Operative PI FSC Order").

## 1. ELECTRONIC TRIAL BINDERS

As set forth in the Operative PI FSC Order, parties/counsel must file and serve Trial Readiness Documents at least five calendar days prior to the FSC. Instead of providing the court that will be conducting the FSC with the trial binders as described in the Operative PI FSC Order and appearing in person, parties/counsel are ordered to provide the trial binders in electronic form. This will allow parties and attorneys to appear remotely for the final status conference and provide the court with the opportunity to review the trial binders to determine whether the parties/counsel are ready for trial. Hard copies of the binders prepared in accordance with the Operative PI FSC Order will continue to be required for the trial courtroom.

///

SECOND AMENDED SUPPLEMENTAL STANDING ORDER RE COVID PROTECTIVE MEASURES RELATED TO FINAL STATUS CONFERENCES IN PERSONAL INJURY CASES AT THE SPRING STREET COURTHOUSE

## 2.   REQUIREMENTS OF ELECTRONIC TRIAL BINDERS

At least two court days before the FSC, parties/counsel must submit via email a joint electronic trial binder to the courtroom conducting the FSC as follows:

a.   The parties/counsel must submit in one PDF the joint statement of the case, joint witness list, joint list of jury instructions, full-text joint and contested jury instructions, joint and/or contested verdict form(s), joint exhibit list, and joint deposition designation chart as listed in paragraph 4 of the Operative PI FSC Order.

b.   The trial briefs and motions in limine, oppositions, and replies, if any, must be submitted in a separate PDF.

c.   The PDFs must be text searchable.

d.   The PDFs must be bookmarked which is essentially an electronic tab so that the FSC judge can easily find and navigate among the trial documents. (See https://helpx.adobe.com/acrobat/using/page-thumbnails-bookmarks-pdfs.html and/or https://support.microsoft.com/en-us/office/ for bookmarking instructions).

e.   The PDFs must be emailed to the applicable email address listed below:

Department 27 at sscdept27FSC@LACourt.org

Department 28 at sscdept28FSC@LACourt.org

Department 29 at sscdept29FSC@LACourt.org

Department 30 at sscdept30FSC@LACourt.org

Department 31 at sscdept31FSC@LACourt.org

Department 32 at sscdept32FSC@LACourt.org

f.   The subject line in the email must include identifying case information as follows:

[Insert Case Number] Trial Readiness Binder, FSC, [Insert MM/DD/YEAR of Hearing Date] (e.g. 19STCV00001 Trial Readiness Binder, FSC 01/11/2021).

SECOND AMENDED SUPPLEMENTAL STANDING ORDER RE COVID PROTECTIVE MEASURES RELATED TO FINAL STATUS CONFERENCES IN PERSONAL INJURY CASES AT THE SPRING STREET COURTHOUSE

g.   Each email should have two PDFs attached – one containing the Trial Readiness documents and the other containing the trial briefs and motions in limine, if applicable.

h.   The parties need not submit the evidentiary exhibit binders at the FSC. However, the parties shall prepare the exhibit binders as required in paragraph 5 of the Operative PI FSC Order and be prepared to represent to the court that they have been properly prepared. Hard copies of the exhibit binders will be required for trial.

**3.   FAILURE TO COMPLY WITH FSC OBLIGATIONS**

The court has discretion to require any party/counsel who fails or refuses to comply with this Supplemental Standing Order to show cause why the Court should not impose monetary, evidentiary and/or issue sanctions (including the entry of a default or the striking of an answer). In addition, failure to timely and fully comply with this order may result in the case not being assigned a trial courtroom by Dept. 1.

