Roland Tellis (SBN 186269)
rtellis@baronbudd.com
David B. Fernandes, Jr. (SBN 280944)
dfernandes@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: 818-839-2333

Courtney L. Davenport (*pro hac vice*)
courtney@thedavenportlawfirm.com
**THE DAVENPORT LAW FIRM LLC**
18805 Porterfield Way
Germantown, Maryland 20874
Telephone: 703-901-1660

Adam J. Levitt (*pro hac vice*)
alevitt@dicellolevitt.com
John E. Tangren (*pro hac vice*)
jtangren@dicellolevitt.com
Daniel R. Ferri (*pro hac vice*)
dferri@dicellolevitt.com
**DICELLO LEVITT LLC**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| James DeBiasio, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>Polaris Industries, Inc.,<br><br>Defendant. | Case No. 2:22-cv-03715-JLS-PVC<br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br>DEMAND FOR JURY TRIAL |

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.   NATURE OF ACTION.................................................................1

II.  JURISDICTION AND VENUE..................................................4

III. THE PARTIES.........................................................................5

  A.  Plaintiff.............................................................................5

  B.  Defendant..........................................................................6

IV.  FACTUAL BACKGROUND...................................................6

  A.  Polaris' Defective Engine and Engine Configuration......6

  B.  Thermal Degradation and Corrosion...............................16

  C.  Thermal Damage Recalls Began Shortly After ProStar Debut......................22

  D.  Polaris Vehicles Give Off More Heat Than Competitor Vehicles................41

V.   CLASS ACTION ALLEGATIONS.......................................51

VI.  TOLLING..............................................................................55

VII. CLAIMS...............................................................................61

VIII. PRAYER FOR RELIEF.......................................................70

IX.  DEMAND FOR JURY TRIAL.............................................72

i
FIRST AMENDED CLASS ACTION COMPLAINT

# I.   **NATURE OF ACTION**

1.     Plaintiff **JAMES DEBIASIO** (hereinafter, "Plaintiff"), through his attorneys, brings this Amended Class Action Complaint (hereinafter, "Complaint"), for himself and all others similarly situated, seeking damages and any other available legal or equitable remedies resulting from the fraudulent actions of Defendant **POLARIS INDUSTRIES, INC.** (hereinafter "Polaris"), with regard to Polaris's fraudulent business practices, as described in detail below, that caused Plaintiff and the other Class members damages.

2.     All allegations in this Complaint are based upon information and belief, except for those allegations which pertain to Plaintiff. Plaintiff's information and beliefs are based upon, *inter alia*, the investigation conducted to date by Plaintiff and his counsel. Each allegation in this Complaint either has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery. Unless otherwise stated, Plaintiff alleges that any violations by Polaris were knowing and intentional.

3.     This action concerns recreational off-road vehicles ("ROVs") manufactured by Polaris that all suffer from a common design defect causing the vehicles' engine compartments to reach temperatures in excess of what they are designed to withstand (the "Thermal Degradation Defect" or the "Defect"). The Thermal Degradation Defect causes premature wear and damage to the engine components in all of the Class Vehicles[1] and puts the owners' lives at risk.

---

[1] The Class Vehicles are the: 2011-2014 RZR XP 900 series, 2012-2018 RZR 570 series, 2014-2018 RZR XP 1000 series, 2016-2018 RZR 1000 series, 2015-2018 RZR 900 and S 900 series, 2016-2018 RZR XP Turbo series, 2016-2018 General 1000 series, 2014-2018 Ranger XP 900 series, 2017-2018 Ranger XP 1000, 2014-2018 Ranger Crew XP 900, 2014-2018 Ranger 570 series, 2014-2018 Ranger 570 Crew series, 2017-2018 Ranger 500, 2017-2018 Ace 500, 2017-2018 Ace 570, and 2017-2018 Ace 900.

FIRST AMENDED CLASS ACTION COMPLAINT

4.      As described in detail below, the Thermal Degradation Defect is manifest in all Class Vehicles because their engine compartments all reach temperatures in excess of what the vehicles' components are designed to withstand, which immediately and prematurely degrades them.

5.      The Class Vehicles are equipped with a high-powered "ProStar" engine that is located directly behind the occupant compartment in a tight space that restricts airflow and provides the surrounding components with little clearance from the hot exhaust and the complex series of insufficient heat shields. This tight engine compartment is also covered by a plastic bed, further reducing airflow and preventing the ability to detect damaged components. The ProStar's exhaust gas exits the engine via the exhaust manifold head pipe, which is routed forward toward the occupants, then turns 180 degrees, creating a U-shape, where it is connected to the remainder of the exhaust piping, located longitudinally in the engine compartment along the upper right side of the engine head and attached to the silencer (the muffler), which is mounted at the rear of the vehicle inches from the back of the engine, where the exhaust is released.

6.      The exhaust manifold and piping that makes up the system lacks proper ventilation and relies on a series of complex heat shields that provide inadequate thermal protection from the design and retain high temperatures. Thus, the hottest area of this high-performance engine is located inches behind the occupants, in an enclosed area of the vehicle with little room for airflow to dissipate the high heat.

7.      The Thermal Degradation Defect is exacerbated by a design with limited clearances between the exhaust system and plastic body components, as well as critical hoses, wiring, and fuel and brake lines, which are continually exposed to high temperatures. The extremely high temperatures, combined with inadequate cooling and heat shielding, result in the degradation and melting of the surrounding

components, including fuel system components, leading to a reduced life cycle and compromised parts and assemblies.

8.     Since the release of the first model with this engine configuration, Polaris has been aware that it causes component degradation, melting, and even fires. In fact, Polaris employees suggested changing the orientation of the exhaust and removing components from proximity to the exhaust pipe as complaints increased, but Polaris declined to do so because of costs.

9.     Since 2013, Polaris has recalled, at different times, all of the Class Vehicle models due to the Thermal Degradation Defect having caused melting components, hundreds of fires, dozens of severe injuries, and at least four deaths.

10.     None of these recalls, however, addressed the root problem (the defectively designed tight engine/exhaust configuration) that leads to the Class Vehicles emitting excessive heat that degrades components. Therefore, Polaris's recalls have failed to remedy the effects on vehicle owners, and the Thermal Degradation Defect continues to subject Plaintiff and the other Class members to component degradation.

11.     Polaris's competitors have designed and packaged their engines and exhaust systems in a way that allows for rapid heat dissipation. There are also numerous aftermarket products available for Polaris off-road vehicles, ranging from fans to heat shields and wraps, intended to reduce the engine compartment temperatures and protect various components from continued exposure to extreme heat. Because consumers only search for aftermarket products after they have purchased the vehicles, and often find them only through targeted searches about the issue they are experiencing, consumers are not aware of these products or the need for them before they purchase the vehicles. The sellers of these products frequently note that Polaris vehicles run hotter than they should.

FIRST AMENDED CLASS ACTION COMPLAINT

12.     Polaris has concealed from Plaintiff, the other Class members, and the public the full and complete nature of the Thermal Degradation Defect, and that it has failed to develop an adequate, permanent fix for the Thermal Degradation Defect. In fact, Polaris is aware that the best fix is a significant redesign of all Class Vehicles, which is likely unavailable to Class members. In the absence of a significant redesign, the Class Vehicles require an extensive combination of mitigating measures, which Polaris has failed to offer. Instead, it has implemented several band-aid repairs that even Polaris has acknowledged are ineffective.

13.     Class Vehicle owners and lessees are unable to operate their Class Vehicles without their vehicles suffering the thermal degradation of component parts that occurs due to the Thermal Degradation Defect.

14.     Because of this misconduct, Plaintiff and the other Class members have suffered actual damages. Plaintiff and the other Class members did not receive the benefit of their bargain; rather, they purchased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Purchasers of the Class Vehicles either would have not purchased the vehicles at all or would have paid significantly less had the Thermal Degradation Defect been disclosed. Plaintiff and the other Class members were deprived of a safe, defect-free Class Vehicle.

## II.   <u>JURISDICTION AND VENUE</u>

15.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs and one or more of the other Class members are citizens of a different state than Defendant.

FIRST AMENDED CLASS ACTION COMPLAINT

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events and omission giving rise to Plaintiffs' claims occurred within this district.

17.     On information and belief, Polaris operates a large portion of their business within California. The unlawful acts alleged herein has a direct effect on Plaintiff and those similarly situated within the state of California. The claims alleged herein arise from the purchase of Class Vehicles by Plaintiff and the other Class members from Polaris within the state of California.

### III.     THE PARTIES

**A.     Plaintiff**

18.     Plaintiff James DeBiasio is a citizen of California and a resident of Van Nuys, California. Plaintiff purchased a new 2016 RZR XP 1000 Series (for purposes of this section, "Class Vehicle") from Simi RV, which at the time was an authorized Polaris dealership, in Simi Valley, California, on or around August 8, 2016. Plaintiff purchased his Class Vehicle without knowledge of the Thermal Degradation Defect. When Plaintiff purchased his Class Vehicle, he reasonably expected that it would not generate excessive heat during his use and have its component parts suffer from exacerbated thermal degradation due to the Thermal Degradation Defect. Plaintiff operated his Class Vehicle in a reasonably foreseeable manner and as Polaris intended it to be used. Nonetheless, Plaintiff's Class Vehicle generated excessive heat due to the Thermal Degradation Defect, causing its component parts to degrade.

19.     Before purchasing his Class Vehicle, Plaintiff researched the 2016 RZR XP 1000 series on Polaris's website. Plaintiff recalls Polaris touting the performance of the Class Vehicle and its engine. Polaris omitted on its website the fact that the Class Vehicle generated excessive heat and that this excessive heat leads to its component parts degrading and a risk of fire. Plaintiff also discussed the Class Vehicle with a salesperson at Simi RV, who also failed to disclose to Plaintiff that

the Class Vehicle generates excessive heat that leads to its component parts degrading and a risk of fire. Had Polaris disclosed its knowledge of the Thermal Degradation Defect, Plaintiff would have heard, seen and been aware of it. When Plaintiff purchased his Class Vehicle, he did not expect that it would generate excessive heat, nor did he expect that his Class Vehicle's component parts would degrade from normal use due to the Thermal Degradation Defect. Plaintiff suffered injury-in-fact and lost money as a result of the conduct at issue because, had Polaris disclosed the existence of the Thermal Degradation Defect and the fact that the component parts on Plaintiff's Class Vehicle would degrade from normal use, he would not have purchased the Class Vehicle. Indeed, as part of the purchase of his Class Vehicle, Plaintiff believed he was paying for a safe, functioning vehicle, which did not contain a known design defect, but that is not what he received.

**B.     Defendant**

20.     Polaris Industries, Inc. is a Delaware corporation, with its principal place of business located at 2100 Highway 55, Medina, Minnesota, and is a citizen of Minnesota and Delaware. Polaris is also registered as an active foreign corporation in California.

## IV.     FACTUAL BACKGROUND

**A.     Polaris's Defective Engine and Engine Configuration**

21.     Polaris first entered the off-road vehicle ("ORV") market in 1985 and produced its first Recreational Off-Road Vehicle ("ROV," also often referred to as a "side-by-side"), the six-wheeled Ranger, in 1998.[2] In 2000, Polaris unveiled the four-wheeled Ranger.[3]

---

[2] Polaris, 2014 Annual Report, Form 10-K, Dec. 31, 2014, at 4.
[3] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

22.     Polaris introduced the Ranger RZR in 2007 (for Model Year 2008), as a smaller, sportier, and more agile alternative to the utilitarian Ranger.[4] Polaris subsequently shortened its name to RZR (hereinafter referred to as "RZR").

23.     Ranger models are utility variants often used in commercial applications on farms, for land management, and for maintenance jobs. The inability to use them can affect livelihoods. Class Vehicles include two-person and four-person Ranger models, all with a plastic cargo bed mounted directly above the engine.

24.     RZR models are high performance vehicles with a narrow chassis, sport-tuned suspension, a plastic engine cover, and small stowage area. Class Vehicles include two-person through six-person models.