Dated: _10/8/2021_

David J. Cowan
Supervising Judge, Civil
Los Angeles Superior Court

SECOND AMENDED SUPPLEMENTAL STANDING ORDER RE COVID PROTECTIVE MEASURES RELATED TO FINAL STATUS CONFERENCES IN PERSONAL INJURY CASES AT THE SPRING STREET COURTHOUSE

**FILED**   2021-SJ-008-00
Superior Court of California
County of Los Angeles

**JUN 23 2021**

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
Cortez Albino

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE PERSONAL INJURY CASES )
ASSIGNED TO PERSONAL INJURY )
COURTROOMS AT THE SPRING STREET )
COURTHOUSE )
)
)
)
)
)

SIXTH AMENDED STANDING ORDER
RE: MANDATORY SETTLEMENT
CONFERENCE
(Effective June 21, 2021)

TO EACH PARTY AND TO THE ATTORNEY OF RECORD FOR EACH PARTY:

Pursuant to California Code of Civil Procedure, the California Rules of Court and the Los Angeles Court Rules, the Los Angeles Superior Court (Court) HEREBY AMENDS AND SUPERSEDES THE FEBRUARY 24, 2020 FIFTH AMENDED STANDING ORDER, AND THE COURT HEREBY ISSUES THE FOLLOWING SIXTH AMENDED STANDING ORDER:

The Court orders the parties to participate in a virtual Mandatory Settlement Conference (MSC) supervised by a judge and staffed by volunteer attorneys who have significant experience in handling these types of cases and are members of the American Board of Trial Advocates, the Association of Southern California Defense Counsel, the Consumer Attorneys Association of Los Angeles, and or the Beverly Hills Bar Association, and have continuing professional interest as officers of the court in its successful operation.

1. Plaintiff's counsel shall within two (2) court days of the Court's Order of an MSC access the ResolveLawLA website at www.resolvelawla.com to create an account and register the case for MSC. Plaintiff's counsel must coordinate with defense counsel and select a mutually agreed upon date and time for the MSC prior to the trial date. Plaintiff's counsel shall also provide the name, email address, and phone number for defense counsel when registering the case for an MSC.

2021-SJ-008-00

2. A mandatory settlement conference statement shall be lodged by each party with the ResolveLawLA website and served on all parties not less than five (5) court days before the scheduled MSC. The settlement conference statement shall be limited to five (5) pages on the MSC Brief and ten (10) pages for exhibits. ResolveLawLA MSCs are available at 9 a.m. and 1:30 p.m. Monday through Friday, excluding court holidays, and are conducted via Zoom.

3. Pursuant to California Rules of Court, Rule 3.1380(b) and Los Angeles Superior Court Rule 3.25(d), trial counsel, the parties and persons with full authority to settle the case (including insurance company representatives) must attend virtually via the website unless a judge has excused the virtual appearance for good cause. Once defense counsel is notified that the matter has been scheduled for a remote MSC, defense counsel shall create their own login to the resolvelawla.com system, and shall list all parties, party representatives and insurance adjusters' names, phone numbers, and emails where indicated. In the event the MSC needs to be canceled, it must be canceled through the ResolveLawLA system.

4. If the case settles prior to the scheduled MSC, Plaintiff's counsel shall forthwith notify the courtroom to which the case is assigned of such settlement. The parties should also document their settlement agreement in a writing signed by all parties. Upon receiving notification, the ResolveLawLA system will send notifications via text and/or email and will include a Zoom link for counsel, the parties, and insurance representatives to join the remote MSC.

5. The Court has the discretion to require any party and/or counsel who fails or refuses to comply with this order, to show cause why the Court should not impose monetary sanctions.

IT IS SO ORDERED.

Dated: _____6/23/21_____

_____David J. Cowan_____
Judge David J. Cowan
Supervising Judge, Civil Division

**FILED**
Superior Court of California
County of Los Angeles

FEB 24 2020

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Lorena Albino

2020-SJ-004-00

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| IN RE PERSONAL INJURY CASES ASSIGNED TO THE PERSONAL INJURY COURTS AT THE SPRING STREET COURTHOUSE | THIRD AMENDED STANDING ORDER RE: FINAL STATUS CONFERENCE, PERSONAL INJURY ("PI") COURTS (Effective January 13, 2020) |