25.     Polaris's 2006 patent filing for a "Side-By-Side ATV" design, which became the Ranger RZR, was designed to reduce the width from the usual 54" to 50". (The term "ATV," or "All-Terrain Vehicle," is sometimes used interchangeably with the terms "ROV" or "ORV.") Reducing the width was an important market advantage because the vehicles could move at an accelerated pace and could be loaded into the bed of a full-size pickup truck for transport. However, reduced width typically increases the risk of rollover, a significant problem with ROVs. In an attempt to mitigate this rollover risk, Polaris's design lowered the vehicle's center of gravity by positioning heavier components, such as the engine, closer to the height of the vehicle's frame, thereby improving the stability of the vehicle. To accomplish this width reduction, the patent disclosed a behind-the-seat engine location, rather than the previous under-the-seat location.[5]

26.     The patent, which was granted in 2008, describes a narrower vehicle width and improved center of gravity. According to the patent: "In this embodiment, engine is a 760 cc engine producing about 50 horsepower. Engine produces excellent

---

[4] *Id.*

[5] US2008/0023249 A1, "Side-by-Side ATV," filed July 28, 2016.

FIRST AMENDED CLASS ACTION COMPLAINT

acceleration characteristics and responsiveness. ATV weighs about 950 pounds and has a power to weight ratio of about 0.053/1. Any suitable engine may be used in ATV, and ATV may be constructed to any suitable weight, however the present invention contemplates ATVs having a power to weight ratio of at least 0.045/1."[6]

27.    The patent drawings depict the exhaust manifold and head pipe exiting the engine on the right side of the engine bay and then up and toward the rear of the vehicle, away from the occupant compartment and open to the side of the vehicle, resulting in a less obstructed air flow, as shown below:



Exhaust manifold and header pipe exit engine on the right side

28.    When it debuted in 2007, the Ranger RZR had an engine configuration and offset placement that matched that described in this patent. Its top speed was 55 mph, its weight was 945 lbs., and its power-to-weight ratio was .055, which was 44% higher than the competitor Yamaha Rhino.[7] It could accelerate faster than any other ROV, and its compact size made it capable of navigating narrow trails. As Polaris describes it: "The new Ranger RZR delivers total Side x Side domination with its monstrous 800 Twin EFI. It's the only trail-capable Side x Side you can buy, going everywhere other Side by Sides can't. With the fastest acceleration, the highest

---

[6] *Id.* at 4.
[7] Polaris Ranger 2008 Brochure, at 6.

top speed, incredibly responsive handling, and all the utility you need, the Ranger RZR leaves all other Side x Sides in the dust."[8]

29.    Polaris claimed its handling performance attributes were the result of its low center of gravity design: "The RANGER RZR and RZR S use a patented design that positions the engine behind the seat, creating the lowest center of gravity. It's like you're riding on rails, with razor-sharp handling and performance."[9]

30.    Below is an image of this original, patented configuration on a RZR 800. The engine exhaust pipe is directed away from the occupant compartment and exposed to a relatively open wheel well:[10]



Exhaust manifold and header pipe exit engine on right side of engine allowing for heat dissipation via open wheel well.

31.    This design in the older Ranger/RZR models is similar to the design found used by the RZR competitor, Yamaha YXZ1000R, which ports its exhaust valves to the left side and away from the plastic bed and plastic fuel system components:[11]

---

[8] Polaris Ranger 2008 Brochure, at 8.

[9] Polaris Ranger 2009 brochure, at 21.

[10] Product Review Polaris RZR 800, DuneGuide.com, http://www.duneguide.com/ProductReview_Polaris_RZR800.htm, accessed Apr. 2, 2018.

[11] Yamaha Motor Sports. 2021 Yamaha YXZ1000R, https://www.yamahamotorsports.com/pure-sport-side-by-side/models/yxz1000r.

FIRST AMENDED CLASS ACTION COMPLAINT

32.     In 2011, Polaris unveiled its new ProStar 900 Twin EFI engine, specifically designed for the RZR XP 900. According to Polaris, the ProStar 900 engine "cranks out an industry-leading 88 HP and delivers 29% faster acceleration than the closest competitor."[12] With a vehicle weight of 1,190 lbs., the new XP 900 increased the power-to-weight ratio to 0.0739 – significantly more than originally envisioned with the patented behind-the-seat design. The new engine "delivers fast throttle response, groundbreaking power and revolutionary acceleration."[13]

33.     Unlike the original behind-the-seat configuration with the engine exhaust ported on the right side, the ProStar engine was placed squarely behind the occupant compartment, with the exhaust manifold and header pipe exiting forward toward the occupants, only inches from the seats and seat belts. The pipe then turns 180 degrees, creating a U-shape, where it is connected to the remainder of the exhaust piping, located longitudinally in the engine compartment along the upper right side of the engine head and attached to the silencer (a.k.a., the muffler), which is mounted at the rear of the vehicle inches from the back of the engine.

---

[12] Polaris Ranger Brochure 2011, at 11.
[13] Polaris Ranger Brochure 2011, at 11.

FIRST AMENDED CLASS ACTION COMPLAINT

34.    The photographs below, taken with the plastic engine covering removed, show this configuration from different angles in single-cylinder and twin-cylinder versions of the ProStar engine.[14]





35.    A thick plastic bed covers the tight engine compartment and nearby components, further limiting the amount of air flow around the exhaust manifold and header pipe, as depicted in the images below:

[14] Long Term Report – The Polaris RZR 570, ATV & SXS Illustrated, http://atvillustrated.com/content/long-term-report-polaris-rzr-570, accessed Apr. 2, 2018.

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18



19
20
21
22
23
24

36.     The enclosed engine and exhaust pipe configuration in the Class Vehicles prevents airflow from dissipating the heat from the exhaust. Heat buildup occurs particularly at low speeds and under high load conditions, frequently experienced while traversing inclines, operating in sand, and with additional occupants. The engine and exhaust configuration, which limits adequate heat

25
26
27
28

---

[15] 2015 RZR 4 XP 1000 for sale, Haacke Motors, https://www.haackemotors.net/2015_Polaris_RZR%204%20XP%201000_Layton_UT_11324333.veh.
[16] UTV Scene's Polaris RZR XP 4 1000 Break In, UTV Scene Magazine, Oct. 30, 2014, https://utvscene.com/utv-scenes-polaris-rzr-xp-4-1000-break-in/

FIRST AMENDED CLASS ACTION COMPLAINT

dissipation, is located only inches from occupants and plastic body components, as well as critical hoses, wiring, and fuel and brake lines, which are continually exposed to excessively high temperatures that are retained in close proximity. The excessive heat exposure degrades these components, melts plastic components in and around the engine, and ignites surrounding combustible materials.

37.    Polaris's singularly focused marketing shows that the company was committed to significantly exceeding the power output of its competitors' products, at the expense of safety. Even as Polaris learned of the Thermal Degradation Defect associated with its new ProStar engine configuration, discussed below, it continued introducing models with the ProStar engine and Defect. For example, in 2013, Polaris introduced the Ranger XP 900, which it touted as containing the new ProStar 900 engine that "pumps out 60 HP, with incredible class-leading torque across the power band. All that power and torque lets you easily tow up to one ton, or haul up to 1,000 lbs."[17] At the same time, Polaris advertised, "[i]t's also a quiet ride, thanks to a new engine placement behind the seat and below the box. Ground clearance is a high, obstacle-clearing 12"."[18] In its press release announcing the vehicles, Polaris stated, "In recent years, Polaris has aggressively launched new products, evolved its off-road offerings and become No. 1 in the off-road industry with the best and most-innovative ATV and Side-by-Side offerings available."[19]

38.    In 2014, Polaris debuted the RZR XP 1000, Ranger 900, and Crew 900, and Ranger 570 and Crew 570. Each of these vehicles contained a ProStar engine with the exhaust manifold and header pipe routed forward inches from the occupant space.[20] The RZR XP 1000's engine "provides an industry-leading 107 horsepower

---

[17] Polaris 2013 Off Roads Vehicles Brochure, at 5.
[18] *Id.*
[19] Press Release, Polaris Debuts 2013 ORV and Motorcycle Product Lines, Aug. 1, 2012.
[20] Press Release, Polaris Debuts New Products for 2014 Off-Road and Motorcycle Lines, July 31, 2013.

FIRST AMENDED CLASS ACTION COMPLAINT

and a true 999ccs of displacement, making it the most powerful and largest engine in the class."[21] Thus, this RZR had more than double the horsepower originally envisioned in the RZR patent.[22] Noting its "insatiable push to evolve its offerings," Polaris stated it has "become the industry leader by aggressively introducing new products and continuing to innovate our current product lines."[23]

39.    In model year 2015, Polaris debuted the RZR 900 and S 900, which featured "unequalled power from their 75 horsepower ProStar 900 engine offering improved power-to-weight ratio and faster acceleration . . . ."[24] In its press release, Polaris stated, "Our model year 2015 lineup is evidence that we have never been stronger and have no intention of slowing down. We are once again introducing more new, innovative products and technologies to create opportunities for more growth in markets around the world."[25] There were hints of a problem, however: All full-size Ranger vehicles received "new intake openings on the pillars behind the driver and passenger, allowing for improved airflow for the engine and clutch air intake systems."[26] However, these air intake systems proved insufficient. Polaris was aware by this point that its engine configuration did not allow sufficient airflow around the hot engine.

40.    For model year 2016, Polaris introduced the RZR XP Turbo and RZR XP 4 Turbo, this time acknowledging that such a high-powered engine needed additional cooling: "The Polaris ProStar Turbo engine provides an industry-leading 144 horsepower – 30 percent more horsepower and 45 percent more torque than the

---

[21] *Id.*

[22] *Id.*

[23] Press Release, Polaris Debuts New Products for 2014 Off-Road and Motorcycle Lines, July 31, 2013.

[24] Press Release, Polaris Debuts 2015 ORV and Motorcycle Product Lines, July 29, 2014.

[25] *Id.*

[26] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

RZR XP 4 1000 EPS. The ProStar Turbo effortlessly carries a full load of thrill seekers over the most power-robbing terrain. The new engine was developed for extreme performance. . . . For consistent performance at all temperatures, the vehicle also includes a new liquid charged air cooler with front-mounted, dual radiators with high-capacity fan and high-flow electric pump. To control the massive power delivered by the ProStar Turbo, the engine management system has also been updated to include knock detection, boost control and a high-flow return style fuel system ensuring that the engine delivers maximum power under all conditions, altitudes, and temperatures."[27]

41.     However, the dual radiator fans, positioned far from the exhaust, were not sufficient to address the excessive heat, and the model year 2017 RZR XP Turbo vehicles were designed with a new high-capacity cooling system that "ensures the engine can breathe for maximum power delivery." Nonetheless, the 2017 RZR XP Turbo vehicles also exhibited problems associated with excessive heating, including fires.

42.     By 2016, all RZR and all gas-powered 500cc or larger Ranger models contained a ProStar engine situated in a tight compartment with limited airflow directly behind the occupants. Importantly, with the exception of the unique Youth RZR, which does not appear to contain a ProStar engine, all of the ROVs that contain the ProStar engine and exhaust routed forward, directly behind the occupant compartment in a tight, constricted space have been recalled for melting and fire risks.

---

[27] Press Release, Polaris RZR Expands 4-Seat Line-Up to Share the Off-Road Experience with Friends and Family, Oct. 6, 2015.

FIRST AMENDED CLASS ACTION COMPLAINT

**B.    Thermal Degradation and Corrosion**

43.    Thermal management is an important aspect of vehicle development.[28] Polaris vehicles do not sufficiently manage thermal conditions, allowing excessive heat retention, which leads to thermal degradation of plastic components installed in all Class Vehicles. Thermal degradation often occurs microscopically within the plastic, and thus vehicle owners are unaware their vehicle components are degrading.