The dates for Trial and the Final Status Conference ("FSC") having been set in this matter, the **COURT HEREBY AMENDS AND SUPERSEDES ITS August 9, 2019 STANDING ORDER RE: FINAL STATUS CONFERENCE, PERSONAL INJURY ("PI") COURTS AND, GENERALLY ORDERS AS FOLLOWS IN THIS AND ALL OTHER GENERAL JURISDICTION PERSONAL INJURY ACTIONS:**

## 1. PURPOSE OF THE FSC

The purpose of the FSC is to verify that the parties/counsel are completely ready to proceed with trial continuously and efficiently, from day to day, until verdict. The PI Courts will verify at the FSC that all parties/counsel have (1) prepared the Exhibit binders and Trial Document binders and (2) met and conferred in an effort to stipulate to ultimate facts, legal issues, motions in limine, and the authentication and admissibility of exhibits.

///

///

///

2.    **TRIAL DOCUMENTS TO BE FILED**

At least five calendar days prior to the Final Status Conference, the parties/counsel shall serve and file the following Trial Readiness Documents:

A.    **TRIAL BRIEFS (OPTIONAL)**

Each party/counsel may, but is not required to, file a trial brief succinctly identifying:

(1) the claims and defenses subject to litigation;

(2) the major legal issues (with supporting points and authorities);

(3) the relief claimed and calculation of damages sought; and

(4) any other information that may assist the court at trial.

B.    **MOTIONS IN LIMINE**

Before filing motions in limine, the parties/counsel shall comply with the statutory notice provisions of Code of Civil Procedure ("C.C.P.") Section 1005 and the requirements of Los Angeles County Court Rule ("Local Rule") 3.57(a). The caption of each motion in limine shall concisely identify the evidence that the moving party seeks to preclude. Parties filing more than one motion in limine shall number them consecutively. Parties filing opposition and reply papers shall identify the corresponding motion number in the caption of their papers.

C.    **JOINT STATEMENT TO BE READ TO THE JURY**

For jury trials, the parties/counsel shall work together to prepare and file a joint written statement of the case for the court to read to the jury (Local Rule 3.25(g)(4)).

D.    **JOINT WITNESS LIST**

The parties/counsel shall work together to prepare and file a joint list of all witnesses that each party intends to call, excluding impeachment and rebuttal witnesses (Local Rule 3.25(g)(5)). The joint witness list shall identify each witness by name, specify which witnesses are experts, estimate the length of the direct, cross examination and re-direct examination (if any) of each, and include a total of the number of hours for all witness testimony. The parties/counsel shall identify all potential witness scheduling issues and special requirements. Any party/counsel who seeks to elicit testimony from a witness not identified on the witness list must first make a showing of good cause to the trial court.

THIRD AMENDED ORDER RE FINAL STATUS CONFERENCE, PERSONAL INJURY COURTS
(Effective January 13, 2020)

**E.     LIST OF PROPOSED JURY INSTRUCTIONS**
         **(JOINT AND CONTESTED)**

The parties/counsel shall jointly prepare and file a list of proposed jury instructions, organized in numerical order, specifying the instructions upon which all sides agree and the contested instructions, if any.  The List of Proposed Jury Instructions must include a space by each instruction for the judge to indicate whether the instruction was given.

**F.     JURY INSTRUCTIONS**
         **(JOINT AND CONTESTED)**

The parties/counsel shall prepare a complete set of full-text proposed jury instructions, editing all proposed California Civil Jury Instructions and insert party name(s) and eliminate blanks, brackets, and irrelevant material.  The parties/counsel shall prepare special instructions in a format ready for submission to the jury with the instruction number, title, and text only (i.e., there should be no boxes or other indication on the printed instruction itself as to the requesting party).

**G.     JOINT VERDICT FORM(S)**

The parties/counsel shall prepare and jointly file a proposed general verdict form or special verdict form (with interrogatories) acceptable to all sides (Local Rule 3.25(g)(8)).  If the parties/counsel cannot agree on a joint verdict form, each party must separately file a proposed verdict form.