44.    High temperatures make "it essential to monitor the temperatures of all components that may be at risk of failure due to thermal loads and provide appropriate thermal protection. This could be achieved by: 1. Relocating the component, 2. Insertion of heat shields between the exhaust and the component, 3. Innovative airflow management techniques that increase the convection around the component."[29]

45.    The exhaust system temperature is the primary source of heat into the engine compartment.[30] In the vehicle industry, it is well known that excessive temperatures in the engine/exhaust compartment, particularly in tight spaces with little airflow, reduce component service life and cause unseen degradation to nearby components. This is known as thermal degradation in polymers like plastics and resins, which is defined as "molecular deterioration as a result of overheating."[31] In

---

[28] Kumar Srinivasan et al., Vehicle Thermal Management Simulation Using a Rapid Omni-Tree Based Adaptive Cartesian Mesh Generation Methodology, 2004 ASME Heat Transfer/Fluids Engineering Summer Conf. (July 2004), at 1.
[29] *Id.* at 2.
[30] *Id.*
[31] Thermal Degradation of Plastics, Zeus Indus. Prods, Inc., Tech. Whitepaper (2005), at 1.

FIRST AMENDED CLASS ACTION COMPLAINT

metal components, damage that occurs from excessive temperatures is called high temperature corrosion.[32]

46.    Excessive heat caused by restricted airflow leads to component malfunction or premature failure of components or materials.[33] "Vehicle components are expected to retain an acceptable level of their initial properties. However, exposure to heat will reduce component life due to the negative effect of heat on material properties.…Effective management of heat can be addressed by some clearance requirements during the packaging phase, upgrading component materials, using heat shields or management airflow around these components."[34]

47.    Polaris vehicles contain many plastic components near the engine and exhaust system. Within the plastics industry, it is well known that: "Thermoplastics exposed to elevated temperatures for long periods of time will generally become brittle and lose both mechanical strength and toughness. This process will occur more slowly at moderate temperatures and more quickly as the operating temperature for a material is increased."[35]

48.    Additionally, plastics generally have a higher rate of thermal expansion than metals or other materials and thus, "[w]hen plastic and metal components are used together in a device that must operate over a wide temperature range, the

---

[32] Manabu Noguchi & Hiroshi Yakauwa, Lecture on Fundamental Aspects of High Temperature Corrosion and Corrosion Protection Part 1: Basic Theory, Ebara Engineering Review No. 252 (2016-10), at 1.
[33] Martin W. Wambsganss, Thermal Management in Heavy Vehicles: A Review Identifying Issues and Research Requirements, Vehicle Thermal Management Sys. 4 Conference (May 1999), at 7.
[34] Alaa El-Sharkaway, et al., Transient Modeling of Vehicle Under-hood and Underbody Component Temperatures, 9 SAE Int'l J. Material Mfg. 330 (May 2016).
[35] Keith Hechtel, Turning Up the Heat: Considerations for High Temperature Applications, IAPD Magazine (Apr./May 2014), at 18.

17

FIRST AMENDED CLASS ACTION COMPLAINT

relatively high thermal expansion of polymers becomes an important design consideration."[36]

49.    It is also well known that "elevated operating temperatures may affect a number of other performance characteristics of a thermoplastic. These include electrical properties, chemical resistance, environmental stress crack resistance, fatigue resistance and the ability of the polymer to perform in friction and wear applications, all of which tend to be reduced at the upper end of a material's operating temperature range."[37] Another possible effect is that the plastics can soften, changing their structure and reducing their strength.[38]

50.    Simply put, the "hotter the environment becomes, the less performance we can expect."[39]

51.    Thermal degradation is often an internal process not noticeable to the human eye. For instance, in plastics with exposure to high temperatures, "degradation is inevitable and the resulting chain reaction will accelerate unless the cycle is interrupted in some manner – the only real variable is how long it is going to take for thermal degradation to become evident and result in a loss in properties that is significant enough for the end-user to notice."[40] Significantly, "[i]n some cases, thermal degradation shows no effect for some time and when it occurs the onset of significant thermal degradation can be very rapid, i.e. there is a gestation time before anything appears to happen and then the degradation is both rapid and catastrophic."[41]

52.    Thus, from the beginning, the plastic components exposed to the excessive heat begin degrading internally without the owner's awareness.

---

[36] *Id.* at 19.

[37] *Id.* at 20.

[38] Michael Sepe, The Effects of Temperature, Plastics Tech., July 27, 2011.

[39] *Id.*

[40] Thermal Degradation of Plastics, *supra*, at 1.

[41] *Id.* at 6.

53.     Likewise, excessive temperatures cause high temperature corrosion: "Without water, in many cases the corrosion rate at a normal temperature does not cause a particular problem. However, as the temperature rises, corrosion progresses at a rate that is an engineering problem not to be ignored."[42] Additionally, "[s]ince a corrosion reaction is a thermal activated reaction, basically the reaction rate varies exponentially against the temperature."[43]

54.     Some metals can experience a reduction in thickness and thermal stress, particularly when temperature fluctuations occur, such as with the starting and stopping of machinery.[44] This is "a very critical problem."[45]

55.     As discussed below, despite industry knowledge that thermal management is an important consideration in vehicle design, Polaris did not have a thermal engineer on staff until mid-2016, long after it was apparent the Class Vehicles exhibit significant thermal issues.

56.     The Thermal Degradation Defect is exacerbated by the Class Vehicles' design that places some components closer to hot surfaces than they should be. The systemic, and immediate, problems caused by the Thermal Degradation Defect are readily apparent in several Polaris recalls.

57.     For instance, Polaris's April 2016 recall, CPSC recall number 16-146, included several potential problems for various models and years – one of those was improperly routed plastic fuel lines that "may have insufficient clearance to the

---

[42] Lecture on Fundamental Aspects of High Temperature Corrosion and Corrosion Protection Part 1: Basic Theory, *supra*, at 1.

[43] Manabu Noguchi & Hiroshi Yakauwa, Lecture on Fundamental Aspects of High Temperature Corrosion and Corrosion Protection Part 2: Corrosion Protection and Coatings, Ebara Engineering Review No. 252 (2016-10), at 10.

[44] Lecture on Fundamental Aspects of High Temperature Corrosion and Corrosion Protection Part 1: Basic Theory, *supra*, at 8.

[45] *Id.* at 9.

FIRST AMENDED CLASS ACTION COMPLAINT

exhaust head pipe."[46] The misrouted fuel line could allow the line to become kinked, which would cause the fuel tank to build pressure and expand, resulting in contact with the spinning prop shaft and causing a leak.[47]

58.    The Thermal Degradation Defect is correlated to these issues. For example, small changes to the plastic fuel vent line routing can cause the part to degrade and develop kinks due to high temperature exposure because of its proximity to the exhaust head pipe. This leads to a cascading effect: the thermally degraded vent line allows the plastic fuel tank to over-pressurize, expand, and contact spinning driveshaft components. The plastic fuel tank is also directly affected by the Thermal Degradation Defect because its proximity to the high-temperature environment reduces its ability maintain its shape. These elements all point back to the design configuration of the Class Vehicles, which do not safely allow for normal and expected movement, shifting, or assembly tolerances of critical components without potential for catastrophic failures in the presence of such high temperatures.

59.    The softening that these fuel lines undergo in the excessive heat without airflow will often escape unnoticed once the vehicle stops and the lines harden again, in the same way some plastic bowls are softer when they are first removed from the microwave but re-harden after a minute out of the microwave. However, in the Class Vehicles, the softened, drooping fuel line could contact another hot component, causing a leak that results in a fire. This is particularly true where, as here, the component does not have proper clearance from the exhaust, leaving zero margin of error.

60.    The Canadian recall for the 2015-2016 Ranger 570 and Crew 570 vehicles specifically pointed to the Thermal Degradation Defect as the culprit,

---

[46] Polaris Indus., CPSC Recall No. 16-146, Safety Bulletin Z-16-01-AD, Apr. 19, 2016.
[47] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

stating, "[d]uring prolonged vehicle operation at low speeds the air flow in the engine/exhaust area could be reduced, and may result in elevated engine/exhaust compartment temperatures, which could cause the seat close-off panel to overheat which may pose a fire hazard causing injury and/or damage to property."[48] That the panel that is supposed to protect occupants becomes too hot is evidence of thermal degradation.

61.    Likewise, in September 2016, Polaris recalled the 2014 Ranger XP 900 and Crew 900 for heat shields that could fall off, which it expanded in April 2017 to include model year 2015 as well. The stated cause was that the heat shield fasteners could come loose, but consumers reported that the excessive heat softened or melted the plastic panel to which the shields are attached enough that the fasteners became loose in the holes.[49, 50]

62.    Additionally, Polaris's April 2018 recall for exhaust silencer cracking in 2014-2018 model year RZR 1000 vehicles suggests high temperature corrosion is at the root of the problem. Early life failures of exhaust silencers, which are designed to withstand high temperatures, point to the effect of the excessively high temperatures on the metal. Furthermore, it is yet another prescient signal that the Class Vehicles are experiencing excessive temperatures when, as this recall notes, exhaust silencers crack, and the heat escaping from the cracks is melting nearby components and causing fires – even though they are designed with heat shields to dissipate the anticipated temperatures at this location.

---

[48] Canada Recall and Safety Alerts No. 2016326, June 27, 2016.

[49] PRCForum.com, posted by Chris, 2014 900 potential fire issue, June 22, 2015, available at http://www.prcforum.com/forum/26-ranger-problems-solutions/61961-2014-900-potential-fire-issue.html

[50] Polaris Indus., CPSC Recall No. 18-133, Safety Bulletin, Z-18-01, Apr. 2, 2018.

FIRST AMENDED CLASS ACTION COMPLAINT

**C.     Thermal Damage Recalls Began Shortly After ProStar Debut**

63.     Before Polaris installed the ProStar engine behind the occupant compartment, Polaris ROVs were not plagued by thermal degradation and engine fires. The only Polaris recall that involved fire risk in the RZR was a 2007 recall of 330 model year 2008 RZR 800 vehicles for fuel tank leaks, which according to Polaris had not caused any fires.[51] Likewise the only recall for fire risk in the Ranger vehicles was a 2009 recall of 3,800 model year 2009 Ranger Crew and 6x6 vehicles, concerning a risk of electrical shorting and fire in the rear tail light wiring harnesses.[52]

64.     After the release of the first Class Vehicle, the 2011 RZR XP 900, thermal degradation issues immediately became apparent. Polaris first issued a Technical Safety Bulletin ("TSB") in 2011 (R-11-03) after observing that plastic dividers between the engine and the occupants were melting.

65.     According to facts detailed in a recent Minnesota state court case, *Thompson v. Polaris Industries, Inc.*, which was brought by an owner of a 2017 Polaris XP RZR 900 who suffered burns after his Polaris caught fire, a 2011 RZR 900 caught fire at a Polaris facility in 2011, when the initial Class Vehicles were first released on the market.[53] Expert evidence presented in *Thompson* confirms that "the architecture of the exhaust and fuel system 'are substantially and functionally similar' across all RZR 900 models, starting in 2011 and past 2017."[54]

66.     Additionally, the then-manager of Polaris's Corporate Product Safety department testified that, at that time, the company's Product Action Procedure ("PAP") Committee recommended a recall due to the number of customer reports.[55]

---

[51] Polaris Indus., Recall No. 08-521, Dec. 6, 2007.
[52] Polaris Indus., Recall No. 09-762, Aug. 4, 2009.
[53] *Thompson v. Polaris Indus., Inc.*, Minn., Hennepin Co. Dist. Ct., No. 27-CV-17-12608, Order Granting Motion to Amend Complaint, Feb. 18, 2022, at 2.
[54] *Id.* at 9.
[55] *Id.* at 2-3.

Polaris decided instead to develop a heat shield for dealers to install only if a customer complained.[56]

67.    The *Thompson* plaintiff learned that in 2012, the Consumer Product Safety Commission ("CPSC") began investigating the 2011 RZR XP 900, and Polaris downplayed the risks posed by melting components by asserting they "did not 'constitute[] a substantial product hazard or pose[] a significant risk of injury."[57] Nevertheless, the CPSC insisted there was a "substantial product hazard" and recommended that Polaris recall or correct the vehicles.[58]

68.    On June 19, 2013, Polaris recalled 4,500 model year 2011 RZR XP 900 vehicles with the ProStar engine/exhaust configuration (CPSC recall number 13-740). The specified cause according to the recall: the firewall behind the driver and passenger seats could overheat and melt.