**H.     JOINT EXHIBIT LIST**

The parties/counsel shall prepare and file a joint exhibit list organized with columns identifying each exhibit and specifying each party's evidentiary objections, if any, to admission of each exhibit.  The parties/counsel shall meet and confer in an effort to resolve objections to the admissibility of each exhibit.

**I.     PAGE AND LINE DESIGNATION FOR**
         **DEPOSITION AND FORMER TESTIMONY**

If the parties/counsel intend to use deposition testimony or former trial testimony in lieu of any witness's live testimony, the parties/counsel shall meet and confer and jointly prepare and file a chart with columns for each of the following:  1) the page and line designations of the deposition or

1  former testimony requested for use, 2) objections, 3) counter-designations, 4) any responses thereto,
2  and 5) the Court's ruling.

3  **3.**     **EVIDENTIARY EXHIBITS**

4         The parties/counsel shall jointly prepare (and be ready to temporarily lodge for inspection at
5  the FSC) three sets of tabbed, internally paginated by document, and properly-marked exhibits,
6  organized numerically in three-ring binders (a set for the Court, the Judicial Assistant and the
7  witnesses).  The parties/counsel shall mark all non-documentary exhibits and insert a simple written
8  description of the exhibit behind the corresponding numerical tab in the exhibit binder.  If the parties
9  have a joint signed exhibit list and electronic copies of their respective exhibits, then the
10  parties/counsel will not be required to produce exhibit binders at the FSC.  However, the exhibit
11  binders will be required by the assigned trial judge when the trial commences.  In the absence of
12  either a joint signed exhibit list or electronic copies, exhibit binders will be required to be produced
13  by all parties/counsel at the FSC.

14  **4.**     **TRIAL BINDERS REQUIRED IN THE PI COURTS**

15         The parties/counsel shall jointly prepare (and be ready to temporarily lodge and include the
16  following for inspection at the FSC) the Trial Documents consisting of conformed copies (if
17  available), tabbed and organized into three-ring binders with a table of contents that includes the
18  following:

19         Tab A:        Trial Briefs (Optional)
20         Tab B:        Motions in Limine
21         Tab C:        Joint Statement to Be Read to the Jury
22         Tab D:        Joint Witness List
23         Tab E:        Joint List of Jury Instructions (identifying the agreed upon and contested
24                       instructions)
25         Tab F:        Joint and Contested Jury Instructions
26         Tab G:        Joint and/or Contested Verdict Form(s)
27         Tab H:        Joint Exhibit List

28

THIRD AMENDED ORDER RE FINAL STATUS CONFERENCE, PERSONAL INJURY COURTS
(Effective January 13, 2020)

1  Tab I:  Joint Chart of Page and Line Designation(s) for Deposition and
2          Former Testimony
3  Tab J:  Copies of the Current Operative Pleadings (including the operative complaint,
4          answer, cross-complaint, if any, and answer to any cross-complaint).
5          The parties/counsel shall organize motions in limine (tabbed in numerical order) behind Tab
6  B with the opposition papers and reply papers for each motion placed directly behind the moving
7  papers.  The parties shall organize proposed jury instructions behind Tab F, with the agreed upon
8  instructions first in order followed by the contested instructions (including special instructions)
9  submitted by each side.

10 **5.     FAILURE TO COMPLY WITH FSC OBLIGATIONS**
11         The court has discretion to require any party/counsel who fails or refuses to comply with this
12 Amended Standing Order to Show Cause why the Court should not impose monetary, evidentiary
13 and/or issue sanctions (including the entry of a default or the striking of an answer).

14
15
16 Dated: _Feb. 24, 2020_
17                                        SAMANTHA P. JESSNER
18                                        Supervising Judge of Civil Courts
19
20
21
22
23
24
25
26
27
28

THIRD AMENDED ORDER RE FINAL STATUS CONFERENCE, PERSONAL INJURY COURTS
(Effective January 13, 2020)