69.    In its earlier corresponding TSB, detailing the issue to dealers prior to the recall, Polaris stated: "Some Ranger RZR XP 900 models may experience hot air leakage from the engine compartment that travels over the service divider panel separating the occupant compartment from the engine compartment, which can cause deformation of the panel. This hot air leakage into the passenger area can also create elevated air and component temperatures that could cause burns to the occupant of the vehicle. Polaris has developed an aluminum heat shield to deflect the hot air and prevent it from damaging the service divider panel."[59] The TSB noted that this safety bulletin updated a previous TSB issued in 2011 (R-11-03) that was completed through warranty claims. The repair was simply to install the heat shield,

---

[56] *Id.* at 3.
[57] *Id.*
[58] *Id.*
[59] Polaris Indus., Tech. Serv. Bulletin R-13-03, Apr. 25, 2013, at 1.

FIRST AMENDED CLASS ACTION COMPLAINT

which "was already installed on 2012 and 2013 RZR 900s that continued to have the same melting and fire issues."[60]

70.    It is important to note that "hot air leakage" is caused by such excessive heat coming off the engine/exhaust that it deforms the plastic panel installed specifically to contain the hot air. Further, as explained above, thermal degradation and high temperature corrosion are inevitable in "elevated air and component temperatures" environments.

71.    Thus, from the first vehicle containing the ProStar engine with the exhaust manifold and header pipe ported toward the front of the vehicle in a tight compartment, Polaris acknowledged the engine elevated temperatures of nearby components and could result in deformation of plastics. Like the recalls that would follow, Polaris advised customers to stop using the vehicles and bring them in for an unspecified repair.

72.    In the June 2013 recall announcement, Polaris asserted that there had been one report of burn injuries to a finger.[61] However, at least one owner of a 2011 Ranger RZR XP 900 notified the CPSC that in 2012, he was driving the vehicle through the woods when he and his passenger smelled a burning smell. Moments after they exited the vehicle, they observed a flame behind the seat, which "immediately began to spread and subsequently engulfed the entire [vehicle], until all that remained was the burnt out frame of the vehicle."[62] When he contacted the dealer and Polaris in May 2012, prior to the recall, they offered him a $5,500 credit toward another purchase.[63] Thus, when it asserted in the recall that the firewall could melt and had only burnt a finger, Polaris concealed the fact that it was aware of at

---

[60] *Thompson, supra*, at 3.
[61] Polaris Indus., Tech. Serv. Bulletin R-13-03, Apr. 25, 2013, at 1.
[62] CPSC, Epidemiologic Investigation Report No. 140724CCC2757, Sept. 6, 2014, at 2.
[63] *Id.*, at 2.

FIRST AMENDED CLASS ACTION COMPLAINT

least one incident in which the entire vehicle burned in minutes and the fact that the CPSC had already determined that even the melting of components, in absence of fire, was a substantial product hazard.

73.    Over the eight years following that first recall related to thermal issues, Polaris has issued at least fifteen recalls related to fire risks that are often caused by components that have been thermally damaged. (See Exhibit A for a detailed timeline of the recalls.) All of these recalls involved vehicles with the ProStar engine in the tight engine compartment with limited airflow. They include all vehicles made from 2011 through 2018 that contain the ProStar engine configuration, and several models made between 2019 and 2021 containing that configuration. Many vehicles have been recalled more than once for different problems that created a fire risk.

74.    The recalls cite a myriad of root causes aimed at portraying the thermal issues as discreet problems easily remedied with new components. However, Polaris itself has admitted a more systemic issue was occurring.

75.    According to a *Thompson* opinion detailing facts gleaned through documents and depositions, during this time, Polaris employees were raising alarms about the engine configuration: "In 2015, Polaris's engineering manager over powertrain, Rupak Paul, proposed to upper management that the exhaust of the RZR be rotated, such that it exited the rear of the vehicle rather than toward the occupant seats. Mr. Paul believed this change would significantly reduce RZR fires, and thought that the changes could be implemented in time for the 2017 model year. However, the cost of implementing the change would have been large and Polaris ultimately decided against making this proposed change."[64]

76.    Despite several years of component degradation and fires related to the excessive heat, Polaris did not hire its first thermal engineer, Ramesh Goyal, until June 2016. In August 2016 – the same month Class Plaintiff purchased his vehicle –

---

[64] *Thompson*, *supra*, at 4.

FIRST AMENDED CLASS ACTION COMPLAINT

Goyal wrote an internal email summarizing the issues with the vehicles.[65] As detailed by the court, Goyal concluded the following:[66]

- Key issue seems to be in the shielding as well of its implementation, air flow limitation, and on architectural issues.

- Components are densely packaged especially on the exhaust pipe sides and not well protected from radiation heat.

- Dense packaging and limited air flow in engine compartment.

- Packaging components in the vicinity of exhaust system.

- Heat shield attached to the heat pipe with no air gap in-between make shield ineffective. This makes high temperature environment in the close vicinity.

- Limited packaging space – need architecture refinement.

- Thermal sensitive materials and hoses/conduits needs to be routed away from the heat source if possible.

77.     Goyal concluded that in future vehicles, Polaris needed to, "[t]ry to re-route thermal sensitive components away from the exhaust system side."[67]

78.     In April 2016, Polaris issued its largest recall, which included 133,000 model year 2013 to 2016 vehicles, saying the vehicles "can catch fire while consumers are driving, posing fire and burn hazards."[68] Polaris reported it had received 160 reports of fires with just those vehicles and 19 injury reports, including some for third degree burns, as well as the death of a 15-year-old girl.[69]

---

[65] *Thompson, supra*, at 5.
[66] *Id.*
[67] *Id.*
[68] Polaris Indus., Recall No. 16-146, Apr. 19, 2016.
[69] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

79.     In a press release, Polaris stated it had "already begun implementation of its Corrective Action Plan and has made manufacturing updates in new-production vehicles."[70] Polaris's Chairman and CEO Scott Wine assured the public, "[w]e are working day and night to inform our customers and dealers and to obtain the parts needed for the repairs we identified in our comprehensive analysis. We apologize for the inconvenience to our customers as we work to ensure all the systemic thermal risks we identified are eliminated from our vehicles."[71] Thus, Polaris admitted it had *systemic* problems with containing the excessive heat but did not inform the public that its own engineers had concluded the overarching problem was the engine configuration, which it had no plans to change.

80.     Polaris's 2016 Annual Report also acknowledged the systemic issues, stating, "As Polaris has always done, we attacked our problems head-on and learned a great deal as we addressed them. We are putting that knowledge to use as we continue to strengthen our Global Safety and Quality function. Safety and quality have been, and remain, our top priorities, but we know we still have much work to do. We will continue to closely monitor our vehicles' performance. When an issue arises, we will act swiftly to keep our customers safe."[72] Among the new Global Safety and Quality Organization's functions was "Conduct post-sale surveillance, tracking warranty data and social media to identify and address safety trends sooner."[73]

81.     The CPSC privately expressed reservations with the efficacy of Polaris's proposed remedies to Polaris employees. In response to numerous Freedom of Information Act requests to the CPSC from safety advocacy group Safety

---

[70] Press Release, Polaris Industries Voluntarily Recalls Certain RZR 900 and 1000 Off-Road Vehicles, Apr. 19, 2016.

[71] *Id.*

[72] Polaris Indus., 2016 Annual Report, at 3.

[73] *Id.* at 11.

FIRST AMENDED CLASS ACTION COMPLAINT

Research & Strategies, the CPSC produced redacted documents related to an investigation into fires in the 2016 RZR Turbo vehicles, which had caused at least 19 fires, resulting in six burn injuries, and a 15-acre fire in Utah's American Fork Canyon in which a 6-year-old passenger on the Polaris was severely burned. The documents show that in a July 27, 2016, email from Jeffrey Jaucshneg, Compliance Officer at the CPSC, to Stacy Bogart at Polaris, Jaucshneg asked whether Polaris had conducted real-world testing of its most current proposed fix, an Electronic Control Unit calibration, to ensure it would actually work in all conditions. The following is an excerpt of his email:[74]

This is only my opinion, but you stated (Firm Engineers) at the meeting that this vehicles engine was trimmed out for performance (maxing the engines abilities) and my understanding that this engine runs hot anyway. Is this problem going to fester in after 50 rides instead of 20... I do not believe you can come up with a conclusive fix without several weeks of testing.

We have to make sure this fix is not just engineered, it needs to be  real world tested, we cannot get this one wrong.

I am concerned that the ECU calibration is not going to solve the issue it will just prolong it from happening again.

I have always given my all to your cases, my gut feeling on this to offer a refund to just get these units out of population, that way you have given the consumer an out.  I really think even with the recalibration the vehicles will still have incidents in the future.

In general, I am expecting to have fires reported until Labor day weekend (last big holiday weekend of summer)... I am not going to be surprised seeing you sending in updates.

With the high fire danger in the west, I would expect a another wildfire incident... we have extreme temperatures, bad combination. You could go to the U.S. Forest Service DC Office and ask them to post your recalls and stop ride notices at the trail head of all Public land. I would ask them to ban your vehicles from Forest Service Property until the units have been properly fixed, they could draft

82. Despite his reservations, Jauschneg signed off on the proposed fix by August 2016.[75] However, his concerns proved correct: on September 19, 2016,

---

[74] CPSC FOIA Response RP160488, at PDF pg. 18.
[75] *Id.* at PDF pg. 31.

FIRST AMENDED CLASS ACTION COMPLAINT

Jeffrey Eyres at Polaris informed the Commission he had just learned of a RZR Turbo fire in Oklahoma in a vehicle that had already received the recall repair.[76]

83.    As depicted in the photo below, owners of vehicles repaired under this recall posted on online forums that the heat shield their dealer installed on the exhaust pipe to repair this recall had burned shortly thereafter.[77]



84.    The *Thompson* court noted that in September 2016, as the number of fires in Polaris vehicles continued increasing, Polaris considered adding fire extinguishers to the vehicles but did not like the optics.[78] It also considered using flame-resistant materials because "the number of thermal incidents 'in which the vehicle is left unrecoverable…begin in the engine compartment where the main heat source is the engine's exhaust system.'"[79] The same defect that causes fires begins causing thermal damage immediately on use; whether or not that eventually results in a fire is an unfortunate luck of the draw.

85.    In September 2016, Polaris issued an update to its 2016 Full-Year Guidance, lowering its estimated share earnings because since its investor day in July 2016, "the Company has experienced additional RZR thermal-related issues and

---

[76] *Id.* at PDF pg. 222.

[77] RZR Forums.Net, 16 Turbo with Recall done heat shield allegedly burning, Sept. 24, 2016, http://www.rzrforums.net/rzr-xp-turbo/336465-16-turbo-recall-done-heat-shield-allegedly-burning.html, accessed Apr. 2, 2018.

[78] *Thompson, supra*, at 5.

[79] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

was unable to sufficiently validate the initially identified RZR Turbo recall repair, necessitating a more complex and expensive repair solution."[80] CEO Scott Wine stated, "Our number one priority is to get our loyal owners back to riding safely. We share the frustration of our customers and dealers and are working diligently to expedite the completion of the recall repairs and significantly improve the quality and safety of our products."[81] Polaris did not inform the public that it was aware the root cause of the thermal damage and fires was the tight engine configuration with limited airflow and vulnerable components in close proximity to excessively high temperatures, which could not be remedied through the band-aid fixes included in its recalls.

86.    Despite all of these recalls, asserted "fixes," and promises to improve safety, on December 19, 2017, Polaris and CPSC issued a joint statement warning the public that fires in the 2013-2017 RZR 900 and 1000 vehicles had caused death, serious injuries, and property damage.[82] The warning noted that many of the vehicles had previously been recalled, "[h]owever, users of the vehicles that were repaired as part of the April 2016 recall continue to report fires, including total-loss fires."[83] The warning also stated that some of the 2017 RZR vehicles not previously recalled have also experienced fires.[84]

87.    The joint statement offered no solution, saying only that "[t]he CPSC and Polaris continue to work together to ensure fire risks in these vehicles are addressed. However, at this time, the CPSC and Polaris want to make the public aware of the fires involving these vehicles."[85] This was an admission that Polaris's

---

[80] Polaris Indus., *Polaris Updates 2016 Full-Year Guidance*, Sept. 12, 2016.
[81] *Id.*
[82] Joint Statement of CPSC and Polaris on Polaris RZR 900 and 1000 Recreational Off-Highway Vehicles (ROVs), Dec. 19, 2017.
[83] *Id.*
[84] *Id.*
[85] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

"fixes" had not corrected the "systemic" thermal issues and that Polaris did not know how to mitigate the excessive heat in the Class Vehicles.

88.    On April 2, 2018, the CPSC confirmed Polaris's duplicity, fining the company a record $27.25 million for failing to timely report defects and fire hazards in the RZR and Ranger models that it knew could result in serious injury or death.[86] Neither the CPSC nor Polaris's press releases announcing the fine mentioned the unsolved defect situation with the RZR vehicles.

89.    Since then, the company has continued recalling vehicles for fire risks and thermal damage.

90.    Additionally, Polaris does not make obtaining the recall repair an easy process. Polaris tells vehicles owners that only a dealer can conduct the replacement repairs, and owners often live far from dealerships.  Many Ranger owners use their vehicles as utility vehicles on farms or other remote locations, with dealerships miles away.  For example, one forum user who has a 2015 Ranger XP 900 stated, "According to my dealership, which is 90 miles away, I need to return it there and can't do the work myself.  He also stated that if it caught fire while riding it, neither Polaris nor my insurance company would be liable.  I'd be on the hook for damages myself."[87]

91.    Thus, Ranger owners whose vehicles have been recalled are also forced to make the decision between taking time to deliver the Ranger to a dealership, possibly leaving it there for days while waiting for the repair, or using a vehicle that could catch fire while they are using it.

---

[86] CPSC, Press Release, Polaris Agrees to Pay $27.25 Million Civil Penalty for Failure to Report Defective Recreational Off-Road Vehicles, Apr. 2, 2018.
[87] Ranger Forums.Net, 2015 XP900 Recall Notice, Apr. 24, 2017, http://www.rangerforums.net/forum/polaris-ranger-xp900/35433-2015-xp900-recall-notice.html, accessed on Apr. 2, 2018.

31

FIRST AMENDED CLASS ACTION COMPLAINT

92.     Consumers have complained to the CPSC of burning plastic components. On July 5, 2017, the owner of a 2016 Polaris RZR XP 4 Turbo reported to the CPSC that temperatures in his vehicle had repeatedly reached 220 to 260 degrees during normal operation, causing the smell of burning plastic and burnt oil, prompting him to buy a fire extinguisher and a rearview mirror to check for flames.[88] The vehicle had overheated and shut down with smoke several times, and the last time, his friends had driven their 2017 RZR XP 4 to pick them up.[89] As they drove back to get a truck and trailer to tow his RZR XP 4 Turbo, the friend's RZR caught fire and burned the rear cargo before he could put the flames out.[90] Polaris replaced the friend's RZR – often its under-the-radar reaction when there is a confirmed fire – but would not allow the dealership to inspect the complainant's engine to determine the cause of the shut downs.[91] The owner concluded, "Currently my family will not ride in the RZR because of the high probability of fire. This vehicle is unsafe and should not be allowed on the trails or road."[92]

93.     On November 23, 2017, the owner of a 2015 Polaris RZR 900 complained to the CPSC that she and her husband had been riding the vehicle for one minute when they noticed a burning smell.[93] When they removed the engine cover, flames and smoke were coming out of the engine.[94] They were able to put the fire out with an extinguisher, but stated that "[t]he entire engine melted. Also, anything that was plastic melted. The ROV is not repairable."[95] When she contacted

---

[88] CPSC, Epidemiologic Investigation Report, No. 20180111-14A85-2147393789, Jan. 11, 2018.
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] CPSC, Epidemiologic Investigation Report, No. 20180118-BD800-1727075, Jan. 18, 2018.
[94] *Id.*
[95] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Polaris, the company reportedly told her that the vehicle was out of warranty and that "it was her issue, not theirs."[96]

94.    As noted, the Thermal Degradation Defect begins causing component degradation upon first use, but some vehicles catch fire as a result of the thermal damage, such as a fuel line becoming so soft that it droops and touches the exhaust, causing a fuel leak that abruptly spreads into a fire in the presence of the hot exhaust.

95.    In addition to the recalls, these risks are highlighted in consumer complaints posted on forums. Unfortunately, warnings posted on forums are often read only after a current owner visits the site looking for answers to problems that are already occurring. A consumer posted on a forum that, in November 2016, his new 2016 Ranger XP 900 had caught fire only three days after he purchased it after mud and straw ignited on the engine. The consumer reported, "I am choked. I have used this brand new item for 1.5 working days since Nov. 9. The dealer and Polaris see me as 'overreacting,' and I can't get Polaris to contact me."[97]

96.    Polaris was well aware that its "fixes" did not actually mitigate the excessive heat or prevent fires. For instance, on March 5, 2016, a fire started in a 2015 RZR XP4 1000 while a 19-year-old and 13-year-old were sitting in the occupant compartment.[98] The fire engulfed the vehicle and burned it down to the metal chassis before help could arrive.[99] The recall repair had been completed three months earlier.[100] The CPSC report for the incident included the following photos:

---

[96] *Id.*

[97] Ranger Forums, XP 900 on Tracks Major Problems, by Frankie Paper Boy, Nov. 23, 2016, http://www.rangerforums.net/forum/polaris-ranger-xp900/30402-xp-900-tracks-major-problems.html, accessed Apr. 2, 2018.

[98] CPSC, Epidemiologic Investigation Report, No. 160309CBB1457, Mar. 28, 2016.

[99] *Id.* at 3.

[100] *Id.* at 1.

33

**FIRST AMENDED CLASS ACTION COMPLAINT**

 

97.    On February 17, 2018, the owner of a 2015 RZR 1000 that had previously been repaired under recall reported to the CPSC that he had been riding the vehicle for fifteen minutes when he smelled smoke.[101] When he inspected the engine compartment, there was a fire in the front of the engine that engulfed the whole vehicle in flames within minutes, although he was able to put the fire out himself.[102] The CPSC report notes that, "Caller sent an email to Polaris back in February expressing his disappointment with his product catching on fire. Polaris sent him a $1000 voucher to purchase a new product."[103]

98.    In 2013, a firefighter posted a warning on a forum under the subject heading, "2013 polaris ranger 900 xp exhaust FIRE danger," saying after he purchased the vehicle, he and his fellow firefighters discovered that in the "new Polaris setup the muffler gets really hot." That is a danger because of "the vehicle's exhaust and muffler placement."[104]

---

[101] CPSC, Epidemiologic Investigation Report, No. 20180411-488A0-1750788, Apr. 11, 2018.

[102] *Id.*

[103] *Id.*

[104] PRC Ranger Club, 2013 Polaris Ranger 900 xp exhaust FIRE danger, July 26, 2013,                http://www.prcforum.com/forum/154-ranger-xp-900-570-fs-discussions/50505-2013-polaris-ranger-900-xp-exhaust-fire-danger.html,    accessed Apr. 2, 2018.

FIRST AMENDED CLASS ACTION COMPLAINT

99.     Indeed, in August 2016, a 2015 Polaris RZR 1000 vehicle caught fire in California's San Bernardino Forest, destroying 8,110 acres of forestry.[105] The Pilot Fire, as the fire became known, required mandatory and voluntary evacuations, closed schools, put hundreds of firefighters in danger, and came at a significant cost.[106] The following are pictures of the fire:[107]



---

[105] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Complaint filed Aug. 6, 2019, at 3.

[106] "Pilot Fire Grows to 10 Square Miles, Evacuations Ordered," KPCC News, Aug. 8, 2016.

[107] *Id.*, photos by Stuart Palley.

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21





22    100.   The United States sued Polaris in the Central District of California,
23  alleging negligence, strict product liability, and violations of several statutes related
24  to public resources and public safety.[108] Originally, Polaris contested the negligence
25  and strict product liability claims, asserting the "allegations boil down to 'a Polaris-
26  manufactured product caused damages,'" rather than pleading facts identifying the

27  _____
    [108] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Complaint filed Aug.
28  6, 2019.

FIRST AMENDED CLASS ACTION COMPLAINT

defect.[109] The government amended its complaint to note the numerous recalls, 2016 Full-Year Guidance update, CPSC and Polaris joint announcement, CPSC fine, and a *New York Times* article about Polaris fires that noted there are dozens of YouTube videos showing RZR vehicles burning and "a slew of litigation."[110] The amended complaint blamed the engine/exhaust configuration that provides little airflow to dissipate heat.[111] After the amended complaint was filed, Polaris moved to dismiss statutory claims but did not move to dismiss the negligence and strict liability claims.[112] In January 2022, Polaris settled with the government.[113]

101.   Despite knowing that its vehicles have caused several land fires, Polaris has denied there is a safety defect even when the vehicle fire causes a forest fire: On May 31, 2018, a man was driving his brand new 2018 Polaris RZR 900 when there was "a small explosion followed by a noticeable smell of gas followed by seating compartment being on fire with the seatbelt attachment button already melting. Resulting fire shot flames 30 feet into the air with gas tank exploding causing major forest fire."[114] Polaris's response to the CPSC was that although it was investigating and had offered to buy back the vehicle, "[t]he customer's report does not reasonably support a conclusion that the vehicle contains any defect which could create a substantial product hazard or creates an unreasonable risk of death or serious injury. Polaris further disputes that the report indicates any safety problem related to the

---

[109] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Motion to Dismiss filed Jan. 14, 2020, at 9.
[110] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Amended Complaint filed Feb. 3, 2020.
[111] *Id.*, at 9.
[112] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Motion to Dismiss, Feb. 18, 2020.
[113] *U.S. v. Polaris Indus., Inc.*, C.D. Cal., No. 2:19-cv-06830, Joint Stipulation for Dismissal Pursuant to Settlement, Jan. 3, 2022.
[114] CPSC, Epidemiologic Investigation Report, No. 20180618-7565A-2147387322, June 18, 2018.

FIRST AMENDED CLASS ACTION COMPLAINT

vehicle and denies any and all liability for the reported incident."[115] Polaris did not mention that it had recently issued a voluntary field action (not an official recall) for several model year 2018 RZR vehicles for a degraded fuel pump flange assembly that could result in a fuel leak but had excluded the RZR 900.[116]

102.    Polaris itself has shown that it is aware the Class Vehicles did not have adequate airflow. When Polaris debuted the 2019 RZR XP 4 Turbo at auto shows, it made clear that it had changed the design to allow for 80 percent more airflow:[117]



103.    Similarly, a review of the 2020 RZR Pro XP, the replacement for the RZR XP Turbo, noted that, "Polaris engineers have added a coolant vent line to the top of the head to help bleed out trapped air which has plagued some owners and

---

[115] *Id.*
[116] Press Release, Polaris Issues Voluntary Field Action for Certain RZR and ACE Models, Apr. 2, 2018.
[117] UTV Action, 2019 Polaris RZR XP 4 Turbo S, July 11, 2019.

FIRST AMENDED CLASS ACTION COMPLAINT

been the cause of overheating in the past."[118] The review included a picture of the frame and engine compartment[119]:



104.    Despite its awareness of its vehicles' need for greater airflow and exhaust pipes that did not exit from the front of the engine in a tight loop surrounded by plastic components, Polaris's recalls did not include the introduction of air intakes or fans. Nor did they include replacing the plastic components with components made of sturdier, more flame-resistant materials. Even though these measures would not have removed the Thermal Degradation Defect, they may have mitigated or prevented some of the thermal damage and fires that resulted from the Thermal Degradation Defect.

105.    Weighing all of the evidence introduced by the *Thompson* plaintiff, the court concluded he could pursue punitive damages because "Plaintiff has presented prima facie evidence that the alleged defective design creates a high probability of injury. The hottest part of the exhaust system is located directly behind the passenger

[118] SXSBlog.com, 2020 Polaris RZR Pro XP: Tech Review, Aug. 2, 2019.
[119] *Id.*

seat in a confined space, with limited airflow. Polaris exacerbated the heat issue by adding more shielding, which restricted airflow even further, driving the exhaust temperature up. This superheated system is packaged in close proximity to the fuel system and directly below the cargo bed, where Polaris knows that customers often carry spare gasoline canisters. The temperatures are so high that any leak of fuel from the fuel system or from a spare fuel container will automatically ignite directly behind the passenger seating and spread rapidly."[120]

106.   The court also concluded that "Plaintiff presents compelling prima facie evidence that Polaris acted with indifference to the high probability of injury to others. The prima facie evidence shows that Polaris rushed out a newly designed engine and exhaust system for the RZR 900 in order to stay ahead of the competition. In its rush, Polaris failed to follow several safety measures, despite being aware that the new design would create heat issues behind the passenger seats. …Despite all of the information that Polaris had about the dangers of the exhaust system architecture in the RZR 900s, Polaris chose to continue using the same architecture in its machines from model years 2011 through and past 2017 – the model year that burned Plaintiff. Plaintiff's prima facie evidence presents a compelling picture from which a jury could find that Polaris chose not to do so for financial reasons, arguably placing profits over the safety of its customers."[121]

107.   Finally, as noted above, the Court held that "Plaintiff has put forth expert evidence supporting his argument that the architecture of the exhaust and fuel system 'are substantially and functionally similar' across all RZR 900 models [the model at issue in the case] starting in 2011 and past 2017."[122]

108.   The same "substantially and functionally similar" architecture is present in all Class Vehicles and is causing component degradation and thermal

---

[120] *Thompson, supra*, at 10.

[121] *Id.*, at 11, 12.

[122] *Id.*, at 9.

FIRST AMENDED CLASS ACTION COMPLAINT

damage in all Class Vehicles, resulting in the same "high probability of injury to others" caused by a common defect Polaris has been indifferent to.

**D.    Polaris Vehicles Give off More Heat Than Competitor Vehicles**

109.    The fact that the heat generated in the Class Vehicles is excessive – *i.e.*, is greater than the heat generated by competitor vehicles and above the level that is safe for surrounding components – can be demonstrated in several ways, including alternative designs undertaken by competitors and the sale of aftermarket products specifically aimed at reducing the Polaris's known excessive heat issues.

**i.    Alternative Designs**

110.    Recognizing the need for sufficient airflow and mechanisms to dissipate the heat, several of Polaris's competitors have located their exhaust header, where the pipe exits the engine, or exhaust pipes in a location that is more open to airflow and further from the passenger compartment. As noted above, this is the reasoning cited by Polaris's powertrain engineer manager, Rupak Paul, in 2015, when he suggested rotating the exhaust pipes.

111.    The Yamaha YXZ1000R, a competitor to the RZR, has its engine "strategically mounted low and longitudinally on its chassis," which means the exhaust headers face outward toward the side of the vehicle, allowing for significant airflow and heat dissipation.[123] As mentioned above, this design is very similar to the original design for the Ranger RZR 800. Below is a picture showing that the exhaust vents out to the side and is located far from the occupants and other components:[124]

---

[123] Yamaha YXZ1000R, UTV Guide, June 19, 2016
[124] Yamaha Motor Sports. 2021 Yamaha YXZ1000R, https://www.yamahamotorsports.com/pure-sport-side-by-side/models/yxz1000r.

FIRST AMENDED CLASS ACTION COMPLAINT



112.  The   Can-Am   Maverick   ROV,   manufactured   by   Bombardier Recreational Products, has the exhaust pipe on the driver's side, open to the side of the vehicle. Can-Am stated that the 1000R package "wears a unique exhaust line and muffler for enhanced airflow" and has an oversized air intake behind the passenger seat to keep the engine cool.[125] Below is a diagram that Can-Am includes in its brochures:[126]

[125] 2019 Can-Am Maverick Sport, UTV Action, Apr. 3, 2018
[126] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT



113.   Can-Am's answer to the RZR Turbo is the Maverick X3, which offers up to 172 horsepower through its Rotax ACE engine. The Maverick X3's engine is located in the rear of the chassis to reduce noise, vibration, and heat.[127] The vehicle has an intercooler for maximized cooling efficiency and a fan that maximizes heat transfer, as well as three large air intakes located behind the driver to "deliver a constant supply of clean air" to the transmission and engine.[128] Below is a photograph of the Maverick X3's engine:[129]

[127] UTV Guide, Can-Am Maverick X3 X mr Turbo – Mud Has Nowhere to Hide, Nov. 30, 2017.
[128] *Id.*
[129] *Id.*

43

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15

114.   Below is a photograph of a Maverick Trail, showing that the exhaust pipe is open to air and away from the passenger compartment and other components:[130]

16
17
18
19
20
21
22
23
24
25
26



27
28

---

[130] Can-Am website, Maverick Trail.

FIRST AMENDED CLASS ACTION COMPLAINT

115.   The previous version of the Can-Am Maverick 1000R had the engine on the centerline below the occupants, with its exhaust pipes elongated to allow air to flow around them and provide clearance from other components, as depicted in this Can-Am diagram:[131]



116.   Can-Am touted the increased airflow and exhaust flow: "When an engine breathes easier, it can produce more horsepower. So we optimized air intake, combustion, and exhaust flow. Larger intake plenum, high-flow heads, larger valves, increased compression ratio, and high-flow dual exhaust all contribute to this more power and efficient engine."[132]

117.   A photograph of the under-hood engine compartment of the Can-Am Defender, a competitor to the Polaris Ranger, shows that, although this vehicle does have the exhaust oriented forward like the Polaris vehicle, Can-Am added a feature that directs airflow from the clutch outlet to the exhaust heat shield via a duct to dissipate the heat. It also left the exhaust pipe open to airflow from the side:[133]

---

[131] Can-Am Maverick 1000R, UTV Guide, May 8, 2015.
[132] 2014 Can-Am Maverick X RS, Top Speed, Mar. 18, 2014.
[133] Can Am Defender 1000 for sale, https://evopowersports.com/product/defender-1000-exhaust-systems

FIRST AMENDED CLASS ACTION COMPLAINT

118.   According to Dirt Wheels Magazine, in the 2019 Honda Talon, a RZR competitor, "the engine is mounted longitudinally in the frame, eliminating unnecessary right angles in the driveline so that an efficient transfer of power to the rear wheels is possible, resulting in strong acceleration."[134] Further, "[k]nowing the rigors through which customers would put the Talon, designers stressed efficient engine cooling, with motorcycle-inspired shrouds and four side vents, all of which are unique to the side-by-side world."[135] In the picture below, the exhaust is seen in left rear wheel well far from the occupant compartment and other components:[136]

---

[134] "2019 Honda Talon, It's Real!," Dirt Wheels, Dec. 3, 2018.
[135] *Id.*
[136] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

119.    The difference between the engine/exhaust compartments in these vehicles and the Polaris vehicles is striking. The competitors' recognition of the need for airflow around the hot engine and exhaust components has offered far better protection to their occupants: the Yamaha YXR1000R, Maverick ROVs, and Honda Talon have not been recalled for fire risks. In fact, the Consumer Federation of America, which tracks recalls of off-road vehicles, recently noted that Polaris has more than three times the number of recalls for fire risks and other crash hazards than the brand with the second highest number of recalls[137]:

[137] Cons. Fed. Of Am., An Analysis of OHV Recalls: Increasing Number of OHVs Pulled from Market Due to Safety Concerns, June 10, 2021.

FIRST AMENDED CLASS ACTION COMPLAINT



**Figure 2. OHV Recalls by Brand from January 1, 2010 - June 10, 2021**

ii.      **Aftermarket Products**

120.   There are numerous aftermarket products, including heat shields, wraps, and cooling system improvements, created specifically for Polaris ROVs. The purpose of these aftermarket products is to protect components that are vulnerable to heat degradation and failure, and to reduce the engine compartment temperatures and improve heat dissipation. Consumers become aware of the products only after they experience the excessive heat and seek solutions through targeted searches. The mere fact that these aftermarket products exist is an indication of a problem. Further, as discussed below, some companies marketing these products note that Polaris vehicles are known for generating excessive heat.

121.   For instance, UTV Driver published an article that noted, "We have heard a few RZR Turbo owners *complaining of their engines overheating. Under super hard driving, under load, we have had it happen to us too. So there has [sic] been a number of companies trying to address the issue* and they have come up with

some pretty interesting products."[138] The article described six aftermarket products that attempt to mitigate excessive heat in Polaris vehicles.

122.   Another company offers an aluminum panel with heat tape on it to stand between the exhaust pipe and the occupant space. The company notes, *"[t]he RZR's are known to melt the plastic behind the passenger seat.*"[139]

123.   Another touts its Polaris RZR Regulator Rectifier by stating "[t]his new Hot Shot rectifier regulator is built using Mosfet Technology, allowing the regulator to run cooler & more efficiently. Rick's worked with RZR owners to customize a part that is easy to install and *will solve common overheating issues*."[140]

124.   Another company highlights the tight engine/exhaust compartment's effects on surrounding components, offering an exhaust pipe heatshield to protect RZR shocks, stating: "Let's face it, heat can really put a damper on your fun. You're riding hard in your Polaris RZR only to have the right rear shock start to get a little spongy. *The culprit is heat from the exhaust cooking the oil in the shock.* Too much heat in the shock and the oil aerates, at which point the worn shocks no longer provide dampening as designed."[141]

125.   Below is a photo of the exhaust wrapped with Heatshield Armor – note the proximity to the right rear shock:[142]

---

[138] "6 Ways to Help the RZR Turbo Not Overheat," UTV Driver, July 21, 2016.

[139] Polaris RZR & RZR-S Exhaust Heat Shield, UTV Inc., Order Form.

[140] Rick's Motorsport Electrics, Polaris RZR Regulator Rectifier, accessed May 6, 2019.

[141] "Eliminate Shock Fade with Heatshield Armor," Heatshield Products, blog.

[142] *Id.*

1
2
3
4
5
6
7
8
9



10    126.   A company called Bikeman Performance sells an AirXtreme kit for
11 RZR 1000 models, noting "the stock 1000 platform is okay but they left so much
12 airflow on the table."[143] The kit, depicted below, comes with "oversize exhaust
13 valves for maximum airflow," a "BMP porting for maximum airflow and efficiency"
14 (this appears to re-port the exhaust to the side of the engine), and "BMP High
15 Performance Cams for maximum airflow."
16
17
18
19
20
21
22
23
24
25
26
27
28

[143] BMP RZR 1000 Big Valve AirXtreme Head Kit, Bikeman, Accessed Jan. 19,
2022.

FIRST AMENDED CLASS ACTION COMPLAINT



## V.    CLASS ACTION ALLEGATIONS

127.    Plaintiff brings this action individually, as well as on behalf of each and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23.

128.    Plaintiff seeks to represent:

> All current and former owners of a Class Vehicle (as defined herein) that was purchased in the State of California.

(the "Class").  Excluded from the above Class is (1) any entity in which Polaris has a controlling interest, its legal representatives, employees, officers or directors, and assignees or successors of Polaris; (2) the Judge to whom this matter is assigned, the members of his or her immediate family, and judicial staff; and (3) Class counsel.

129.    Plaintiffs reserve the right to modify and/or add to the Class prior to class certification.

130.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

**A. Numerosity.**

131.  This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1). The members of the Class are so numerous that individual joinder of all class members is impracticable. Given the breadth of Class Vehicles, Plaintiff is informed and believes that the Class is likely to include tens of thousands of members. While the precise number of Class members is unknown to Plaintiff, it can be ascertained from Polaris's books and records. Plaintiffs anticipate providing appropriate notice to the Class in compliance with Federal Rules of Civil Procedure 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Rule 23(d).

**B. Predominance of Common Issues.**

132.  This action satisfies the requirements of Federal Rules of Civil Procedure 23(a)(2) and (b)(3), because it involves questions of law and fact that have common answers and predominate over questions affecting only individual members of the Class. These include, without limitation, the following:

    a.  whether Polaris engaged in the conduct alleged herein;

    b.  whether Polaris's alleged conduct violates applicable law;

    c.  whether Polaris designed, advertised, marketed, distributed, sold, or otherwise placed the Class Vehicles into the stream of commerce;

    d.  whether Polaris misled Class members about the safety of the Class Vehicles;

    e.  whether Polaris failed to disclose to Class members that the Class Vehicles generate excessive heat due to the Thermal Degradation Defect, causing their component parts to degrade;

    f.  whether the Class Vehicles contain the Thermal Degradation Defect alleged herein;

**FIRST AMENDED CLASS ACTION COMPLAINT**

g. whether Polaris had actual or imputed knowledge about the alleged Defect but failed to disclose it to Plaintiff and the other Class members;

h. whether Polaris's omissions and concealment regarding the quality of the Class Vehicles were likely to deceive Class members in violation of the state consumer protection statutes alleged herein;

i. whether Polaris breached its express warranties to Class members with respect to the Class Vehicles;

j. whether Polaris breached its implied warranties to Class members with respect to the Class Vehicles;

k. whether Class members overpaid for their Class Vehicles as a result of the Thermal Degradation Defect alleged herein;

l. whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

m. the amount and nature of relief to be awarded to Plaintiff and the other Class members.

**C. Typicality.**

133. This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(3), because Plaintiff's claims are typical of the other Class members' claims and arise from the same course of conduct by Polaris. The evidence and the legal theories regarding Polaris's alleged wrongful conduct are substantially the same for Plaintiff and all other Class members.

**D. Adequacy of Representation.**

134. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. Plaintiff and his counsel intend to prosecute this action vigorously.

**E. Superiority.**

135.   This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(2), because Polaris has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

136.   This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3), because a class action is superior to all other available methods for the fair and efficient adjudication of this case or controversy.

137.   Because the damages suffered by any individual Class member may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiff and the other Class members individually to seek redress for the alleged wrongful conduct. Even if any individual persons or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation(s) would proceed. The class action device is preferable to individual litigation(s) because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court, making class adjudication the superior alternative under Federal Rule of Civil Procedure 23(b)(3)(A).

138.   The conduct of this action as a class action instead of as thousands of individual lawsuits presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this Court, making class adjudication superior to other alternatives under Federal Rule of Civil Procedure 23(b)(3)(D).

FIRST AMENDED CLASS ACTION COMPLAINT

139.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Federal Rule of Civil Procedure 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs, or on its own determination, certify the Class for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law, for class- wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide the Class into subclasses.

140.    The Class members expressly disclaim any recovery in this action for physical injury, wrongful death, or emotional distress resulting from the Thermal Degradation Defect, without waiving or dismissing such claims.

## VI.    <u>TOLLING</u>

141.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein, including the specific allegations regarding the omissions in section IV above.

142.    Any applicable statute of limitations that might otherwise render any cause of action asserted herein time barred has been tolled by Polaris's concealment of the facts alleged above, and Plaintiff's claims are thus tolled under the doctrine of fraudulent concealment tolling and the delayed discovery rule.

**A. Fraudulent Concealment.**

143.    Polaris has known since at least 2011 that the Class Vehicles contain the Thermal Degradation Defect and knowingly and intentionally concealed this material fact from Plaintiff and the other Class members. Polaris concealed the Thermal Degradation Defect in contravention of its duty to disclose it, which, along with the complexity of the Defect, prevented Plaintiff and the other Class members from learning of it. Polaris knew consumers would consider thermal degradation and

risk of fire critical attributes when purchasing an ROV. Based on this knowledge, Polaris purposefully and knowingly omitted information regarding the Thermal Degradation Defect because ROVs prone to thermal damage and fire are less desirable and less valuable than ROVs that are not. Indeed, Polaris actively misled owners, and even the CPSC, about the true root cause of the Thermal Degradation Defect by blaming discreet issues and offering "remedies" that it knew would be inadequate and would not address the root cause but would lead owners to believe the vehicle's design was safe.

144.   If Polaris had disclosed the existence and true nature of the Thermal Degradation Defect to Plaintiff in, for example, its marketing and advertising, on its website, or through its dealerships, he would have seen or heard that disclosure prior to his purchase of his Class Vehicle. As alleged above and below, Plaintiff conducted online research and spoke to a salesperson at an authorized Polaris dealership prior to his purchase. Had Plaintiff been aware of the Thermal Degradation Defect, he would not have purchased his Class Vehicle. Plaintiff thus suffered damages as a result of Polaris's fraudulent omissions.

145.   Additionally, Polaris still has not disclosed the existence and true nature of the Thermal Degradation Defect to the public in the years since Plaintiff purchased his vehicle. Despite its knowledge of the Defect since before Plaintiff purchased his vehicle, Polaris has never informed the public about the defective design of its engine compartment and its immediate thermal degradation of components, much less warned owners about the Thermal Degradation Defect or recalled any vehicles for a significant redesign of the engine compartment or an extensive combination of mitigating measures.

### i.  The Thermal Degradation Defect is Material.

146.   As described above in section IV, the Thermal Degradation Defect poses a significant safety concern.

147.   Had Polaris disclosed the existence of the Thermal Degradation Defect and the fact that the component parts on Plaintiff's Class Vehicle would degrade from normal use, Plaintiff would not have purchased the Class Vehicle.

ii.   **Polaris Had a Duty to Disclose the Thermal Degradation Defect.**

148.   The Thermal Degradation Defect causes premature wear and damage to the engine components in all of the Class Vehicles and puts users' and owners' lives at risk. The Thermal Degradation Defect has resulted in melting components, hundreds of fires, dozens of severe injuries, and at least four deaths. Polaris had a duty to disclose the Thermal Degradation Defect to Plaintiff and the other Class members because:

a.   Polaris's knowledge of the Thermal Degradation Defect was exclusive. As described above, Polaris knew of thermal issues in vehicles with ProStar engines as early as 2011 when it began issuing TSBs to its dealerships shortly after its debut of the ProStar engine;

b.   Consumers lack the sophisticated expertise in vehicle components and electrical phenomena that would be necessary to discover the Thermal Degradation Defect on their own;

c.   Polaris knew that the Thermal Degradation Defect gave rise to serious safety concerns for the consumers who purchased Class Vehicles; and

d.   Polaris actively concealed and intentionally downplayed the Thermal Degradation Defect through ineffective repairs and recalls that failed to alert Plaintiff and consumers to the true nature of the Defect, purposefully concealed the severity of the Defect, and failed to reveal that it was the true root cause of thermal issues in Class Vehicles.

149.   Accordingly, Polaris had a duty to disclose the Thermal Degradation Defect to Plaintiff and the other Class members.

### iii. Plaintiff Justifiably Relied On Polaris's Fraudulent Concealment.

150.   The safety, performance, and reliability of his Class Vehicle were critical material facts that influenced Plaintiff's decision to purchase it. Plaintiff conducted diligent research into his Class Vehicle shortly before deciding to purchase it by reviewing Polaris's website and discussing the Class Vehicle with a Simi RV salesperson.

151.   Polaris intended that Plaintiff rely on its omissions regarding the safety, performance, and reliability of the Class Vehicles by actively concealing that the Class Vehicles contained the Thermal Degradation Defect.

152.   Plaintiff's reliance on Polaris's omissions was justifiable given Polaris's active concealment of the Thermal Degradation Defect.

153.   Even though Polaris conducted recalls of Class Vehicles, Polaris misrepresented the true root cause of the recalls – the Thermal Degradation Defect – and fraudulently concealed that those recalls and recall repairs were inadequate to remedy the Defect, and that the Class Vehicles were still affected by the Defect after the recall remedy. Therefore, even if Plaintiff would have been aware of any recalls, which he was not, he or any reasonable person would have believed that a recalled Class Vehicle no longer contained the Thermal Degradation Defect.

154.   Plaintiff justifiably relied on Polaris's concealment; he did not discover the Thermal Degradation Defect until on or around February 28, 2022. Plaintiff learned of the Thermal Degradation Defect after viewing information about counsel's extensive investigation into the Defect on the internet, which led him to contact his counsel in March 2022.

155.   Plaintiff could not have independently discovered the Thermal Degradation Defect before he purchased his Class Vehicle, or during its warranty limitation period. The Thermal Degradation Defect is both hidden and technical. The

ProStar engine is located directly behind the occupant compartment in a tight space, and the tight engine compartment is also covered by a plastic bed, preventing the ability to detect damaged components. The hottest area of this engine is located inches behind the occupants, in an enclosed area of the vehicle. Thus, the engine is not readily visible. Moreover, thermal degradation is not noticeable to the human eye and can go unnoticed. Plaintiff lacked the necessary expertise to analyze the components in the engine compartment for signs of thermal degradation and thus Plaintiff's lack of discovery prior to February 2022 was not due to his lack of diligence.

> ### iv.  Had Polaris Disclosed that the Class Vehicles Contained the Thermal Degradation Defect, Plaintiff Would Have Seen Those Disclosures.

156.   In the weeks leading up to his purchase of his Class Vehicle in August 2016, Plaintiff researched the 2016 RZR XP 1000 series on Polaris's website and spoke to a salesperson at Simi RV. Plaintiff recalls Polaris touting the performance of the Class Vehicle and its engine. Polaris omitted on its website the fact that the Class Vehicle generated excessive heat and that this excessive heat leads to its component parts degrading and a risk of fire. The salesperson at Simi RV also failed to disclose to Plaintiff that the Class Vehicle generates excessive heat that leads to its component parts degrading and a risk of fire. Plaintiff suffered injury-in-fact and lost money as a result of Polaris's fraudulent concealment. Had Polaris disclosed the Thermal Degradation Defect through any of these channels, Plaintiff would have seen and/or heard such a disclosure.

FIRST AMENDED CLASS ACTION COMPLAINT

v. **Plaintiff Suffered Economic Harm as a Result of Polaris's Fraudulent Concealment.**

157.   Had Plaintiff known the truth about the Thermal Degradation Defect, he would not have purchased his Class Vehicle. Accordingly, Plaintiff was damaged by Polaris's fraudulent omissions described herein.

158.   Moreover, Polaris's ongoing concealment of the existence, nature, and extent of the Thermal Degradation Defect in the Class Vehicles prevented Plaintiff from discovering the defect in his Class Vehicles during the limitations period on his claims, thereby preventing him from timely filing those claims.

**B. Discovery Rule.**

159.   Plaintiff's claims are further tolled by the discovery rule.

160.   As alleged above, Plaintiff did not know and could not have known of the Thermal Degradation Defect because he did not have notice of the facts giving rise to his claims until he discovered the Defect on or around February 28, 2022. Plaintiff learned of the Thermal Degradation Defect after viewing information about counsel's extensive investigation into the Defect on the internet, which led him to contact his counsel in March 2022.

161.   Polaris has concealed and has never publicly disclosed the Thermal Degradation Defect. Polaris's public statements and recalls have been purposefully designed to obscure the extent and true nature of the Thermal Degradation Defect so that even owners who have attempted to search for information, which Plaintiff did not, could not obtain correct information.

162.   Prior to February 28, 2022, Plaintiff was not on notice that he might have any claims relating to the Thermal Degradation Defect.

163.   Therefore, Plaintiff's claims did not accrue until he discovered the Thermal Degradation Defect.

FIRST AMENDED CLASS ACTION COMPLAINT

# VII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the California Consumer Legal Remedies Act

### Cal. Civ. Code §§ 1750, *et seq.*

164.   Plaintiff James DeBiasio (hereinafter, "Plaintiff") repeats and realleges Paragraphs 1-163, above, as if fully set forth herein.

165.   Plaintiff brings this Cause of Action individually and on behalf of the other Class members.

166.   Plaintiff and the other Class members were deceived by Polaris's failure to disclose that the Class Vehicles share a common design defect in that they contain the Thermal Degradation Defect.

167.   Polaris engaged in unfair or deceptive acts or practices when, in the course of its business, it knowingly omitted material facts as to the characteristics and qualities of the Class Vehicles.

168.   Polaris failed to disclose material information concerning the Class Vehicles that it had a duty to disclose. Polaris had a duty to disclose the Thermal Degradation Defect because, as detailed above: (a) Polaris knew about the Thermal Degradation Defect, and that it gave rise to serious safety concerns for consumers; (b) Polaris had exclusive knowledge regarding the Thermal Degradation Defect not known to the general public, Plaintiff, or the other Class members; (c) consumers lack the sophisticated expertise in vehicle components and electrical phenomena that would be necessary to discover the Thermal Degradation Defect on their own; and (d) Polaris actively concealed material facts concerning the Thermal Degradation Defect from the general public, Plaintiff, and the other Class members. As detailed above, the information concerning the Thermal Degradation Defect was known to Polaris at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

FIRST AMENDED CLASS ACTION COMPLAINT

169.   Polaris intended for Plaintiff and the other Class members to rely on it to provide adequately designed vehicles, and to honestly and accurately reveal the problems described throughout this Complaint.

170.   Polaris intentionally failed or refused to disclose the Thermal Degradation Defect to consumers.

171.   Polaris's deceptive omissions were intended to induce Plaintiff and the other Class members to believe that the Class Vehicles were adequately designed and manufactured.

172.   Polaris's conduct constitutes unfair acts or practices as defined by the California Consumer Legal Remedies Act.

173.   Plaintiff and the other Class members have suffered injury in fact and actual damages resulting from Polaris's material omissions because they paid inflated purchase prices for the Class Vehicles. Plaintiff and the other Class members are entitled to recover actual damages, punitive damages, costs and attorneys' fees, and all other relief that the Court deems proper under California Civil Code § 1780.

174.   In accordance with section 1782(a) of the CLRA, Plaintiff's counsel, on behalf of Plaintiff and the other Class members, personally served Polaris on April 22, 2022 with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiff and the other Class members, and demanded that they correct or agree to correct the actions described therein within thirty (30) days of such notice. Attached as Exhibit B is a true and correct copy of Plaintiff's letter. Polaris failed to respond to Plaintiff's notice and therefore he seeks compensatory and monetary damages to which Plaintiff and the other Class members are entitled.

## SECOND CAUSE OF ACTION

**Violation of the Song-Beverly Consumer Warranty Act for Breach of Express Warranty**

**Cal. Civ. Code §§ 1790, *et seq.***

175.   Plaintiff repeats and realleges Paragraphs 1-163, above, as if fully set forth herein.

176.   Plaintiff brings this Cause of Action individually and on behalf of the other Class members.

177.   Plaintiff and the other Class members are "buyers" within the meaning of Cal. Civ. Code. § 1791.

178.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791.

179.   Polaris is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791.

180.   Plaintiff and the other Class members bought Class Vehicles manufactured by Polaris.

181.   Polaris made an express warranty to Plaintiff and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

182.   The Class Vehicles share a common design defect, in that they contain the Thermal Degradation Defect.

183.   The Class Vehicles are covered by Polaris's express warranty. The Thermal Degradation Defect described herein substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and the other Class members.

184.   Polaris was provided notice of these issues and defects through numerous consumer complaints, multiple complaints filed against it, and CPSC

FIRST AMENDED CLASS ACTION COMPLAINT

investigations, as well as internal knowledge derived from internal investigations, testing and expert analysis.

185.   Polaris has had the opportunity to cure the Thermal Degradation Defect in the Class Vehicles, but it has chosen not to do so. Giving Polaris a chance to cure the Thermal Degradation Defect is not practicable in this case and would serve only to delay this litigation, and is thus unnecessary.

186.   As a result of Polaris's breach of its express warranty, Plaintiff and the other Class members received goods with substantially impaired value. Plaintiff and the other Class members have been damaged as a result of their overpayment for the Class Vehicles.

187.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff and the other Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their vehicles, or the overpayment of their Class Vehicles.

188.   Pursuant to Cal. Civ. Code § 1794, Plaintiff and the other Class members are also entitled to costs and attorneys' fees.

## THIRD CAUSE OF ACTION

### Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty

### Cal. Civ. Code §§ 1790, *et seq.*

189.   Plaintiff repeats and realleges Paragraphs 1-163, above, as if fully set forth herein.

190.   Plaintiff brings this Cause of Action individually and on behalf of the other Class members.

191.   Plaintiff and the other Class members who purchased their Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code. § 1791.

FIRST AMENDED CLASS ACTION COMPLAINT

192.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791.

193.    Polaris is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791.

194.    Polaris impliedly warranted to Plaintiff and the other members of the Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

195.    Cal. Civ. Code § 1791.1(a) states that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; and (4) Conform to the promises or affirmations of fact made on the container or label.

196.    The Class Vehicles would not pass without objection in the off-road vehicle trade because they share a common design defect in that they contain the Thermal Degradation Defect.

197.    Because of the Thermal Degradation Defect, the Class Vehicles are not fit for their ordinary purposes.

198.    The Class Vehicles were not adequately labeled because the labeling failed to disclose the Thermal Degradation Defect described herein.

199.    Polaris was provided notice of these issues and Defect through numerous consumer complaints, multiple complaints filed against it, and CPSC investigations, as well as internal knowledge derived from internal investigations, testing and expert analysis.

200.    Polaris has had the opportunity to cure the Thermal Degradation Defect in the Class Vehicles, but it has chosen not to do so. Giving Polaris a chance to cure

the Thermal Degradation Defect is not practicable in this case and would serve only to delay this litigation, and is thus unnecessary.

201.  As a result of Polaris's breach of its implied warranty, Plaintiff and the other Class members received goods with substantially impaired value. Plaintiff and the other Class members have been damaged as a result of their overpayment for the Class Vehicles.

202.  Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and the other Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles, or the overpayment for their Class Vehicles.

203.  Under Cal. Civ. Code § 1794, Plaintiff and the other Class members are also entitled to costs and attorneys' fees.

## FOURTH CAUSE OF ACTION

### Fraudulent Omission

204.  Plaintiff repeats and realleges Paragraphs 1-163, above, as if fully set forth herein.

205.  Plaintiff brings this Cause of Action individually and on behalf of the other Class members.

206.  Polaris was aware of the Thermal Degradation Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

207.  Having been aware of the Thermal Degradation Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Thermal Degradation Defect, Polaris had a duty to disclose the Thermal Degradation Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

208.   Polaris did not disclose the Thermal Degradation Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

209.   For the reasons set forth above, the Thermal Degradation Defect within the Class Vehicles comprises material information with respect to the sale of the Class Vehicles.

210.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Polaris to disclose known material defects with respect to the Class Vehicles.

211.   Had Plaintiff and the other members of the Class known of the Thermal Degradation Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

212.   Through its omissions regarding the Thermal Degradation Defect within the Class Vehicles, Polaris intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

213.   As a direct and proximate result of Polaris's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Thermal Degradation Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

214.   Plaintiff repeats and realleges Paragraphs 1-163, above, as if fully set forth herein.

215.   Plaintiff brings this Cause of Action individually and on behalf of the other Class members.

216.   By reason of its conduct, Polaris caused damages to Plaintiff and the other Class members. Plaintiff and the other Class members conferred a benefit on Polaris by overpaying for Class Vehicles at prices that were artificially inflated by Polaris's concealment of the Thermal Degradation Defect.

217.   As a result of Polaris's fraud and deception, Plaintiff and the other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from Polaris's conduct.

218.   Polaris knowingly benefitted from its unjust conduct. Polaris sold Class Vehicles equipped with the Thermal Degradation Defect for more than what the vehicles were worth, at the expense of Plaintiff and the other Class members.

219.   Polaris readily accepted and retained these benefits from Plaintiff and the other Class members.

220.   It is inequitable and unconscionable for Polaris to retain these benefits because they intentionally concealed, suppressed, and failed to disclose the Thermal Degradation Defect to consumers. Plaintiff and the other Class members would not have purchased the Class Vehicles or would have paid less for them, had Polaris not concealed the Thermal Degradation Defect.

221.   Plaintiff and the other Class members do not have an adequate remedy at law.

222.   Equity cannot in good conscience permit Polaris to retain the benefits that they derived from Plaintiff and the other Class members through unjust and unlawful acts, and therefore restitution or disgorgement of the amount of Polaris's unjust enrichment is necessary.

1

**SIXTH CAUSE OF ACTION**

2

**Violation Of The California Unfair Competition Law**

3

**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*

4        223.    Plaintiff repeats and realleges Paragraphs 1-222, above, as if fully set

5    forth herein.

6        224.    Plaintiff brings this Cause of Action individually and on behalf of the

7    other Class members.

8        225.    The California Unfair Competition Law ("UCL"), California Business

9    and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent

10    business acts or practices."

11        226.    Polaris's knowing and intentional conduct described in this Complaint

12    constitutes unlawful, fraudulent, and unfair business acts and practices in violation

13    of the UCL. Specifically, Polaris's conduct is unlawful, fraudulent, and unfair in at

14    least the following ways:

15            a.  by knowingly and intentionally concealing from Plaintiffs and the other

16                Class members that the Class Vehicles suffer from the Thermal

17                Degradation Defect while obtaining money from Class members;

18            b.  by purposefully designing and manufacturing the Class Vehicles to

19                contain a defect that causes premature wear and damage to the engine

20                components in all of the Class Vehicles and puts the owners' lives at

21                risk, concealing the Thermal Degradation Defect from Class members,

22                and failing to fix the Thermal Degradation Defect free of charge; and

23            c.  by violating the other California laws alleged herein, including

24                California common law, the Consumers Legal Remedies Act and Song-

25                Beverly Consumer Warranty Act.

26        227.    Additionally, Polaris's acts, omissions, and conduct were "unfair"

27    because they offend public policy and constitute immoral, unethical, and

28

FIRST AMENDED CLASS ACTION COMPLAINT

unscrupulous activities that caused substantial injury, including to Plaintiff and the other Class members. The gravity of harm resulting from Polaris's conduct outweighs any potential benefits attributable to the conduct and there were reasonably available alternatives to further Polaris's legitimate business interests.

228.   Polaris's omissions and concealment were material to Plaintiff and the other Class members, and Polaris concealed or failed to disclose the truth with the intention that consumers would rely on its concealment and omissions.

229.   Polaris's material omissions alleged herein caused Plaintiff and the other Class members to make their purchases of their Class Vehicles. Absent Polaris's omissions, Plaintiff and the other Class members would not have purchased their Class Vehicles, or would not have purchased their Class Vehicles at the prices they paid.

230.   Accordingly, Plaintiff and the other Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Polaris's concealment of and failure to disclose material information.

231.   Polaris's violations present a continuing risk to Plaintiff and the other Class members, as well as to the general public. Polaris's unlawful acts and practices complained of herein affect the public interest.

232.   Plaintiff requests that this Court enter an order enjoining Polaris from continuing their unfair, unlawful, and/or deceptive practices and restoring to members of the Class any money Polaris acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345, and for such other relief set forth below.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

FIRST AMENDED CLASS ACTION COMPLAINT

233.   An order certifying the proposed Class, designating Plaintiff as the named representative of the Class, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Code of Civil Procedure § 382;

234.   An order enjoining Polaris to desist from further deceptive distribution and sales practices with respect to the Class Vehicles and such other injunctive relief that the Court deems just and proper;

235.   A declaration that Polaris is financially responsible for all Class notice and the administration of Class relief;

236.   An award to Plaintiff and the other Class members costs, restitution, compensatory damages for economic loss and out of pocket costs, damages under applicable state's laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

237.   Any applicable statutory and civil penalties;

238.   An award of costs and attorneys' fees, as allowed by law;

239.   An order requiring Polaris to pay both pre- and post-judgment interest on any amounts awarded.

240.   Leave to amend this Complaint to conform to the evidence produced at trial; and

241.   Such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

FIRST AMENDED CLASS ACTION COMPLAINT

## IX.     **DEMAND FOR JURY TRIAL**

242.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

**DATED**:  November 14, 2022

/s/ *Roland Tellis*

Roland Tellis

Roland Tellis (SBN 186269)
rtellis@baronbudd.com
David B. Fernandes, Jr. (SBN 280944)
dfernandes@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: 818-839-2333

Adam J. Levitt (*pro hac vice*)
alevitt@dicellolevitt.com
John E. Tangren (*pro hac vice*)
jtangren@dicellolevitt.com
Daniel R. Ferri (*pro hac vice*)
dferri@dicellolevitt.com
**DICELLO LEVITT LLC**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900

Courtney L. Davenport (*pro hac vice*)
courtney@thedavenportlawfirm.com
**THE DAVENPORT LAW FIRM LLC**
18805 Porterfield Way
Germantown, Maryland 20874
Telephone: 703-901-1660

***Counsel for Plaintiff and the Proposed Class***

FIRST AMENDED CLASS ACTION COMPLAINT